U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE

- - - - - - - - - - - - - - - - x
                                 :
Patricia Kilby-Robb,             :
                                 :
          Complainant,           :
                                 :
     v.                          : EEOC WFO No.:
                                 : 100-2004-00801X
Margaret Spellings, Secretary,   :
U.S. Department of Education     :
                                 : Agency No.:
          Agency.                : ED-2004-04-00
                                 :
- - - - - - - - - - - - - - - - x


Washington, D.C.

Tuesday, June 14, 2005


Deposition of

DAISY GREENFIELD

a witness of lawful age, taken on behalf of the

Complainant in the above-entitled action, before Ed

Greenberg, Notary Public in and for the District of

Columbia, in the Law Offices of David A. Branch, 1825

Connecticut Avenue, N.W., Washington, D.C., commencing

at 2:10 p.m.



1    Education, or what is -- what is this program?

2        A    It's not a problem

3        Q    What is it?

4        A    It's like a -- there are two different

5    processes that we use within the department.  There are

6    about 16 different formula grant programs that can

7    apply to the Department of Education for funding

8    through the consolidated application, and they get

9    their funding through writing one application, as

10   opposed to writing 16 separate applications, and it

11   cuts across several program offices within the Office

12   of Elementary and Secondary Education, where I work,

13   and it also includes programs from two additional

14   principle offices, the Office of Safe and Drug-Free

15   Schools, and the Office of English Language

16   Acquisition.

17       Q    So, this is totally separate from the OII

18   office.

19       A    Yes.

20       Q    You worked for the PIRC program, or you worked

21   in the PIRC program for a number of years.

22       A    Yes.

1        Q    Is that correct?

2             What -- how many years did you work in the

3    PIRC program?

4        A    Probably from about 1995 or '6 until I went

5    into that PIRC position.

6        Q    2002?

7        A    2002.

8        Q    What was the last position you held in the

9    PIRC program?

10       A    Team leader.

11       Q    Was your grade GS-14?

12       A    Yes.

13       Q    Did you have a team of program officers who

14   worked on your team?

15       A    Eventually.  Not always.

16       Q    Okay.  And just before this reorganization in

17   2002, can you describe for me what your duties were as

18   the team leader?

19       A    Basically responsible for the administration

20   of the Parent Information and Resource Center program

21   and for the administration of the local reform program.

22       Q    And after your -- the PIRC team -- after there

1  was a reorganization in December 2002, you were no

2  longer the team leader, correct?

3      A    I'm not sure I understand that question.

4      Q    Sure.  Is it true that, after the

5  reorganization, in December 2002, you were no longer

6  the team leader for the PIRC program?

7      A    That's correct.

8      Q    And did you decide not to continue with the

9  PIRC program?

10     A    I was not assigned to go to OII --

11     Q    Okay.

12     A    -- in the reorganization.

13     Q    And so what happened?  How did that come

14  about?

15     A    Management made a decision as to what staff

16  they were sending or releasing, I suppose, and which

17  staff they were retaining in elementary and secondary

18  education.

19     Q    So, were you prepared to go with the PIRC

20  program?

21     A    Yes.  I thought that I was going to be

22  reassigned to OII.

 1      A    This is a request for a desk audit for Charles

 2   Lovette and Daisy Greenfield that -- it's a memorandum

 3   to Eugene Bell, director of the Headquarters Services

 4   Group, from Tom Fagan, who was director of Goals, which

 5   was where I was working.

 6           He requested a desk audit for me and Chuck

 7   Lovette.

 8      Q    All right.

 9           And reading over that -- the first paragraph

10   regarding -- I guess the first two paragraphs --

11      A    Uh-huh.   The purpose of this memoranda is to

12   request a desk audit of two members of the Goals 2000

13   Technology Literacy Challenge Fund Office to determine

14   if their current tasks warrant promotion to the GS-14

15   level.

16           I believe that they both have assumed major

17   responsibilities in the operations of departmental

18   initiatives and funded programs that support these

19   initiatives.

20           Daisy Greenfield -- Mrs. Greenfield's normal

21   duties as a program specialist in the Goals 2000 TLCF

22   office include responsibilities for Goals 2000 TLCF

1  programs and states assigned to her -- California,

2  Hawaii, and Pacific jurisdictions -- participation in

3  regional service team activities in regard to those

4  states and jurisdictions, participation in office

5  activities in relation to the three programs

6  administered by the office -- Goals 2000, state and

7  local reform, parental assistance centers, and

8  Technology Literacy Challenge Fund.

9          These activities include development of

10 guidance and other materials, review of state plans and

11 applications, collaboration with other programs in OESE

12 affected by this office's activities, drafting

13 responses to inquiries from other offices in the

14 department, the public, and the Congress, and

15 assistance in planning and overall work of the office.

16         In addition to these duties, Mrs. Greenfield

17 has assumed lead responsibility for the operation of

18 the parent assistance center program and for the

19 connection of this program to the departmental

20 initiative to increase the participation of parents in

21 the education of their children.

22         The parental assistance center program

1    provides competitive grants to private nonprofit

2    agencies to provide --

3        Q    That will be sufficient.  So, you said your

4    recollection was that you had been promoted because you

5    were viewed as a national expert?

6        A    Yes.

7        Q    And how does that relate to what you've just

8    read, in plain English now?

9        A    I think that it relates in terms of -- where

10   it talks about these activities include the development

11   of guidance and other materials to review state plans -

12   - I'm sorry, it's not -- in OESE affected by this

13   office's activities, drafting -- not there either.

14       Q    Is it because you were an expert in PIRC or an

15   expert in Goals 2000 or --

16       A    In parent involvement activities, because of

17   the relationships that we developed around parent and

18   family involvement with all of these external

19   organizations, with Joyce Epstein, with Ollie Moles and

20   all those other folks that we talked about, as well as

21   the additional responsibilities that we have for these

22   other programs.

1      Q    So, what I'm saying is -- there has been much

2   made about like, well, Ms. Kilby-Robb has been doing

3   the work as a team leader for PIRC, isn't that grade 14

4   work?

5           Was that the basis for your promotion, as far

6   as you know?

7      A    Not according to what is here.

8      Q    So, what is your understanding, based on what

9   you've just read?

10     A    Based on what I just read here, it is -- the

11   PIRC is the last thing that's listed.  It was based on

12   the accretion of duties with respect to various

13   programs that were within Goals 2000, and I did have

14   responsibility for California, which was the very

15   complex, largest state that we had in the Goals 2000

16   office, Hawaii, and I did have the responsibility for

17   the Pacific Islands, as well.

18     Q    Okay.

19          You said you worked in Goals 2000 and you also

20   worked with the PIRC group, and you were also asked by

21   Mr. Branch about the fact that there was a

22   predominance, if not all the members of the PIRC, who

1    were African-American.  Do you know whether there was

2    some type of -- or do you have any knowledge or

3    understanding that there was some kind of plan or

4    scheme to make it work that way, best of your

5    knowledge?

6        A    Make the PIRC group work --

7        Q    Yeah, there was some kind of segregation going

8    on or --

9        A    Oh, no.

10       Q    Why do you say that, "Oh, no"?

11       A    I don't have any knowledge that there was

12   anything like -- like that that was planned.

13       Q    So, as far as your know, there's never been

14   any -- as you said, you were a member of the class

15   complaint that was settled.

16            There was nothing from that case or any other

17   case that would say there's a finding that would show

18   that that was, in fact, the case, the allegation, there

19   was some factual basis.

20            Do you understand what I mean?

21       A    Not to my knowledge, no.

22       Q    As to my question or what I just asked you?

1      A      There is no -- to my knowledge, that there is

2    no basis for an assumption that that was -- that there

3    was anything that was orchestrated, organized to have

4    the members of the group who worked on the PIRC be all

5    African-American.

6      Q      You talked about the fact that you were not

7    asked or not informed that there was the newly created

8    OII organization.

9            Is that right?

10     A      That's right.

11     Q      Do you know whether there was any

12   considerations as to race or sex involved or any other

13   question as to why you weren't shifted over?

14     A      No.

15     Q      What is OII in comparison to OESE?

16     A      It's another principle office, separate and

17   apart from OESE.

18           They're -- in the organizational structure,

19   they would be on the same level.

20     Q      What do you mean by "principle office"?

21     A      Within the Department of Education, there are

22   a number of different organizations that have

42

1    responsibility for administering certain programs.

2    That is one.    OII is one office that's responsible for

3    administering a set of programs.    Office of Elementary

4    and Secondary Education would be in a separate box on

5    the same level as OII, with responsibility for

6    administering a separate and different group of

7    programs.

8                MR. FABIA:    All right.

9                That's all.

10                No more questions.

11                MR. BRANCH:    Okay.

12                Thank you for your time.

13                (Whereupon, at 3:08 p.m., the deposition was

14    concluded.)

15                        * * * * *

Statement
and
Responses to Interrogatories

District of Columbia, to-wit:

I, John Fiegel, make the following statement and responses to interrogatories freely and voluntarily to Herbert L. Jackson who has identified himself to me as a contract EEO Investigator for the U. S. Department of Education, investigating a complaint of discrimination filed by Patricia Kilby-Robb ("Complainant"), knowing that this statement and responses to interrogatories may be used in evidence. I understand that this statement and response to interrogatories is not confidential and may be shown to any interested party (those with a legal right to know).

1.    Please provide your race, sex/gender, position title, and a brief description of your duties.

      Response: I am a white male, the Director of the Parental Options and Information (POI) office in the Office of Innocation and Improvement (OII). I have managerial responsibilities for programs related to parental options that include the Public Charter Schools Program, the Magnet Schools Assistance Program, the Voluntary Public School Choice Program, Credit Enhancement for Charter Schools Facilities, the DC School Choice initiative, and the Parent Information Resource Centers.

2.    Are you acquainted with the Complainant? If so, in what capacity have your known her and for how long?

      Response: Yes. The Complainant and I were transferred to OII/POI at the same time, in December of 2003.



3.     Were you the Complainant's performance evaluator for the rating period January 1, 2003 to April 30, 2003? If so, please explain your rationale for rating (or concurring that) her performance was "satisfactory" when she maintains her rating should have been higher given the fact that she had been called upon to perfrom, not only her GS-13 duties, but also in an acting capacity as the PIRC Team Leader previously held by Daisy Greenfield (GS-14).

Response: Yes, I was the rating official. The rating was "successful" not "satisfactory." I independently rated each employee under my supervision using the EDPAS Excel worksheet provided by the Department. The Complainant was rated on 13 critical EDPAS elements. I rated the Complainant "outstanding" on 2 of these elements, "highly sucessful" on 7, and "successful" on 4. Even though the Complainant was rated above the "succesful" level for 9 out of 13 elements, the resulting rating, while at the high end of "successful," was still only "successful." I discussed the Complainant's rating with the Deputy Director of POI, Mr. Steve Brockhouse. Mr. Brockhouse works most directly with the Complainant as her day-to-day supervisor. He had independently arrived at the same rating of "succesful."

The narrative justification for the Complainant's rating recognizes the work she was called on to perform as the lead person for the PIRC program.

4.     Did either you or Steve Brockhouse even counsel Complainant about her allegedly "satisfactory" performance? If so, please explain what was discussed and when.

Response: This rating cycle covered only a four-month period, from January 1, 2003 to April 30, 2003. There was no interim rating, and I don't believe that I ever counseled the Complainant on her performance. I don't view a "successful" rating as negative, so I wouldn't have seen a need to otherwise

"counsel" the Complainant. I don't know if Mr. Brockhouse counseled the Complainant.

5.  Was Complainant afforded a progress review conference with either you or Steve Brockhouse for the rating period January 1, 2003 to April 30, 2003? If not, why not?

    Response:  See response to question # 4, above.  Since the rating cycle covered only 4 months, progress review conferences were not conducted.

6.  Please provide a list of your staff members (by race and sex) who were allowed a progress review conference with either you or Steve Brockhouse for the rating period January 1, 2003 to April 30, 2003.

    Response:  I didn't do progress reviews with any staff members.  I don't know if Mr. Brockhouse did.

7.  Please provide a list of all employees in your chain-of-command, by name, race and sex, and their performance evaluation ratings for the period January 1, 2003 to April 30, 2003.

    Response:

| | | |
|---|---|---|
| Steve Brockhouse | White Male | Outstanding |
| James Houser | White Male | Outstanding |
| Iris Lane | Black Female | Outstanding |
| Donna Hoblit | White Female | Highly Successful |
| Dean Kern | White Male | Highly Successful |
| Richard Kress | White Male | Highly Successful |
| Rik Lanzendorfer | White Male | Highly Successful |
| Rachel Couch | Black Female | Successful |
| James Guitard | Black Male | Successful |

3

| Leslie Hankerson | Black Female | Successful |
| Patricia Kilby-Robb | Black Female | Successful |
| Jennifer McMahon | White Female | Successful |
| Joan Scot-Ambrosio | Black Female | Successful |
| Kay Wagner | White Female | Successful |

8.    Complainant maintains that in August 2002 you stated to her that she would continue in the acting role as PIRC Team-Leader until the vacancy was advertised. Is this true? When was the position advertised?

Response: You probably mean 2003. I didn't know the complainant in 2002. I'm not sure of the timing, but, since the Complainant had the highest grade of any of the employees assigned to the PIRC program, I asked her to continue as the lead person. I did tell the Complainant that, if sufficient S & E funds became available, I was hoping to advertise a new GS-14 position in the PIRC program. To date, this position has not materialized and has not been advertised.

9.    Please provide James Guitard's race and sex.

Response: Black male.

10.    What rating was Mr. James Guitard given for this same rating period? Do you consider him a significant contributor to the PIRC effort/mission? Please explain responses fully.

Response: Mr. Guitard was given a "successful" rating. I consider Mr. Guitard to be a contributor, but not yet a significant contributor. During this rating period, Mr. Guitard's performance was often inconsistent and in some areas bordered on being minimally sucessful. Because of the brevity of the rating period, lasting only 120 days, he was given the benefit of the doubt in borderline areas that had not been sufficiently tested. I followed the same

procedures for rating Mr. Guitard that are outlined in response to question 3 above. Mr. Guitard was rated on the basis of 12 critical EDPAS elements. Of these 12, 2 were rated "highly succcessful," 8 were rated "successful," and 1 was rated "minimally successful." While this put his rating in the very low end of "successful," it was still "successful." The narrative justification for Mr. Guitard's rating reflects the need for improvement in several areas.

11.    Would you consider Mr. James Guitard to be an employee who pulled his weight in the performance of his duties under the team leader? Have you had any performance issues regarding him? If so, who performed his duties?

Response: Mr. Guitard has not always pulled his weight. I have had performance issues with him, and at times other PIRC and POI staff have had to cover for him. I consider Mr. Guitard to be an employee who has shown improvement in some, but not all areas.

12.    When EDPAS was implemented, were your staff members, Complainant specifically, given training or information on the new evaluation system? Was it formally implemented?

Response: All POI staff members, including the Complainant, were assigned to OII at the same time and offered the same information about EDPAS. No formal training was conducted.

13.    While acting as PIRC Team Leader (GS-14) was the Complainant compensated? If not, why not? How long had/has Complainant served in this acting PIRC Team Leader (GS-14) capacity?

Response: There isn't, and never was, a GS-14 PIRC Team Leader position in this office. There are lead program officers/team leaders who are GS-13s, GS-14s, and even one GS-15.

14.    While acting as PIRC Team Leader (GS-14) was the Complainant temporarily promoted? If not, why not?

Response: Again, the Complainant is not acting in a GS-14 position. There is no GS-14 position to be temporarily promoted to.

15.    Was the Complainant ever given a position description for the GS-14 PIRC Team Leader position? If so, please provide a copy of it. If not, please explain why she was not given that document.

Response: No. There is no GS-14 PIRC Team Leader position description.

16.    Did Complainant ever mention to you her illness and medical treatment/regimen? If so, when did she mention it to you?

Response: I'm not positive, but I think the Complainant mentioned to me that she was potentially seriously ill sometime toward the end of Summer or the beginning of Fall 2003. She did not tell me what the specific illness is, and respecting her privacy I did not ask. She said that she had to undergo further testing to determine the appropriate medical treatment/regimen. I do not know what the results were or what the treatment/regimen is. I advised her to do whatever she needed to do to take care of her health. In October 2003 she sent me an email stating that she was working with her endocrinologist, cardiologist, internal specialist, and coumadin practitioner to get the illness under control.

17.    Did Complainant request an accommodation (of a computer) so that she could work from home? If so, what response did she receive? Are/were any other staff member allowed to work from home in the past three years? If so, were

any one of them provided with a computer?  Please provide their names, race, sex and phone numbers.

Response:  As part of her request to work form home one day per week, the Complainant asked that a computer be installed in her home.  The request was denied by the OII Executive Office.  I have one other part-time staff person who works from home.  She has not been provided a computer by OII.  Her name is Jennifer McMahon. She is a white female.  Her phone numbers are (202) 260-9738 and (703) 704-9196.

18.  Are employees absolutely required to sign EDPAS evaluations?  How many employees have refused to sign evaluations that you were involved in either as rating official or approving official (for the past two years)?  If any, please provide their names, race, sex and phone numbers.

Response:  Employees are not required to sign EDPAS evaluations.  The Complainant is the only person who has not signed an EDPAS evaluation that I have been involved with.

19.  Complainant alleges that she was reprimanded for poor judgment for her refusal to sign her EDPAS evaluation for the rating period January 1, 2003 to April 30, 2003.  Why was she so reprimanded and by whom was she reprimanded?

Response:  She was not reprimanded by me, and I don't know if she was reprimanded by anyone else.

20.  Is there anything else you'd like to add that hasn't been addressed above?

Response:  Not at this time.

I solemnly swear or affirm that the above statement, being provided by me, is true to the best of my knowledge and belief.

_____     Date: ___5/11/04_____
John Fiegel

_____
EEO Investigator/Notary Public/Witness

My Commission Expires: _____

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE

- - - - - - - - - - - - - - - - x
                                 :
Patricia Kilby-Robb,             :
                                 :
        Complainant,             :
                                 :
    v.                           : EEOC WFO No.:
                                 : 100-2004-00801X
Margaret Spellings, Secretary,   :
U.S. Department of Education     :
                                 : Agency No.:
        Agency.                  : ED-2004-04-00
                                 :
- - - - - - - - - - - - - - - - x


                        Washington, D.C.

                        Tuesday, June 14, 2005


Deposition of

                STEVEN L. BROCKHOUSE

a witness of lawful age, taken on behalf of the

Complainant in the above-entitled action, before Ed

Greenberg, Notary Public in and for the District of

Columbia, in the Law Offices of David A. Branch, 1825

Connecticut Avenue, N.W., Washington, D.C., commencing

at 9:39 a.m.



1          Do you understand that?

2     A    I do.

3     Q    It's your obligation to answer each question

4    truthfully and fully and honestly.

5          If you're not sure what's been being asked of

6    you, just let me.

7          I'll be more than happy to repeat or rephrase

8    the question.

9          If you answer the question, I will assume that

10   you understand the question.  Are you clear on that?

11    A    I'm clear on that.

12    Q    Are you taking any medication or under any

13   treatment by any health care professional which would

14   impair your ability to testify truthfully here today?

15    A    No, I'm not.

16    Q    Are you currently employed?

17    A    Yes.

18    Q    What is your current title, grade, and

19   position?

20    A    My current title is deputy director, Parent

21   Options and Information, in the Office of Innovation

22   and Improvement.  I am a GS-15.

6

1     Q     And you're at the Department of Education?

2     A     I am at the Department of Education, that's

3     correct.

4     Q     How long have you been in that position?

5     A     I have been in that position since December of

6     2002.

7     Q     How long have you been with the Department of

8     Education?

9     A     Since it was the Office of Education in the

10    Department of Health, Education, and Welfare.

11          If my recollection is correct, June of '74 is

12    when I began.

13    Q     What was your position immediately before the

14    -- December 2002?

15    A     I was an education program specialist in the

16    School Improvement Programs in the Office of Elementary

17    and Secondary Education.

18    Q     So, you were a program specialist?

19    A     Yes.

20    Q     What was your grade?

21    A     GS-15.

22    Q     How long have you been a GS-15?

1       A    I don't recall exactly.  I would say four

2    years, five years.

3           I can obviously check that, but I don't

4    remember anymore specifically.

5       Q    When did you become acquainted with Ms. Kilby-

6    Robb?

7       A    I -- I first met Ms. Kilby-Robb at some point

8    -- I don't remember exactly when -- when she worked

9    elsewhere in the Office of Elementary and Secondary

10   Education, casually meeting.  I became more acquainted

11   with her immediately following the reorganization that

12   created the Office of Innovation and Improvement in

13   December of 2002.

14      Q    You were a program specialist for which

15   program?

16           I'm sorry.

17      A    I was in the -- I was in the Office of

18   Elementary and Secondary Education School Improvement

19   Programs.  I had lead responsibility for administration

20   of the Magnet Schools Assistance Program.

21      Q    And how long did you have lead responsibility

22   for the Magnet Schools Program?

8

1      A     I don't recall, specifically.  It was a number

2   of years, six or more.

3      Q     Are you familiar with the PIRC program, or

4   Parent Information Resource Center program?

5      A     I am.

6      Q     And what is that program?

7      A     The Parent Information and Resource Center

8   program is a discretionary grant program administered

9   by the Department of Education.

10     Q     Is it a separate program, like the magnet

11  program?

12     A     It is.

13     Q     And prior to December 2002, had you worked in

14  the PIRC program at any time?

15     A     No, I had not.

16     Q     Did you have any experience operating the PIRC

17  program --

18     A     No.

19     Q     -- prior to December 2002?

20     A     No.

21     Q     How does the PIRC program differ from the

22  magnet program?

9

1      A     It has a different legislative purpose.    It

2   has its own unique set of authorized activities.    The

3   eligible entities for PIRC program grants are nonprofit

4   organizations.  With the magnet schools program,

5   they're local educational agencies.

6      Q     When you worked as the lead in the magnet

7   program, did you have a counterpart who worked in the

8   PIRC program?

9      A     I don't know.

10          The PIRC program was administered in a

11  different office, different part of the Office of

12  Elementary and Secondary Education, and I don't know

13  how they were organized.

14     Q     Now, I understand that there was a

15  reorganization in 2002.  Is that correct?  December

16  2002?

17     A     That's correct.

18     Q     How did your job change after December 2002?

19     A     I became deputy director for the Office of

20  Parent -- Parent Information in the Office of

21  Innovation and Improvement.

22     Q     Did your job responsibilities change?

10

1       A    They did.

2       Q    And how so?

3       A    They broadened to include responsibility for

4    both the magnet schools program and the PIRC program.

5       Q    And when you say "they broadened to include

6    responsibility," what do you mean --

7       A    Right.

8       Q    -- by "responsibility"?  What were your

9    responsibilities on a day-to-day basis?

10      A    Overall administration of the programs,

11   providing policy guidance and recommendations,

12   providing day-to-day assignments to the staff who were

13   working on those programs.

14      Q    Do you know how you came to assume the

15   responsibilities for these programs?

16      A    My supervisor asked me to take that

17   responsibility.

18      Q    And who do you report to?

19      A    John Fiegel.

20      Q    When you assumed the responsibility for the

21   magnet program and the PIRC program, were there teams

22   in place for those programs?

1       A    There were.

2            There were assigned staffs for each of those

3  programs.

4       Q    And who were the individuals on those staffs?

5       A    For the PIRC program, it was Patricia Kilby-

6  Robb, Rachael Couch, and James Guitard.  For the magnet

7  schools program, Richard Kress, K-r-e-s-s, Donna

8  Hoblit, and Kay Wagner.

9       Q    And what were the titles of the individuals on

10  the magnet -- in the magnet program?

11      A    In all cases, education program specialist.

12      Q    Educational program specialist?

13      A    Yeah.

14      Q    Kress?

15      A    Right.

16      Q    What was his grade?

17      A    GS-13.

18      Q    And Hoblit.

19      A    GS-13.

20      Q    She was an educational program specialist?

21      A    I believe that was her title.

22      Q    And Wagner?

12

1       A       GS-12.

2       Q       And for the PIRC program, did they all hold

3   the same title?

4       A       To the best of my knowledge, yes.

5       Q       Ms. Kilby-Robb?

6       A       Thirteen.

7       Q       She was a 13?

8       A       Right.

9       Q       Rachael Couch?

10      A       Twelve.

11      Q       And Guitard?

12      A       Twelve.

13      Q       What were the races of these folks on the

14   different teams?

15      A       All of the members of the -- who were working

16   with the PIRC program were African-American.

17              All of those working with the magnet program

18   were white.

19      Q       Do you know why that was the case?

20      A       No.

21      Q       Okay.  Prior to December 2002, was the

22   structure the same in PIRC?

15

1    that the department has for the PIRC program.

2           She had lead for preparation of the

3    application package and preparations for a grant review

4    that we knew we were going to be holding.

5       Q    Any other duties?

6       A    She served as a -- as a program officer for

7    many of the -- of the PIRC projects.

8       Q    So the duties that you just mentioned before

9    your last statement, the program officer duties --

10   those were duties in addition to the program officer

11   duties.

12      A    The things like serving as the COR, as having

13   the lead responsibility for the preparation of the

14   application, things like that, yes.

15      Q    What are the duties of the program officer,

16   the program officers?  What duties do you expect them

17   to accomplish?

18      A    The primary duties of the program officers are

19   to serve as program officers for assigned grant

20   projects, be the primary, you know, liaison and monitor

21   for those projects for which they're assigned

22   responsibility.

1      Q     Did you perform any tasks on this new grantee

2   orientation program?

3      A     Yes.

4            I was involved in the review of the agenda.

5            I had -- I had a role on one of the panels, as

6   I recall.

7      Q     Other than reviewing the agenda and serving on

8   one of the panels, did you actually do any work?

9      A     On the conference itself?

10     Q     On this project.

11     A     Not -- not that I recall at this time.

12     Q     On a day-to-day basis, I think you said that

13  your job was basically to -- or let me just clarify.

14  I'll give you another opportunity to speak to this.  I

15  believe you said you gave assignments and -- I didn't

16  write down the other thing, but on a day-to-day basis

17  for the PIRC program, what exactly did you do?  What

18  were your duties?

19     A     My duties were to provide assignments,

20  direction, provide guidance, where necessary.

21     Q     Assignments, guidance, and direction?

22     A     Right.

1      Q    And on an average day, what amount of time

2  would you spend performing these types of tasks?

3           (Pause.)

4           THE WITNESS:  I -- I don't know that I can

5  give you a good estimate on that.  It would -- it would

6  vary considerably.

7           There were times when substantial portions of

8  my day would be devoted to activities related to the

9  PIRC program.

10          There are -- were times when substantial, you

11  know, portions of my time would be devoted to the

12  magnet schools program, and there would be days when

13  substantial proportions of my time would be devoted to

14  other things.

15          I suppose, over the long run, you know, it

16  would probably, you know, come out somewhat slightly

17  less than half of my time.

18          BY MR. BRANCH:

19      Q    What is or what was the work of the PIRC

20  program?

21      A    The work of the PIRC program is to administer

22  grants to nonprofit organizations that provide

1    assistance to parents, to school districts in working

2    with parents, to other organizations in working with

3    parents.

4         When we are not in a time when we are making

5    new awards or contemplating that, the primary job is to

6    make sure -- to monitor those grants to make sure that

7    they are operating, you know, properly, to review them

8    periodically through, well, performance reports, things

9    of that nature.

10    Q    Any other work of PIRC?

11    A    Can you repeat the original question?

12    Q    Yes.

13         Basically, what is the work of PIRC?

14    A    When we are making new awards, which we do

15    periodically, not every year, there is a major

16    component of the work which is devoted to that process.

17    That involves, you know, formulating policy that will

18    be articulated in a closing date notice, preparation of

19    an application package, providing technical assistance,

20    conducting an application review, which involves many

21    particular steps, formulating project recommendations

22    based on that review, formulating what is called SLATE,

1    which is a set of recommendations for awards, getting

2    that approved, making the new awards, and starting that

3    cycle to bring new grantees into the process.

4            We also have activities for expiring grants

5    that fall into the category of close-out.  It's

6    generally not a big part of the job, but it is part of

7    the job.

8            Then, as we've said, for the overall program,

9    the -- the statute includes an authority for technical

10   assistance.

11           We do have a technical -- one technical

12   assistance contract, and -- and the person who has

13   responsibility for that, as we've said, is Patricia

14   Kilby-Robb, who serves as the contract officer's

15   representative.

16       Q    You testified earlier that your job was to

17   provide assignments, guidance, and directions.  Can you

18   give me examples of what you would do on a day-to-day

19   basis in terms of assignments or providing guidance or

20   direction?

21       A    Providing assignments might be dealing with

22   something like uneven distribution of work and -- and

23

```
 1    making, you know, some adjustments --

 2         Q    So, you had --

 3         A    -- in that --

 4         Q    I'm sorry.

 5         A    Yeah.

 6         Q    Were you done?

 7              Excuse me.

 8         A    Yeah.  And some of these things would be

 9    things that aren't necessarily just -- just project

10    assignments.

11              So, when we were into -- as we were in the

12    early spring of 2003 -- gearing up for an application

13    review, there were lots of requests coming in just to

14    be put on mailing lists for applications.

15              So, the easiest thing to do was to move that

16    all to -- to, you know, have all those referred to one

17    person, so that it took the burden of dealing with that

18    off of others.

19         Q    And who was that one person that was referred

20    to?

21         A    My recollection is that, at that time, it was

22    Rachael Couch.
```

24

1      Q    So, are you saying, for assignments, you would

2   make assignments -- all of the assignments in the

3   department, or would someone else have that

4   responsibility?  All of the assignments in the PIRC,

5   all of the work assignments in the PIRC program --

6   would you make those assignments, or would someone else

7   have that responsibility?

8      A    I had that responsibility.

9      Q    So, for each project that had to be done or

10  completed in PIRC, you made the assignment.

11         You would assign it one of the three program

12  officers.

13     A    Correct.

14     Q    Okay.

15         You didn't perform any of the work.

16         You just assigned it to one of the three

17  program officers.

18     A    It would depend on what the work was.  Some

19  work I performed myself.

20     Q    What type of work would you perform yourself?

21     A    Work that I would typically be involved in

22  would be a different type of work in terms of a

1    formulation of policy and providing recommendations for

2    what would go into a closing date notice that the --

3    that the leadership in the Office of Innovation and

4    Improvement wanted and priorities for the program,

5    things of that nature.

6         I also provided some direct technical

7    assistance to applicants.

8         Q    And what about guidance?  You said that you

9    provided guidance.

10        What did you mean by that?

11        A    That could be technical assistance.

12        That could be answering questions of staff.

13        That could be reviewing and making

14   recommendations on correspondence.

15        Q    And you also mentioned you provided direction.

16    What is that?

17        A    This could be overlapping, same things, same

18   types of things.

19        Q    Did you have any responsibility for

20   formulating the budget for the PIRC program?

21        A    No.

22        Q    Who had that responsibility?

26

1      A    I don't know.

2      Q    Did the PIRC program have a budget?

3      A    The PIRC program had an appropriation, yes.

4      Q    And so how was it determined how the funds

5    would be spent or allocated?

6      A    That would be in a spending plan, which --

7    which I differentiate from a budget.

8      Q    Did you have any responsibility for the

9    spending plan for PIRC?

10     A    Yes, I did.

11     Q    And what was -- what was your involvement

12   there?

13     A    My involvement was to formulate the spending

14   plan to have approved by the Office of Innovation and

15   Improvement, and other offices that had input into --

16   and approval over -- over that, which would include

17   principally budget service.

18     Q    Did Ms. Kilby-Robb have any responsibility for

19   the spending plan?

20     A    I don't -- I don't recall what responsibility,

21   if any, she had.

1    was she compensated for those additional

2    responsibilities?

3        A    Can you repeat that question?

4        Q    The duties that Ms. Kilby-Robb performed above

5    her GS-13 program officer duties, the COR, lead for

6    application package, spending plant, serving as the

7    acting team leader -- was she compensated for those

8    additional duties?

9        A    Those duties were not above her GS-13 duties.

10       Q    But were they above her duties as a program

11   officer?

12       A    They were duties beyond what -- our program

13   officer duties, yes.

14       Q    And was she compensated for those duties, the

15   duties that she did above her program officer duties?

16   Was she compensated for those -- for that work?

17       A    She was compensated as a GS-13 for performing

18   the work of a GS-13, which included those things.

19       Q    And did she receive any additional

20   compensation above her normal pay for a program

21   officer, GS-13 program officer, for these additional

22   lead -- acting team lead responsibilities?

1      A    To the best of my knowledge, she received no

2 compensation above her GS-13 salary.

3           (Pause.)

4           BY MR. BRANCH:

5      Q    Do you know why she did not receive any

6 additional compensation?

7      A    I do not.

8      Q    For the period of January 2003 until April

9 2003, when Ms. Kilby-Robb was serving as program

10 officer as well as these additional acting team leader

11 duties, were there any issues brought to your attention

12 concerning her performance for this period of time?

13     A    No.

14     Q    Did you provide Ms. Kilby-Robb any information

15 suggesting that her performance was less than

16 outstanding?

17     A    No.  Neither did I provide her any information

18 suggesting that her performance was outstanding.

19     Q    Did Ms. Kilby-Robb send you an e-mail or some

20 type of correspondence where she said -- or she

21 referenced the fact that I am performing these duties,

22 I want you to let me know if my performance is less

33

1    that, the extent to which an employee is doing more

2    than their fair share of the workload in the rating

3    system, you know, clearly is a factor.

4            (Pause.)

5            BY MR. BRANCH:

6        Q    I just want to go through a couple of things

7    here in terms of Ms. Kilby-Robb and what she actually

8    did.  Was she responsible for implementing all major

9    components of the PIRC program?

10       A    I don't know.  I don't know what you mean by

11   "all major components."

12       Q    Were there different components of the PIRC

13   program?

14       A    There were as -- as we have discussed them

15   earlier, yes.

16       Q    Now, what was Ms. Kilby-Robb's role?  Did she

17   -- was she responsible for implementing the different

18   parts or different components of the program?

19       A    She was -- she was -- clearly had a lead

20   responsibility in implementing most of them but not all

21   of them.

22       Q    Did you have responsibility for implementing

34

1    any of the components of the PIRC program?

2        A    Yes.

3        Q    Which components did you implement?

4        A    I -- I had significant responsibility with

5    respect to working with the OII leadership in terms of

6    formulating a policy that would be reflected in the

7    closing date notice, specifically in terms of

8    formulating priorities that would be included in the

9    notice for substantial involvement in drafting the

10   notice.

11       Q    And what about the day-to-day work, hands-on

12   work with the customers or the clients you service?

13   Did you have any involvement in implementing the

14   programs in that area?

15       A    Some but not a lot.

16       Q    In formulating policy on this closing date for

17   a particular notice, was that more a managerial type

18   function, as opposed to hands-on, day-to-day type work?

19       A    Yeah, I think that's a fair characterization.

20       Q    And so, was Ms. Kilby-Robb responsible for the

21   majority of the day-to-day workings of this PIRC

22   program?

1      A    Most of the day-to-day workings, yes.

2      Q    What about the team meetings or scheduled

3   staff meetings?

4           Who was responsible for setting the agenda and

5   putting out what -- basically the direction of this

6   program?

7      A    I had the primary responsibility for calling

8   staff meetings.

9           I would do that in consultation with Patricia.

10          She often had -- and indeed, at that time,

11   would have had lead responsibility for formulating the

12   agendas for those meetings.

13     Q    And who would direct the meetings?

14     A    It would -- it would vary.  On -- on many

15   things, she would.

16     Q    And how often would you call staff meetings?

17     A    We were not operating on a regular schedule.

18   There would be times when we would have, you know, a

19   lot of meetings in a relatively short time.  For

20   example, when we were -- in the weeks immediately prior

21   to the new grantee orientation, there was a greater

22   need to have meetings to -- to go over agendas, to make

1    sure that, you know, folks were clear as to what their

2    roles were, to try to practice some presentations, to -

3    - to just work out with some presentations how they

4    were going to operate, who was going to say what and do

5    what -- what piece of them.

6        Q    Did you believe or do you believe that your

7    experience or expertise in the PIRC program exceeded

8    that of Ms. Kilby-Robb?

9        A    With -- with respect to the substantive, day-

10   to-day questions of parental involvement, strategies,

11   things like that, no.

12          With respect to some larger management issues,

13   say in the area of grants management process, yes, I

14   do.

15       Q    Did Ms. Kilby-Robb, at some point, inform you

16   that she was having problems getting one of the

17   employees, James Guitard, to work, perform work?

18       A    At some point, yes.

19       Q    What actions or what steps did you take to

20   address this issue?

21       A    I talked to Mr. Guitard about his work.  His

22   work has been monitored closely.

1       A     I'm not clear on what you're referring to.

2       Q     Was she criticized for her performance as a

3  team leader?

4       A     She was criticized not for her performance as

5  a team leader but for a specific act that, in my

6  opinion, constituted poor judgement.

7       Q     What did she do?

8       A     Without consultation, when she was going on

9  travel, she referred all of her telephone callers to

10  me.

11       Q     You were her supervisor, were you not?

12       A     Yes.

13       Q     What was the problem with her referring her

14  calls to you in her absence?

15       A     The problem was that that tied up my voice

16  mail and tied me up without having any -- any prior

17  knowledge that she was going to -- to do this, and it

18  was work that, had she consulted with me as to how to

19  handle all of that incoming -- all of those incoming

20  inquiries, we, you know, could have figured out a -- a

21  better way to do.  This was during a time -- and I

22  think context is important here -- when we were

44

1    getting, you know, just significant and increasing

2    numbers of -- of calls from prospective applicants for

3    new awards.

4            So, it wasn't like the volume of -- of calls

5    was light.

6            This is during a period when there were a lot

7    of -- a lot of calls, very time consuming.  There were

8    other -- and in my judgement -- better ways where we

9    could have handled that.

10           So, I did write to Ms. Kilby-Robb and

11   expressed my unhappiness, and indicated that I did not

12   expect her to -- to do that again, meaning, you know,

13   to refer all of her calls to me without any prior

14   consultation.

15       Q    Did you get a sense of the volume of work that

16   Ms. Kilby-Robb was performing by the number of calls

17   you received?

18       A    I already -- I already had a good sense that -

19   - that the volume of work that -- and the volume of

20   calls that she had from information that she was

21   sharing with me was -- was high.  She was the person

22   who -- you know, whose name and telephone number

1   with were -- were very close.

2        Q    Did you recommend a highly successful for

3   Kress?

4        A    To the best of my recollection, yes.

5        Q    And what about Hoblit?  Did you recommend a

6   highly successful for Hoblit?

7        A    To the best of my recollection, yes.

8             MR. BRANCH:  All right.

9             No additional questions at this point.

10            BY MR. FABIA:

11       Q    Let me ask you some questions about this whole

12   issue of -- you were the -- earlier on, you said that

13   you were tasked as the deputy director.

14       A    Correct.

15       Q    Now, when did that happen?

16       A    That happened in either December or, I think,

17   more likely, in early January of 2003.

18       Q    At that time, you were told you were going to

19   be charged with the magnet and the PIRC?

20       A    At that time, I was asked to take the lead

21   responsibility for those two programs, correct.

22       Q    At that time, you understood that you were

56

1    supposed to be the day-to-day supervisor for those

2    individuals?

3        A    That was my understanding, yes.

4        Q    Was it your understanding that you were

5    supposed to be the rating official, as well?

6        A    No, at that point, that wasn't clear.

7        Q    Why not?

8        A    I recall that Mr. Fiegel gave me two

9    performance agreements to sign.  One of them was a non-

10   supervisor's agreement.  One was the supervisor's

11   agreement.  And he indicated that he would check and

12   see which one I was to use.

13       Q    Was it your understanding that you were

14   supposed to be the rating official for these

15   individuals?

16            I mean there had been a plan that that might

17   occur?

18       A    There was a plan that that might occur.

19   Obviously, if it was -- if I was going to use the

20   supervisor's --

21       Q    Now, do you have any understanding of why that

22   did not come out that way?

57

```
 1       A    It's not clear to me at all why it didn't.

 2       Q    So, if there was confusion, it was not just

 3  with Ms. Kilby-Robb regarding this matter.  You had

 4  one, as well?

 5       A    I had it, as well, yes.

 6       Q    All right.

 7            Now, you know, there's been a discussion about

 8  whether you had issued some kind of, quote, "reprimand"

 9  or "admonishment."

10       A    Yeah.

11       Q    Can you tell us what form that took?

12       A    It was an e-mail message.

13       Q    So, is that considered an official action or

14  anything like that, what we would know as an adverse

15  action?

16       A    No.

17            MR. BRANCH:  Objection to the extent you're

18  asking for a legal conclusion.

19            MR. FABIA:  Well, that's slightly true but

20  also slightly false in the sense that we do have a

21  system of our personnel disciplinary actions that

22  defines things.
```