**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**WASHINGTON FIELD OFFICE**
1801 L Street, N.W., Suite 100
Washington, D.C. 20507
(202) 419-0717; fax: 419-0740

IN RE THE EEO MATTER OF       :

                                    :

Patricia Kilby-Robb.           :

17001 Summers Lane        :

Baden, MD 20613           :     EEOC WFO NO.:

                                   :     100-2004-00801X

                Complainant  :

                                   :     AGENCY CASE NO.:

and                             :     ED-2004-04-00

                                   :

Margaret Spellings,        :     Before:

Secretary,                :

U.S. Department of Education    :     Varice "Ted" Henry, AJ

400 Maryland Avenue, S.W.     :

Washington, D.C. 20202-2110   :

                                   :

                  Agency     :             Date: July 1, 2005

For the Complainant: David A. Branch, Esquire
For the Agency: Robert Fabia, Esquire

## SWORN DECLARATION OF MARGO KOINES ANDERSON

I, Margo Koines Anderson, declare, under penalty of perjury, that the following

statement is true and correct. I came onboard to the Office for Innovation and

Improvement ("OII"), like so many others, by way of a lateral transfer. This was in

December 2002, when OII was created in a reorganization effort undertaken by then

Secretary of Education Roderick Paige. For the record, I am a Caucasian female, over

40, with no apparent or known disabilities.

My prior position at Education was with the Office of Educational Research and

Improvement ("OERI") where I was a GS-0343-15 Management and Program Analyst. I



*No.9*

specifically worked in the Office of Reform Assistance and Dissemination (ORAD) and served as a senior program manager to the ORAD Director.

With the departmental reorganization, I became the OII Executive Officer. In that capacity, I provided for the management of personnel activities including performance appraisals and job announcements. As of February 2005, I became the Associate Assistant Deputy Secretary to Assistant Deputy Secretary Rees. As Associate Assistant Deputy, I have responsibility for all discretionary grant program offices and for the Executive Office.

I am asked to give some insight and background information as to a document that OII head Nina Rees mentioned in her sworn testimony in a deposition given in this case. The document is a June 13, 2005 memorandum from me to Assistant Deputy Secretary Rees on the topic of Promotions and New Hires with OII. See attachment.

Charlene Riggans (African American, female), a GS-11 Staff Assistant, whose duties include personnel functions, collected and prepared this information at my direction. Back in March 2005, the local union at ED made a Freedom of Information Act (FOIA) request for the listed information. As the Recordkeeper for OII Staff, Charlene had access over relevant documents and originally gathered the information from a review of OII personnel documents and records at her disposal. The June memorandum was an update to that initial request by the union.

I was also asked to confirm Steve Brockhouse's placement in OII and his assignment to a deputy position shortly after the reorganization was in place. Pursuant to the Agency Counsel's request for documents related to this assignment, I requested that Charlene pull these documents from our personnel files. I can attest that the attached

2

documents are official copies. Also, I want to point out that based on my knowledge of the new appraisal, system, that ED was moving from a pass/fail to the present system, and that the initial transition rating period for the new rating system was to be a short term one, from January 1 to April 30, 2003. As the Executive Officer, I am aware that the EDPAS rating system, which is and was in effect, requires employees to be supervised by a manager for at least 120 days before that manager can be designated as the appropriate rating official at the end of a rating period. Therefore, since Steve Brockhouse was not certified as the official deputy supervising certain persons until late February 2003, he could not be the designated rating official for these persons come the end of the rating period, which was April 2003.

Ms. Kilby-Robb has made one claim asserting that OII is maintaining a discriminatory practice of hiring young, white females. There is no truth to that. To the best of my knowledge a finding of discrimination has never been made against OII or members of its front office. Selections of entry-level staff and experienced employees are both hiring strategies reflected in OII's Recruitment Plan. This Plan addresses the fact that a large number of senior level OII employees are either currently eligible to retire or will be eligible within the next few years.

We are a very young organization, and we have moved to replace departing staff by hiring at the lower grade levels for economic reasons and because of staff turnover due to current or near future retirements. When we seek to fill these available positions at lower grades, our practice has been to recruit from the pool of Outstanding Scholars and Presidential Management Fellows.

3

The Office of Personnel Management provides the list of eligible applicants for these targeted groups. OII or any part of ED has no control over the applicant pool used and candidates referred for our consideration. Meanwhile, we at OII have hired or promoted a number of minority females since we have come into being.

In regard to the charge that the OII front office denied Ms. Kilby-Robb a use of a PC in line with her flexiplace agreement and this was a failure to reasonable accommodate a disability, I can state categorically that this is not true. When her request for the flexiplace agreement was presented to the front office, I was the one who reviewed it. Yes, she did ask for a PC. But there was nothing in her request that indicated that this was part of or for a reasonable accommodation request as to any particular, identifiable disability.

I have reviewed her flexiplace agreement and there is no evidence that would alert me or anyone else in management that this was a reasonable accommodation concern. I note that she hinted that she would be forthcoming with information to give to her supervisor. Such information, if it did exist was not brought to my attention.

Yes, I now understand that Ms. Kilby-Robb was having a difficult time due to the death of her father. She was allowed to take some time off and was told by her supervisor at the time, John Fiegel, to take more time off if she wished, but she declined to do so. I do understand that Ms. Kilby-Robb had some health issues but I am not aware that she ever presented enough facts or evidence to OII management to make us think that this was something of a legal disability so that we would be legally obligated to accommodate her needs to do her job. Other than that, I can only state that I made the determination not to approve the granting PC for her to use at home. That was our

4

policy, which was based on economic considerations. We did not prohibit her from using her own PC while she was home. We did not prevent her from asking our departmental 504 coordinator to consider a request from her to have the Department provide her with a free PC for work at home purposes as a means of reasonable accommodation. So as far as I know, the disability issue was not an issue for us until she filed a complaint and later added it as an issue.

Finally, let me state that based on my personal knowledge, I am aware that Rachel Couch (African American, female) left OII recently to obtain a promotion at the Office of Postsecondary Education ("OPE"). As for Mr. Guitard, he has not been treated more favorably than Ms. Kilby-Robb. I know that her performance rating has gone up from her initial one with OII; while his has gone down – demonstrating management's displeasure with the less than satisfactory work performance that he has produced for us.

7/1/05
Date

Margo Kohnes Anderson
Margo Kohnes Anderson
Washington, D.C.

Control No. 97- 0124612

Org. Code ESG

From Debbie Kalnasy, OESE

Accretion of Duties Promotion
Daisy Greenfield
Education Program Specialist
GS-1720-14

# Request for Personnel Action
# SF-52
# Supporting Documents



Attn:_____

___Classification___Empl. Rel.

_____Placement_____Processing



*No. 13*

Standard Form 52
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 3

# REQUEST FOR PERSONNEL ACTION

**PART A – Requesting Office** *(Also complete Part B, Items 1, 7-22, 32, 33, 34 and 39.)*

| 1. Actions Requested | 2. Request Number |
|---|---|
| Accretion of Duties Promotion | 97-0124612 |

| 3. For Additional Information Call *(Name and Telephone Number)* | 4. Proposed Effective Date |
|---|---|
| Debbie Kalnasy   260-1926 | |

| 5. Action Requested By *(Typed Name, Title, Signature, and Request Date)* | 6. Action Authorized By *(Typed Name, Title, Signature, and Concurrence Date)* |
|---|---|
| Thomas W. Fagan   *T. Fagan*<br>Director, Goals 2000   6/4/97 | Ruth Hall   *Ruth E. Hall*<br>Executive Office, OESE   6/13/97 |

**PART B – For Preparation of SF 50** *(Use only codes in FPM Supplement 292-1. Show all dates in month-day-year order.)*

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| Greenfield, Daisy V. | | | |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number  ~13610 |
|---|---|
| Education Program Specialist   GS1720-13 | Education Program Specialist   GS1720-14 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 1720 | 13 | | | | GS | 1720 | 14 | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| Office of Elementary & Secondary Education<br>1250 Maryland Avenue, SW<br>Room 4000 - Portals Building<br>Washington, DC 20024-6100 | Office of Elementary & Secondary Education<br>1250 Maryland Avenue, SW<br>Room 4000 - Portals Building<br>Washington, DC 20024-6100 |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 – None   3 – 10-Point/Disability   5 – 10-Point/Other<br>2 – 5-Point   4 – 10-Point/Compensable   6 – 10-Point/Compensable/30% | 0 – None   2 – Conditional<br>1 – Permanent   3 – Indefinite | | YES   NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| | | |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| | | | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 – Competitive Service   3 – SES General<br>2 – Excepted Service   4 – SES Career Reserved | E – Exempt<br>N – Nonexempt | | |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| | |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

| 45. Educational Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship | 50. Veterans Status | 51. Supervisory Status |
|---|---|---|---|---|---|---|
| | | | | 1 – USA  8 – Other | | |

**PART C – Reviews and Approvals** *(Not to be used by requesting office.)*

| | 1. Office/Function | Initials/Signature | Date | | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|---|---|
| A. | | | | D. | | | |
| B. | | | | E. | | | |
| C. | | | | F. | | | |

2. Approval: I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

| Signature | | Approval Date |
|---|---|---|

CONTINUED ON REVERSE SIDE
52-119

OVER

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6239

DEPARTMENT OF EDUCATION

## POSITION AUTHORIZATION AND DESCRIPTION

| PART I – INITIATING OFFICE(S) | PART II – PERSONNEL OFFICE |
|---|---|

| 1. POSITION CONTROL NO. | 2. ORGANIZATION CODE | 1. POSITION DESCRIPTION NO. | 2. SUBJECT TO IA ACTION |
|---|---|---|---|
| 13610 | ESG | | ☐ YES  ☐ NO   LIMIT |

**3. ORGANIZATIONAL TITLE**

Education Program Specialist  GS1720-14

**3. OFFICIAL CLASSIFICATION OF POSITION**

a. TITLE

**4. ORGANIZATIONAL LOCATION OF POSITION**
a. FIRST SUBDIVISION *(Below Department)*

Office of Elementary & Secondary Education

b. SECOND SUBDIVISION

Goals 2000 Program

| b. PAY PLAN | c. OCC. SERIES | d. GRADE | e. PAY BASIS | f. INITIALS |
|---|---|---|---|---|
| | | | | |

c. THIRD SUBDIVISION

| 4. DATE POSITION ESTABLISHED *(Year, month and day)* | 5. DATE POSITION LAST AUDITED *(Year, month and day)* |
|---|---|
| | |

d. FOURTH SUBDIVISION

**CLASSIFICATION/JOB GRADING CERTIFICATION – I CERTIFY** that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.

e. FIFTH SUBDIVISION

f. SIXTH SUBDIVISION

**6. TITLE OF OFFICIAL TAKING ACTION** *(Type or print)*

g. SEVENTH SUBDIVISION

**5. REASON FOR SUBMISSION** *(Show any positions replaced)*

☐ REDESCRIPTION ☐ NEW    ☐ REPLACES PD NO.

☐ REESTABLISH. ☒ OTHER    Promotion

**7. NAME AND SIGNATURE**

| 6. EMP. FIN. STATE. REQUIRED | 7. PAY BLK. | 8. TIMEKPR. DEL CODE |
|---|---|---|
| No | SB4 | 202 |

**8. STANDARD(S) USED IN CLASSIFYING OR GRADING POSITION**

**9. SIGNATURE OR NAME OF EMPLOYEE** *(Optional)*

Daisy Greenfield    DATE

| 9. OCC. SERIES MODIFIER | 10. POSITION STATUS |
|---|---|
| | ☐ COMPETI–TIVE  ☐ EXCEPTED *(Specify)* |

**SUPERVISORY CERTIFICATION – I certify** that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations. *(FPM Chapter 511, Subchapter 4-3.b.)*

| 11. SUPERVISORY CODE | 12. MERIT PAY POOL | 13. GRADE RANGE |
|---|---|---|
| | | LO ____ HI ____ |

| 14. FLSA CODE | | 15. COMPETITIVE AREA | 16. COMPETITIVE LEVEL CODE |
|---|---|---|---|
| ☐ E  ☐ N | | | |
| ☐ M  ☐ D | | | |

**10. NAME AND TITLE OF IMMEDIATE SUPERVISOR** *(Type or print)*

Thomas W. Fagan

| 17. LMR CODE | 18. BARGAINING UNIT | 19. FUNC. CLASS |
|---|---|---|
| | ☐ 0030  ☐ 7777  ☐ 8888 | |

| 11. SIGNATURE | DATE 6/4/97 |
|---|---|

| 20. POSITION TENURE | 21. AGENCY CODE | |
|---|---|---|

**12. NAME AND TITLE OF HIGHER LEVEL SUPERVISOR OR MANAGER** *(Type or print) (Optional)*

**LOCATION DATA** *(Personnel Use)*

| 13. SIGNATURE | DATE |
|---|---|

| 22. SPO | 23. OPF OFFICE | 24. EMP. OF. LOC. |
|---|---|---|

| 14. SIGNATURE OF SECURITY OFFICER | DATE 6/13/97 |
|---|---|
| Debbie Kalnasy | |

| 25. DUTY STATION | | STATE | CITY | COUNTY |
|---|---|---|---|---|

| 15. SENSITIVITY CODE | 16. CAN NUMBER |
|---|---|
| 5 | E008125 |

| 17. SIGNATURE OF EXECUTIVE OFFICER | DATE 6/13/97 |
|---|---|
| Beth C. Hall | |

| PART III – RESERVED | | | | |
|---|---|---|---|---|
| CLASSIFICATION SURVEY | INITIALS | DATE | INITIALS | DATE |
| 1. Supervisor | | | | |
| 2. Classifier | | | | |

**REMARKS**

Description of major duties and responsibilities *(See attached)*

| COPIES: ☐ PAY/PERS  ☐ EMPLOYEE  ☐ EXEC. OFFICE  ☐ OPF  ☐ SUPV:  ☐ MPP/FILE  ☐ O|

EDUCATION PROGRAM SPECIALIST
GS-1720-14

## I. INTRODUCTION

This position serves as an Education Program Specialist in the United States Department of Education. The position performs professional work for an educationally related program (or group of programs) directed towards improving American education. Program objectives are achieved through the management of grants, contracts, and loans, as well as through professional leadership and expertise.

## II. MAJOR DUTIES AND RESPONSIBILITIES

Serves as a nationally recognized authority for the assigned broad program. Provides professional leadership and guidance to department and State officials in planning, developing, and carrying out the assigned program. Also provides leadership and expertise in improving and evaluating the assigned program. Develops tests and applies new program approaches and innovative techniques to better serve customers and meet the program's goals.

Provides consultant services to top-level officials of ED, State and local agencies, institutions and organizations. Provides authoritative technical assistance in developing, planning, and evaluating programs. Develops technical assistance approaches and materials, program regulations, guidelines and other criteria that serve to promote program responsiveness and effectiveness.

Analyzes developments and keeps abreast of trends related to the program to which assigned. Incorporates and adapts such developments into program plans and initiatives that offer promising solutions to long-standing or controversial program issues and problems.

Initiates, plans, and conducts regional or national meetings, workshops and seminars. Represents the Department at a variety of meetings and conferences and maintains effective relationships with professional groups and other organizations.

Performs other related duties as assigned.

## III. FACTOR LEVELS

Factor 1 - Knowledge Required

Expert knowledge of education theories, principles and practices and the roles of the Federal, State and local governments sufficient to plan, evaluate, and advise on OESE programs, their requirements and problems.

Knowledge sufficient to assess innovative approaches to long-standing problems from the standpoint of educational soundness, likelihood of success, feasibility, and consistency with program objectives.

Skill sufficient to conduct indepth analyses involving complex variables. Skill sufficient to extend and apply new developments and approaches to broad program problems.

Factor 2 - Supervisory Controls

The supervisor or team leader provides only administrative direction in terms of broadly defined objectives and missions. The employee independently determines the approach and carries out the assignment. Recommendations and decisions are considered authoritative and are normally accepted without significant change. Review is in terms of achievement of program objectives and consistency with broad policies.

Factor 3 - Guidelines

Guidelines consist of legislation and very broad policy statements. The incumbent uses ingenuity in extending and adapting existing guidelines and in developing a framework of guidelines for use by others.

Factor 4 - Complexity

The work involves the provision of planning, consultative and evaluative services for the assigned program. Assignments entail controversial issues on which conflicting views are held by different groups and authorities. The incumbent generates new ideas and serves as a catalyst in getting new approaches accepted and implemented.

Factor 5 - Scope and Effect

As a recognized expert in one or more OESE programs, the employee develops new approaches and guidelines that have significant impact on the program and its beneficiaries and on participating agencies, institutions and organizations. Analyses and evaluations conducted serve as the basis for decisions affecting the direction of the program.

Factor 6 - Personal Contacts

Contacts are generally with high-level officials from outside ED and include heads of State and local education agencies, key officials of other Federal agencies and educational institutions, leaders of major education organizations, and congressional staff members.

Factor 7 - Purpose of Contacts

These contacts are for the purpose of providing technical assistance, defining and developing solutions for complex problems, developing new procedures, directing and monitoring special projects and assignments, and gaining acceptance of new or changed program requirements and approaches.

Factor 8 - Physical Demands

There are no special or unusual physical demands.

Factor 9 - Work Environment

Work is performed in a typical office setting.

IV.  UNIQUE POSITION REQUIREMENTS



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF ELEMENTARY AND SECONDARY EDUCATION

May 21, 1997

MEMORANDUM

To:  Eugene Bell, Director, Headquarters Services Group

From:  Thomas Fagan, Director, Goals 2000/Technology Fund

Re:  Request for desk audits - Charles Lovett and Daisy Greenfield

The purpose of this memorandum is to request a desk audit of two
members of the Goals 2000/Technology Literacy Challenge Fund Office
to determine if their current tasks warrant promotion to the GS-14
level.    I  believe  that  they  both  have  assumed  major
responsibilities in the operation of departmental initiatives and
funded programs that support those initiatives.

DAISY GREENFIELD

Ms. Greenfield's normal duties as a program specialist in the Goals
2000/TLCF office include responsibilities for Goals 2000/TLCF
programs in states assigned to her (CA, HA, and the Pacific
jurisdictions); participation in regional service team activities
in regard to those states and jurisdictions; participation in
office activities in relation to the three programs administered by
the office (Goals 2000 State and Local Reform, Parental Assistance
Centers, and the Technology Literacy Challenge Fund).   These
activities include development of guidance and other materials,
review of state plans and applications, collaboration with other
programs in OESE affected by this office's activities; drafting
responses to inquires from other offices in the department, the
public, and the Congress, and assistance in planning the overall
work of the office.

In addition to these duties, Ms. Greenfield has assumed lead
responsibility for the operation of the Parental Assistance Center
Program and for the connection of this program to the Departmental
initiative to increase the participation of parents in the
education of their children.   The Parental Assistance Center
program provides competitive grants to private, nonprofit agencies
to provide direct assistance to parents in urban and rural areas

and to coordinate other parent support activities within its geographic area, normally a state. It is currently funded at $15 million, and will, at the end of the current funding cycle, support activities in approximately 40 states, with grants that average approximately $350,000 - large grants to private nonprofit agencies. In addition, the program will also establish a central technical assistance center to help these grantees with their efforts to support school districts plan and carry out other Federally supported parent activities (especially the Title I parent compacts).

Ms. Greenfield's duties in regard to Parental Assistance Centers include the following:

1. Give leadership to a team, composed of three other members of the Goals 2000/TLCF staff, that administers the Parental Assistance Center Program.

2. Establish and implement procedures for receipt and review of applications for grants and make recommendations for funding to the Director of Goals 2000/TLCF. It should be noted that this is a highly competitive program, with approximately 1 application in 10 being supported.

3. Oversee review of annual reports of existing grantees and recommend continuations, when appropriate.

4. Serve on a senior level Departmental team to increase parental participation in all schools and coordinate federal support for parental assistance. The team is chaired by the Counselor to the Secretary.

5. Determine monitoring of the grantees, using staff from the Goals 2000/TLCF office, and conduct monitoring herself when needed.

6. Participate in decisions regarding program budget for the program and respond to congressional inquiries regarding the request.

7. Conduct the selection of a technical assistance center to serve the grantees and oversee its work. As part of the latter, oversee a needs assessment of the current centers to determine their technical assistance needs.

8. Review the current status of the program and begin consideration of reauthorization. This entails development of a policy paper to guide departmental decisions.

CHARLES LOVETT

Mr. Lovett's normal duties are the same as those described above for Ms. Greenfield.

In addition to those duties, Mr Lovett has assumed major

responsibility for the implementation of the Technology Literacy Challenge Fund.  The Fund, currently funded at $200 million, is scheduled to rise to $425 next year and, over a five year period make available $2.0 billion to states and, through states, to local districts.  Its purposes are to provides teachers with professional development in the area of technology, connect all schools to the internet, provide modern computers for every school, and promote development and use of software as an integral part of curriculum.  Grants to states are contingent upon Departmental review of State Technology plans and updates of them.   Mr Lovett provides leadership to this effort and to a team of three additional members of the Goals 2000/Technology Fund staff.  Responsibilities include:

1.   Development and dissemination of all materials needed for application for funds.

2.  Development and dissemination of guidance for states and local districts.    There are no regulations for the program, making guidance particularly important.  This is done in conjunction with the Office of General Counsel.

3.  Development of guidance for peer reviewers to use in reviewing state plans and overseeing the review process.  Now complete for the first year, some states will need additional review due to conditions put on their grants during the initial review.   In addition, several states will amend their plans substantially as technology changes and in response to their own legislative mandates.

4.  Assist all Goals 2000 members with issues related to the Fund.  This will involve not just technical issues related to the program, but to other programs that also support technology in school districts.

5.   Serve as advisor to the regional service teams on issues related to the fund.  As a new program, the Fund is not well understood by the regional service teams, that will include it as part of their integrated review responsibility. Mr. Lovett will have major responsibility for professional development of staff in this area.

6.   Serves on the Departmental Technology Team, led by Linda Roberts.  The team is responsible for the implementation of the portion of the plan of action related to technology.  Other members are Departmental persons who head our other major technology efforts - the Technology Innovation Grant program, Star Schools, and the OERI office responsible for the evaluation of the Fund.

7.   Brief other departmental officials, outside groups, and congressional staff on fund operations.

8.   Represent the Department at major technology conferences, including making presentations on the fund.

9.  Participating in decisions related to budget issues and doing the necessary planning to insure a smooth flow of funds.  The Fund is the first program that will be directly identifiable in each states letter of credit system, providing the Department and Congress with better and more timely information on when obligations are being made at state and local levels.

| U.S. DEPARTMENT OF EDUCATION<br><br>PERSONNEL MANUAL INSTRUCTION | PMI   430-2<br>DATE November 6, 2002<br><br>APPROVED:<br><br>*Veronica D. Trietsch*<br>DIRECTOR, HUMAN<br>RESOURCES SERVICES |
| --- | --- |

Effective January 1, 2003, supersedes Personnel Manual
Instruction 430-2, dated May 9, 1996.

**SUBJECT:   Education Department Performance Appraisal System
(EDPAS)**

## TABLE OF CONTENTS

I.      AUTHORITY ............................................... 2
II.     POLICY ................................................. 2
III.    APPLICABILITY .......................................... 2
IV.     DEFINITIONS ............................................ 2
V.      DUTIES OF RESPONSIBLE PARTIES .......................... 2
VI.     DESCRIPTION OF ED'S PERFORMANCE APPRAISAL SYSTEM ....... 4
VII.    ELEMENTS AND STANDARDS ................................. 4
VIII.   APPRAISAL PERIOD ....................................... 5
IX.     PLANNING PERFORMANCE ................................... 5
X.      REVIEWING PROGRESS ..................................... 8
XI.     APPRAISING PERFORMANCE ................................. 8
XII.    DISPUTE RESOLUTION ..................................... 9
XIII.   INTERIM RATINGS ....................................... 10
XIV.    UNACCEPTABLE AND MINIMALLY SUCCESSFUL LEVELS OF
        PERFORMANCE ........................................... 11
XV.     REDUCTION IN FORCE (RIF) .............................. 12
XVI.    TRAINING AND EVALUATION ............................... 13
XVII.   EDPAS RECORDKEEPING ................................... 13

APPENDIX A, DEFINITIONS ....................................... 14
APPENDIX B, EDPAS Employee Performance Plan
            for Nonsupervisors ................................ 16
APPENDIX C, EDPAS Performance Plan for Supervisors .......... 18
APPENDIX D, Scale and Achievement Level Descriptions Used to
            Interpret and Score the Standards and Elements .. 20
APPENDIX E, Tables for Use in Rating Standards, and Elements,
            and Arriving at the Summary Rating .............. 24
APPENDIX F, EDPAS Rating for Nonsupervisors ................. 28
APPENDIX G, EDPAS Rating for Supervisors .................... 30



I.    AUTHORITY

Title 5, United States Code (U.S.C.), Chapter 43,
Subchapter I; Title 5, Code of Federal Regulations (CFR),
Part 430, Performance Management, Subparts A and B.

Title 5, U.S.C, Section 7106 (a) – Pertains to management's
right to assign work and direct employees including the
right to determine the number, identity and content of
performance elements and standards, the number of rating
levels, and the method for arriving at an overall rating.

II.   POLICY

It is the policy of the Department of Education (ED) to
have a performance appraisal system that, to the maximum
extent feasible, permits accurate evaluation of job
performance on the basis of objective criteria related to
the job in question for each employee or position under the
system, and promotes a high-performance organization that
is customer focused and obtains results.

III.  APPLICABILITY

This Instruction covers the performance appraisal of all
employees in General Schedule (GS), General Merit (GM)
(formerly covered by the Performance Management Recognition
System), Administratively Determined (AD), and prevailing
rate pay plans.   It does not cover senior executives,
experts and consultants, or temporary employees serving on
appointments of 120 calendar days or less in a consecutive
12-month period.

IV.   DEFINITIONS

See Appendix A (page 14).

V.    DUTIES OF RESPONSIBLE PARTIES

A.   Director, Human Resources Services (HRS)

Advises Secretary, Deputy Secretary, and Assistant
Secretaries on all aspects of the Education Department
Performance Appraisal System (EDPAS). Monitors
compliance with the regulatory requirements regarding
the administration of the EDPAS system.  Provides
advice and guidance to the Principal Offices (POs) on
regulatory and policy issues.

VIII.  APPRAISAL PERIOD

    A.  The appraisal period for all employees covered by EDPAS is May 1 to April 30.  The actual preparation of the annual performance appraisals will be sufficiently staggered so that supervisors can initially focus on preparing employee ratings and subsequently be appraised for the next appraisal period on how they carry out their performance appraisal responsibilities. The Director, HRS, may approve alternative annual appraisal periods for special employment situations.

    B.  An individual must serve for a minimum of 120 calendar days in his/her current position under an EDPAS plan in order to receive an appraisal.  When the minimum 120-day appraisal period cannot be served in the employee's current position before the end of ED's established appraisal period, the period will be extended until the 120 days are met.  The employee's performance will be appraised at that time and any interim ratings will be considered.  The employee will then receive a Rating of Record.

       Immediately upon completion of an extended appraisal cycle, a new performance plan will be required to cover the period from that date until the end of the current appraisal period.

    C.  Any employee who is under an existing Performance Improvement Plan as of the effective date of this Personnel Manual Instruction (PMI), and who has not completed the specified period under such plan, will continue under the Pass/Fail system until his/her performance has been appraised.  Upon the expiration of the specified period under the performance improvement plan and the occurrence of an appraisal, the employee shall be subject to the five-level system set forth in this PMI.

IX.  PLANNING PERFORMANCE

    A.  Standards

       Within 30 calendar days after the beginning of the appraisal period, or after entry into a new EDPAS position, the supervisor and employee will develop between three (3) and eight (8) performance standards for the elements of Organizational Priorities and

C. The standards for the Organizational Priorities and Customer Service elements, as well as any constructed standards for the supervisory element, may be changed during the rating period but must be in effect for 120 calendar days in order for an employee to be rated against them.

X. REVIEWING PROGRESS

A. At least one formal, documented, progress review must be held with the employee by the supervisor. This progress review will cover at least 120 calendar days and be held at the mid-point of the appraisal period. During the progress review, the supervisor will fully discuss the employee's performance to date in conjunction with the standards and elements in his/her performance agreement and any development activities that will help improve the employee's performance.

B. Employees who have not been in an EDPAS position for 120 calendar days prior to the mid-point of the normal appraisal period will be given a progress review at the mid-point of their individual appraisal cycle.

C. Additional progress reviews may be initiated at any time by the supervisor or the employee to discuss performance, provide feedback, and/or add or delete standards to be evaluated. The supervisor must initiate such a meeting if the employee's performance appears to be falling below the Successful level on any critical element.

XI. APPRAISING PERFORMANCE

A. Mid-Point of Appraisal Period

Supervisor considers any input submitted by the employee on tangible accomplishments that the employee would like to have considered for the mid-point progress review. Supervisor conducts the mid-point progress review and discusses any developmental activities that would help improve the employee's performance.

B. End of Appraisal Period

1. Employee is strongly encouraged to provide the supervisor with a list of tangible accomplishments

for each critical element. Employee may also provide his/her supervisor with information from other sources regarding his/her performance (e.g., letters, e-mail) that the employee wishes to have considered.

2.  Supervisor considers input by the employee and information from other sources (e.g., customers, co-workers, other supervisors) that has come to the supervisor's attention. Supervisor rates employee's performance on elements, assigns the summary rating of record and provides narrative justification for each critical element rating. See Appendix D and E for detailed instructions on rating the performance standards and arriving at element ratings and the overall summary Rating of Record.

3.  Approving official reviews and approves summary Rating of Record.

4.  Supervisor provides the summary Rating of Record to the employee and discusses the basis for the rating and developmental needs with the employee. Any documentation (i.e., information from other sources) that is used to support the rating of record must be disclosed to the employee.

XII.  <u>DISPUTE RESOLUTION</u>

A.  Bargaining unit employees must use either the Department's Informal Dispute Resolution (IDR) Center process or the Problem Resolution Procedure in Article 42 of the Department's Collective Bargaining Agreement to initiate dispute resolution over most performance appraisal issues; e.g., issues regarding the performance plan, ratings of standards or elements, the Rating of Record, tangible accomplishments used to support the ratings, interim ratings, etc. Employees should promptly contact the IDR Center or consult the Collective Bargaining Agreement for further information, including time frames within which issues must be raised. For information on raising issues of discrimination, see paragraph C. below.

B.  Non-bargaining unit employees must use the IDR Center process as the first step of the administrative grievance process to initiate dispute resolution over

performance rating issues. Employees must initiate contact with the IDR Center within 45 days of the date the incident occurred or the date they became aware of the incident. When the IDR Center process is completed, a nonbargaining unit employee has 15 calendar days to file a formal grievance under the provisions of PMI 771-1.

For information on raising issues of discrimination, see paragraph C. below.

C.   Employees who wish to raise issues of discrimination covered by federal equal employment opportunity statutes must contact the IDR Center within 45 days of the date the incident occurred or when they became aware of the incident as the first step of the equal employment opportunity complaint process.

XIII.   INTERIM RATINGS

A.   Position Changes

ED supervisors must provide interim ratings when: (1) the supervisor departs his/her position; or (2) the employee changes positions and has been in an EDPAS position for at least 120 calendar days.

B.   Details/Temporary Promotions

When an employee is expected to be on a detail or temporary promotion for at least 120 calendar days, the supervisor managing the detail or promotion will work with the employee to develop a performance plan, implement the performance plan within 30 calendar days, and provide an interim rating to the employee's supervisor at the completion of the detail, promotion, or at the end of the rating period. The worksheets in Appendix B or C should be used to document the employee's performance plan and the worksheets in F or G should be used to document the employee's interim rating while on detail or temporary promotion. Comments may be attached to the worksheet.  For details or temporary promotions less than 120 calendar days, the ED supervisor managing the detail or promotion will provide a written summary of the employee's accomplishments to the employee's supervisor of record.

ED supervisors will obtain interim ratings from the previous supervisors of employees who have been in one

or more EDPAS positions for at least 120 calendar days.
ED supervisors will also obtain written summaries for
employees who are detailed or temporarily promoted for
less than 120 calendar days. When an ED supervisor
vacates his/her position, s/he will provide interim
ratings to the approving official for all employees on
his/her staff who have been in EDPAS positions for at
least 120 days.

Interim ratings will be provided to the employee when
they are received by the supervisor. The interim
ratings and written summaries must be taken into
account for the next applicable rating of record.

XIV.   UNACCEPTABLE AND MINIMALLY SUCCESSFUL LEVELS OF PERFORMANCE

At any time during the performance appraisal period, if
the supervisor determines that an employee's level of
performance on a critical element falls to the
Unacceptable level, he/she shall initiate immediate
assistance geared toward raising the employee's level of
performance back to the Minimally Successful level.  Such
assistance may include but is not limited to formal
training, on-the-job training, counseling, and/or closer
supervision.  The supervisor will meet with the employee
to discuss ways to improve his/her performance.
Information on the scale for arriving at element and
summary ratings is available in Appendix E on page 24.

Specific steps that must be taken include:

1.   Except for Schedule C or probationary employees, who
     may be terminated at any time, or other employees
     excluded from coverage by 5 CFR 430.202, an employee
     rated Unacceptable on his/her Rating of Record, or
     whose performance falls to the Unacceptable level on a
     critical element during the performance appraisal
     period, must be given a reasonable opportunity to
     demonstrate Minimally Successful performance on the
     critical element(s) rated Unacceptable.  In order to be
     rated at the Unacceptable level, the employee must have
     worked in his/her current position, with a performance
     agreement in place, for at least 120 calendar days.

     The employee will be informed in writing of:  the
     critical element(s) for which performance has been
     rated at the Unacceptable level on the Rating of Record
     or has fallen to the Unacceptable level during the

APPENDIX F

| EDPAS Rating for Nonsupervisors | |
|---|---|
| Employee: | Title: |
| Pay Plan/Series/Grade: | Rating Period: |
| Organization: | Dates: |

Check One:

[ ] **Rating of Record** - The performance rating prepared at the end of an appraisal period for performance over the entire period, including the assignment of a summary rating.

[ ] **Interim Rating** - An interim rating provide feedback to the employee's supervisor on the employee's accomplishments during a temporary assignment of, or in excess of, 120 days. It should be considered by the supervisor when s/he develops the rating of record.

Achievement level descriptions for assigning scores for the performance standards are contained in Appendix D of PMI 430-2. The worksheet for arriving at element ratings and the summary Rating of Record is in Appendix E of PMI 430-2. Standard and Element ratings will be assigned using the following scale.

| Unacceptable 1 | Minimally Successful 2 | Successful 3 | Highly Successful 4 | Outstanding 5 |
|---|---|---|---|---|

**I. Organizational Priorities (Critical) -**    Element Rating: _____

    Standard Ratings:
      _____ 1.
      _____ 2.
      _____ 3.
      _____ 4.
      _____ 5.
      _____ 6.
      _____ 7.
      _____ 8.

Justification:   (Discuss Tangible Accomplishments that support ratings for the standards and elements - continuation sheets may be attached)

Page 2 , Appendix F, EDPAS Rating for Nonsupervisors

**II.  Customer Service (Critical)**          -          **Element Rating:** _____

Standard Ratings:

_____ 1.

_____ 2.

_____ 3.

_____ 4.

_____ 5.

_____ 6.

_____ 7.

_____ 8.

Justification:  (Discuss Tangible Accomplishments that support ratings for the standards and elements - continuation sheets may be attached)

[  ]  Rating of Record:

[  ]  Interim Rating:

_____

| | |
|---|---|
| Supervisor's Signature | Date |
| Approving Official's Signature | Date |
| Employee's Signature | Date |
| Employee wishes to respond        Yes | No | |

Employee response may be attached to rating of record or interim rating.

APPENDIX G

| EDPAS Rating for Supervisors | |
|---|---|
| Employee: | Title: |
| Pay Plan/Series/Grade: | Rating Period: |
| Organization: | Dates: |

[ ] **Rating of Record** - The performance rating prepared at the end of an appraisal period for performance over the entire period, including the assignment of a summary rating.

[ ] **Interim Rating** - An interim rating provide feedback to the employee's supervisor on the employee's accomplishments during a temporary assignment of, or in excess of, 120 days. It should be considered by the supervisor when s/he develops the rating of record.

Achievement level descriptions for assigning scores for the performance standards are contained in Appendix D of PMI 430-2. The worksheet for arriving at element ratings and the summary Rating of Record is in Appendix E of PMI 430-2. Standard and Element ratings will be assigned using the following scale.

| Unacceptable 1 | Minimally Successful 2 | Successful 3 | Highly Successful 4 | Outstanding 5 |
|---|---|---|---|---|

**I. Organizational Priorities (Critical)**          -          **Element Rating:** _____

Standard Ratings:
_____ 1.
_____ 2.
_____ 3.
_____ 4.
_____ 5.
_____ 6.
_____ 7.
_____ 8.

Justification:   (Discuss Tangible Accomplishments that support ratings for the standards and elements - continuation sheets may be attached)

Page 2, Appendix G, EDPAS Rating for Supervisors

**II.  Customer Service  (Critical)**                    -         Element Rating: _____

Standard Ratings:
____ 1.
____ 2.
____ 3.
____ 4.
____ 5.
____ 6.
____ 7.
____ 8.

Justification:  (Discuss Tangible Accomplishments that support ratings for the standards and elements
- continuation sheets may be attached)

**III. Management and Leadership (Critical)**    -      Element Rating: _____

Standard Ratings:
____ 1. Demonstrates leadership by communicating organizational direction; setting clear values and
high performance expectations; and encouraging employee development through, for example,
mentoring and coaching, and individual development plans.

____ 2. Aligns and manages work processes, available resources, and technology to meet
organizational goals and priorities, and provides honest and timely employee performance
evaluations.

____ 3. Communicates regularly and openly discusses with employees within the work unit about
work assignments and new or changed assignments.

____ 4. Makes assignments in a fair manner consistent with employees' grade levels and solicits
employee interest/input; performance expectations are clear and feedback is provided regularly
relative to performance.

____ 5. Recruits, develops and retains high performing employees; deals promptly and appropriately
with performance and conduct problems.

____ 6.
____ 7.
____ 8.

31

Page 3, Appendix G, EDPAS Rating for Supervisors

Justification: (Discuss Tangible Accomplishments that support ratings for the standards and elements - continuation sheets may be attached)

[ ] Rating of Record:

[ ] Interim Rating:

_____

| | |
|---|---|
| Supervisor's Signature | Date |
| Approving Official's Signature | Date |
| Employee's Signature | Date |
| Employee wishes to respond    Yes | No |

Employee response may be attached to rating of record

32

| EDPAS Rating for Nonsupervisors | |
| --- | --- |
| Employee: KILBY-ROBB,       PATRICIA | Title: Education Program Specialist |
| Pay Plan/Series/Grade: GS/1720/13 | Rating Period: 01/01/03 - 04/30/03 |
| Organization: OII/POI | Dates: 01/01/03 - 04/30/03 |

☒ **Rating of Record** - The performance rating prepared at the end of an appraisal period for performance over the entire period, including the assignment of a summary rating.

☐ **Interim Rating** - An interim rating provide feedback to the employee's supervisor on the employee's accomplishments during a temporary assignment of, or in excess of, 120 days. It should be considered by the supervisor when s/he develops the rating of record.

Achievement level descriptions for assigning scores for the performance standards are contained in Appendix D of PMI 430-2. The worksheet for arriving at element ratings and the summary Rating of Record is in Appendix E of PMI 430-2. Standard and Element ratings will be assigned using the following scale.

| Unacceptable 1 | Minimally Successful 2 | Successful 3 | Highly Successful 4 | Outstanding 5 |
| --- | --- | --- | --- | --- |

## I. Organizational Priorities (Critical) - Element Rating: S

Standard Ratings:

 3  1. In years when funds are available for Parent Information and Resource Center grant competitions, leads the development of the application process, including: developing application materials, priorities, and selection criteria that are tied to the Strategic Plan and Department policies and initiatives.

___  2. In years when funds are available for Parent Information and Resource Center grant competitions, leads the process of reviewing applications including: writing the technical review plan, identifying readers, and overseeing the process through grantee selection in accordance with Department policies and procedures.

 4  3. Leads the implementation of the program monitoring plan, providing technical assistance to grantees focused on performance and results while guarding against fraud, waste, and abuse.

 5  4. Serves as the contract officer's representative for Parent Information and Resource Center contracts.

 3  5. Assists in the development of budget materials and policy for the Parent Information and Resource Centers.

 4  6. Serves as a Department-wide resource on Parent Information and Resource Centers.

 4  7. Participates in improvements to work processes including GAPS and e-gov initiatives.

___  8.

Justification: (Discuss Tangible Accomplishments that support ratings for the standards and elements - continuation sheets may be attached)
Ms. Kilby-Robb was asked to step into the role of acting team leader for the Parent Information and Resource Center Program during a time of transition for the program. While she relied a great deal on the assistance of the Deputy Director, POI, she handled this assignment well and her work products were usually of high quality. She scheduled meetings with the PIRC team and program representatives from OGC and budget to determine priorities in the Strategic Plan and select technical review criteria based on

Department policies and initiatives. She helped to incorporate these selection criteria in the application materials. She developed the draft of the application package after reviewing POI application packages for other programs that were approved by OII. She coordinated the process of identifying readers by organizing potential reader resumes in folders and sending the copies of resumes electronically of new potential readers to team member responsible for developing the list. She provided follow-up information on how to submit the resumes to the Executive office.

She met with representatives in the Executive office responsible for the statement of work for the contractor for e-review to discuss the process for reviewing applications. She shared the Parent Information and Resource Center Technical Review Handbook for discussion for adherence to Department policies and procedures.

She coordinated the development of the PIRC Monitoring and Technical Assistance Plan, including facilitating New Grantee Orientation, PIRC Technical Assistance Conference, and Spring Institutes. She coordinated the development of Monitoring Travel Plans and Budget Analysis. She scheduled meetings and provided copies of old PIRC documents, including monitoring and screening instruments to facilitate team participation in instrument development. She developed the draft of the On-site Monitoring Instrument and Telephone Contact Instrument.

Ms Kilby-Robb coordinated, monitored, reviewed reports, and approved activities and services provided by RMC Research Corporation, Inc., the technical assistance contractor for PIRCs. She facilitated the Annual PIRC Director's National Conference in Baltimore, Maryland, and she3acilitated the planning for three Regional Conferences. She oversaw the financial aspects of the contract with ED's Contract Specialist, Group A, in the Office of the Chief Financial Officer, and submitted financial reports (PR) to Executive Office and Budget Office for unpaid receipts from the 2002 contracts.

She developed the Parent Information and Resource Center Spending Plan.

She assisted with draft of Annual Performance Report, coordinated revision of Question and Answers, Parent As Teachers Outcomes, and HIPPY outcome follow-up. She maintained contact with PIRC grantees via telephone, meetings, and respond to e-mails.

She responded to questions about PIRC legislation/issues from OII staff/ OESE/OELA and other program office staff.

She served as the resource on PIRCs at the New Grantee Orientation and the Director's Conference. Utilize grants management/monitoring and create discretionary reports in GAPS.

## II. Customer Service (Critical) - Element Rating: S

Standard Ratings:

 3  1. Delivers quality products and services that address customer requirements.

 4  2. Meets essential deadlines and commitments.

 4  3. Communicates clearly, courteously and effectively.

 4  4. Improves and applies skills and technical knowledge to carry out assignments effectively

 3  5. Shares skills and knowledge effectively; works cooperatively with others to achieve goals

 5  6. Willingly accepts and completes a fair share of the workload.

 4  7. Adapts willingly and in a timely way to changing assignments, priorities and responsibilities.

 ___  8.

Justification: (Discuss Tangible Accomplishments that support ratings for the standards and elements - continuation sheets may be attached)

Ms. Kilby-Robb served as acting team leader with all responsibilities associated with this leadership position as well as the Program Officer for 22 States.

Ms. Kilby-Robb oversaw the work RMC, the contractor that produces many of the products for PIRC customers, including Needs Assessment Reports, Orientation and Conference agendas. She submitted Monitoring and Technical Assistance Plan/Travel and Budget Plan/ Spending Plan in a timely manner. All commitments and deadlines have been met with RMC and customers. Positive comments have been received from customers/PIRC Directors/RMC relating to a courteous professional communication style. She communicated to the PIRC team assignments, projects, problems to be solved, and/or program issues under review, and deadlines and time frames for completion. She provided resource materials including old PIRC documents and past history (to avoid pitfalls) of activities (hard copies or e-mail) for preparation of assignments. She scheduled meetings and sent e-mails to ensure that the strategic plan, mission, vision, and values are communicated to the team and integrated into the team's strategies, goals, objectives, work plans and work products and services.

With the Assistance of the Deputy Director, POI, Ms. Kilby-Robb has improved throughout the rating period in ensuring that each employee has an integral role in developing the final team product. She monitored and reported on the status and progress of work, checked on work in progress and reviewed completed work . She report to the team on progress in meeting established deadlines for completion of assignments, projects and tasks, and ensured that all team members are aware of and participate in planning for achievement of team goals and objectives. She represented the team in dealings with the supervisor for the purpose of obtaining travel for the PIRC Director's conference, use of overtime or compensatory time. She reported to the supervisor periodically on team and individual work accomplishments, problems, and progress in work processes.

She demonstrated flexibility and adaptability in changing assignments as an active participant of the ED-wide Parental Involvement Task Force. She made last minute corrections and changes to orientation and conference agendas, and she has helped to refocus the PIRC program to accommodate increased parent options and choice.

Rating of Record: <u>S</u>

Interim Rating: ____

| | | | |
|---|---|---|---|
| Supervisor's Signature | | Date | 5/23/03 |
| Approving Official's Signature | | Date | 7/27/03 |
| Employee's Signature | | Date | |

| Employee wishes to respond | Yes ☑ | No ☐ |
|---|---|---|

Employee response may be attached to rating of record

## Comments For EDPAS Rating

Before providing comments, I requested a meeting to discuss areas of disagreement on: Organizational Priorities, specifically 1.1,1.3, 1.5, 1.6, 1.7; and Customer Service, specifically 2.1, 2.2, 2.3, 2.4, 2.5, and 2.7 in accordance with PMI 430-2 (XI)(4). I explained that I had questions because I have not received any training or preparation from OII/POI on how to collect/present information with this new appraisal system. I have only received the mandatory criteria and was instructed to include them in the process. If this information was shared with other staff members before I transitioned to OII, I was not aware of the date. I also requested documentation for the scores (values assigned to each element-percentage of time on task, level of effort, quality and quantity of assignments, grade of employment verses performance, and other standards of assessment), especially since for the most part all of the comments were positive. The scores did not appear to be consistent with the comments. I just needed clarification on each element.

During my midpoint review, I had no indication I was performing less than highly successful/outstanding. That is the reason I continued to work "beyond the call of duty", demonstrated initiative, motivation, and characteristics of dedication and commitment to the GS-14 position. Was I evaluated as a GS-13 or GS-14? In support of my appraisal, I only sent a partial list of performance indicators because I was apprised that my supervisor would provide additional documentation.

It was stated in the justification, "Ms. Kilby-Robb was asked to step into the role of acting Parent Information and Resource Center Team Leader...." It was not stated that Ms. Kilby-Robb (GS-13 employee) was detailed to work in GS-14 position (a higher position with a great deal of responsibility). The previous Team Leader vacated the GS-14 position by voluntarily declining to transition to the OII program. It was not stated that not only was Ms. Kilby-Robb assigned as a Team Leader under unusual circumstances (2 team members), but that Ms. Kilby-Robb had to continue **all** of her previous duties and responsibilities as a GS-13 because no one was hired to fill her position. It was stated that Ms. Kilby-Robb served as a COR with a 5 rating (40-50% of time) but that" she relied a great deal on the assistance of the Deputy Director, POI, she handled this assignment well and her work products were usually of high quality." It did not state she worked extremely well with her supervisor to support him in his supervisory efforts –not because Ms. Kilby-Robb relied on his assistance in her capacity as COR or her GS-13 and 14 workloads. To the contrary, the supervisor articulated on several occasions that he worked for Ms. Kilby-Robb. It was not stated that the work entailed three major assignments requiring more than the average required 40-hour week.

Patricia Kilby-Robb

#03 1312504

# DEPARTMENT OF EDUCATION
## AWARD NOMINATION FORM

## Recipient:

Name: __Kilby-Robb__        __Patricia__        ____
       (Last)                  (First)              (MI)

Mailing Address: _____
                _____

## Award Type and Amount:
### (Please Check the Appropriate Box)

[] Spot Cash Award

[] Time Off Award          _____hours

[x] Cash Award             $500

[] Cost Savings Award      _____

[] Suggestion Award        _____

[] Non-monetary (Type)     _____

Award criteria and justification requirements are on the reverse side of this form.  This form and the Request for Personnel Action (SF-52) should be forwarded to the Servicing Personnel Office for processing.

## Certifications:

Recommending Official:

Signature: _John Fitz_____        Date: 8/25/03
  Name: _John Gieger_

Approving Official

Signature: _Jim E. Rees_____        Date 8/27/03
  Name:

Awards Budget/Executive Officer

Signature: _Margo K. Anderson_____        Date: 8/26/03
  Name:

CAN Number: _____ Amount: _____

## Spot Cash Award
Results in a net payment of $150.  May be made to recognize contributions within or outside of assigned job responsibilities such as producing high quality work under tight deadlines; performing added or emergency

assignments; demonstrating exceptional courtesy, tact, or responsiveness as an individual or team member; or exercising extraordinary initiative or creativity in addressing a critical need or difficult problem.

## Time Off From Duty Award

May be granted for recognition of contributions to the quality, efficiency or economy of government operations. See spot cash award for criteria.

## Cash Award

May be made to an employee as an individual or member of a group based on: superior accomplishment or other personal effort that contributes to the efficiency, economy, or improvement of government operations or achieves a significant reduction in paperwork; a special act or service in the public interest in connection with or related to official employment; or performance.

## Cost Savings Disclosure Award

A lump sum cash award in the amount of 1 percent of the savings to government (limit $10,000) may be made for disclosures about fraud, waste, and mismanagement. The justification must include an explanation of the amount of savings to the government which must be confirmed by the Inspector General. Employees making disclosures directly to the IG may remain anonymous, and in these cases, the IG may initiate the award action.

## Suggestion Award

May be made to recognize employees who submit ideas which directly contribute to economy in, or the effectiveness of, government operations. Award amount ($25 - $35,000) is based on a percentage of savings to the government. Justification must include the suggestion, contribution, and related cost savings.

## Non-Monetary Award

Honor awards such as letters of commendation or appreciation, certificates, plaques, pins, etc. May be awarded in lieu of, or in conjunction with, monetary awards. These awards are administered by each PO.

## Justification

Please address below or attach a brief statement. The justification must address the basis for the award; i.e., what special effort and/or special circumstances made the act or effort a substantial one. Cost Saving and Suggestion awards must include cost saving information.

Ms. Kilby-Robb was asked to step into the role of acting team leader for the Parent Information and Resource Center Program during a time of transition for the program. She handled this assignment well and her work products were usually of high quality. She scheduled meetings with the PIRC team and program representatives from OGC and budget to determine priorities in the Strategic Plan and select technical review criteria based on Department policies and initiatives. She helped to incorporate these selection criteria in the application materials.

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF COLUMBIA

 3

 4   - - - - - - - - - - - - x

 5   PATRICIA KILBY-ROBB,        :

 6          Plaintiff,          :

 7                      v.              : Civil No:

 8   1:05CV02270            MARGARET SPELLINGS,     :

 9   SECRETARY, U.S. DEPARTMENT:

10   OF EDUCATION,            :

11          Defendant        :

12   - - - - - - - - - - - - x

13                    Washington, D.C.

14                    Friday, January 19, 2007

15

16

17

18   Whereupon,

19              PATRICIA KILBY-ROBB

20   the Witness, called for examination by Counsel for the

21   Defendant, pursuant to notice and agreement of counsel as to

22   time and place, at 501 3rd Street, NW, Washington, DC, where

23   were present on behalf of the parties:

24

25
```



```
 1        Q     Okay.  But Daisy still got her 14 somewhere else.
 2   So my question is, did you ever ask anyone to perform a desk
 3   audit of what you were doing when you moved to OII?
 4        A     Not initially I did not, but since then I have asked
 5   my supervisor about a desk audit.
 6        Q     When did -- how - when did you ask for a desk audit?
 7        A     I'm going to say probably in 2006.
 8        Q     Okay.  Has that occurred?
 9        A     It has not occurred.
10        Q     Okay.  So Mr. Fiegel basically said he was going to
11   see what he could do about having the positions, yours, Iris
12   Lane's and who was the other person?
13        A     Just Iris and myself.
14        Q     Okay.  See what he could do about having those
15   positions elevated to GS-14, your position?
16        A     No.  It was not -- he did not state it that way.
17        Q     How did he --
18        A     He said, I am submitting the documentation on the
19   PDs.
20        Q     Okay.
21        A     He even talked to me about compensation before he
22   submitted that.
23        Q     How would that, how would that occur?
24        A     I don't know.  I'm not that astute with all
25   personnel issues, so I have to go to the personnel specialist
```

FREE STATE REPORTING, INC.

```
 1      Q    And is that John Fiegel?

 2      A    John -- yes, John Fiegel.

 3      Q    John Fiegel, okay.  So he was your immediate

 4  supervisor at the time.  I think my question to you is, are

 5  you aware of anyone else under his supervision who -- it's

 6  your position that you were performing job duties at the GS-14

 7  level and not being paid at that level.

 8      A    Yes.

 9      Q    Correct?

10      A    Yes.

11      Q    Are you aware of anybody else under

12  Mr. Fiegel's supervision who was performing GS-14 duties and

13  he arranged to have that individual upgraded to a GS-14?   Was

14  my question clear or do you need me to rephrase it?   It was a

15  little bit vague.

16      A    Right.

17      Q    In other words, was there anybody under

18  Mr. Fiegel's supervision that was comparable to you?

19           MR. BRANCH:  Forget -- people.

20           MS. BRASWELL:  I'm sorry, Mr. Fiegel.

21           BY MS. BRASWELL:

22      Q    Was there anybody under Mr. Fiegel's supervision

23  that was at all comparable to you and he actually arranged for

24  that individual to be paid at the GS-14 level?

25      A    The answer is no.
```

FREE STATE REPORTING, INC.

1      Q      Okay.

2      A      There were only Magnet School programs, Charter

3  School programs, Charter Facility programs, Voluntary Public

4  School Choice and PIRC, and Iris Lane and I were the only two

5  people who were 13s in those positions.

6      Q      And did Iris Lane, did she ever become a

7  GS-14?

8      A      No.

9      Q      Okay.  I'm not going to go back through your

10 performance appraisal because you did that length in your

11 prior deposition.

12     A      Right.

13     Q      But let me ask you this.  I understand that you have

14 an opinion that your performance appraisal was not at the

15 level you thought it should be.  Am I correct that your prior

16 performance appraisal was simply a pass/fail basis?

17     A      Correct.

18     Q      So the performance appraisal as -- that's Exhibit 3

19 is the result of a new appraisal system.  Is that right?

20     A      Correct.

21     Q      And was this the first time that supervisors had to

22 actually do this kind of numerical rating?

23     A      Correct.

24     Q      All right.  And I understand that you disagree with

25 the numbers you were given by

FREE STATE REPORTING, INC.

1    A    No, we were all African Americans.

2    Q    Well, I was asking you what your evaluation was.

3    A    I understand.  Everybody received satisfactory.

4    Q    Okay.

5    A    And on the other hand, the Caucasian employees

6    received higher evaluations.

7    Q    In different programs?

8    A    In the same program.  All of the people assigned or

9    that worked in our program --

10    Q    Well, many --

11    A    Magnet School and PIRC.

12    Q    Okay.

13    A    The Magnet School program is all Caucasian working

14    with Steve.

15    Q    Okay.

16    A    And the PIRC program was all African American.

17    Q    Right.  And did anybody in the Magnet School, to

18    your knowledge in the Magnet School program receive a, I think

19    it was successful, not satisfactory.  Isn't it successful?

20    A    The employees --

21    Q    Successful.  Did any of the individuals in the

22    Magnet School program receive a successful evaluation?

23    A    The only person I know received satisfactory -- I

24    mean successful --

25    Q    Successful.

1    A    -- was Kay Wagner and she was retiring.

2    Q    Okay.  And she was Caucasian?

3    A    She was Caucasian.

4    Q    Who else was in the Magnet School besides Kay

5    Wagner?

6    A    Donna Hoblet (phonetic), Richard Kress, those two.

7    Q    And Donna, I'm sorry, Hob --

8    A    Hoblet.

9    Q    Hoblet.  And then Steve Brockhouse was responsible

10   for the Magnet School program and PIRC?

11   A    He was responsible for the Magnet School program.

12   Q    And you said you didn't know -- was responsible?

13   A    Correct.

14   Q    Okay.

15   A    Correct.  But he was present at my evaluation.

16   Q    And at that time, when he was present at your

17   evaluation, you don't know what position he was actually

18   holding.  Is that correct?

19   A    Correct.

20   Q    All right.  Do you know who was the first, who was

21   considered the first line supervisor for the employees in the

22   Magnet School?

23   A    No one ever told me what was on their sheet so I'm

24   assuming it was John.  I'm not sure.

25   Q    Okay.  And John then probably was the first line

FREE STATE REPORTING, INC.

1  for the technical assistance component and it requires about

2  70 to 80 percent of my time, it is regulated by law.

3         It's -- I mean, it's all established.  You have your

4  scope of work, your statement of work.  You have all your

5  deliverables and, and so nobody can assume those

6  responsibilities unless they take over the position.

7      Q    Okay.  And so you're still carrying out those

8  duties?

9      A    So I'm still carrying out those duties.

10     Q    All right.  You have raised the claim of hostile

11 work environment in your complaint.  What do you contend

12 constitutes your hostile work environment?  What's making your

13 environment hostile?

14     A    Okay.  Just for an example, I would sign a leave

15 slip and say it was my birthday and I was going to be out that

16 day.  Then with my contractual obligations, a e-mail would be

17 sent and say to the contractors, Patricia is not in so I'm

18 going to ask a question.  Steve Brockhouse would send an e-

19 mail to the contractors as if there was some duty I was

20 supposed to perform and didn't.  When -- after I filed my EEO

21 complaint, Steve Brockhouse sent me an e-mail saying --

22 reprimand and because I had asked people to call him instead

23 of calling me because I was going to an institute and I was

24 responsible for the contract and --

25     Q    What about a reprimand?  I"m sorry.

FREE STATE REPORTING, INC.

1    A    Yeah.  He said that it could affect my, my

2 performance rating.

3    Q    Were you, were you given a reprimand?

4    A    Well, I called it a reprimand.  It was poor

5 judgment.  He considered it poor judgement.

6    Q    But a reprimand is a term of art in the agency so

7 it's actual written discipline given to you.

8    A    I understand.

9    Q    Did you ever get one of those?

10    A    No, I was not.

11    Q    Okay.

12    A    We clarified that for many of these discussions.

13    Q    Okay.

14    A    But he said it could influence my performance

15 evaluation.  Now, the fact is --

16    Q    What is it that could influence?  I'm sorry, I don't

17 understand --

18    A    My poor judgement for asking -- there was a period

19 when James Guitard and Rachel were, were not performing at a

20 certain level.

21    Q    Right.

22    A    And Steve told me to tell him or ask him to do

23 certain things rather than to ask them.  He would take care of

24 that.  And so, I went to New Orleans to an institute and I

25 asked the people who were calling in to contact Steve, my

1  supervisor, and I thought he was the supervisor at that time

2  but he wasn't.  But anyway, and so he -- himself reprimanding

3  me for doing what they told me to do.

4      Q    So he was unhappy with you having people call him

5  when you were gone?

6      A    Correct.

7      Q    Okay.

8      A    And that's -- and we talked about it and he said for

9  me to do that.  But then he has a memory lapse.  If it's not

10  in writing, whatever discussions we had -- we could have had a

11  billion discussions -- he will not remember.  It's only what

12  is in writing.  So it takes me twice as much time to write

13  everything out so that he can remember it.

14      Q    Okay.

15      A    So that's very hostile in that I have two -- I'm

16  carrying two jobs.  I'm still performing as a program officer.

17  I have the core responsibilities.  And on top of that I have

18  additional responsibilities.  So it's more than an 80 hour

19  work period for two weeks.  It's always 100 to 120 hours.  I

20  work through the weekends.  Many times I'd see Steve in the

21  office on the weekends before I had gotten my computer.  I was

22  staying late at nights and, and -- but it was never enough.

23  He was still sending e-mails to embarrass me and discredit me

24  and that's when Mike Petrelli told me that he had received all

25  those e-mails.

FREE STATE REPORTING, INC.

1    Q    And what other e-mails?  You just described one

2  where he questioned your -- he disagreed with a judgment call

3  you made.  What else has he done that you consider hostile?

4    A    Well, as a matter of record, I gave my

5  e-mails and in one e-mail it was when I was out sick.  I had -

6  - I was out with a thyroid condition.

7    Q    Right.

8    A    And I was on 13 pills a day to -- so that I could

9  handle this job and, and I had to go on leave to come off of

10  the pills so that they could prepare me for surgery.  And

11  Steve sends out an e-mail to the staff, suggesting that I was

12  not following up and doing what I was supposed to do and in

13  actuality I was.  I performed every task as a core and I spent

14  70 to 80 percent of my time , even through my

15  hospitalizations, my father's death and my illnesses, and with

16  use or lose time left, but he would suggest that I was not

17  performing.

18    Q    Would he suggest that just to you or --

19    A    At one point --

20    Q    -- to others?

21    A    Well, in this one particular e-mail because I

22  literally cried out.  I said I am ill.  Nobody wants to be

23  ill.  Because I was still grieving during that time, but he

24  had sent it out, this e-mail out as if I was not up to date

25  with preparing for the institute or the annual conference, et

1  to keep myself together.  I completed that review and all of

2  the panel members couldn't believe the organization because I

3  had everything laid out, A through Z.  It worked so smoothly,

4  and so I received all these positive comments.

5        And at the end of that review, I told Steve

6  -- I had gotten to the point where I could not walk from my

7  cubicle to the bathroom with a, with a straight gig because

8  the medicine was poisoning my system.  I was going to the rest

9  room, throwing up, coming back to the desk to work and I --

10  this one day Steve came by my cubicle and I said, "Steve, I

11  can't make this."  I said, "It's just too much."

12        And I had -- even though I had -- I said, "I've just

13  thrown up and I've got to come off of the medicine," and so I

14  thought that I would receive positive comments.  Patricia, you

15  gave away those $40 million and, and, and so now it's done.

16  We did have to -- one more piece to it and there were people

17  who were reviewing those applications, and that's when I went

18  on leave.

19        It came up for a peer award.  People started calling

20  me at home, said, "Patricia, you deserve this award."  And so

21  somebody submitted my name with what I had done because they

22  knew what I had gone through to have this review.  They knew

23  that I had taken over Daisy's job.  They knew that I was

24  working my own job.  They knew that I did not have assistance,

25  and so my name was up for this award.

1            We had an activity, a Christmas activity, and they

2    said, "Patricia, you received the first leadership award for

3    OII." It was so embarrassing. John Fiegel and Steve

4    Brockhouse looked at me as if -- I mean, as if it was the

5    worst thing that happened.

6        Q    Wait a minute. I'm not understanding. You got a

7    leadership award?

8        A    Yes.

9        Q    Why was that embarrassing?

10       A    No, because my, my supervisors looked at me as if I

11   shouldn't have gotten it. You would have thought that they

12   would have said, wow, this is somebody in our program.

13       Q    And that's part of your claim of hostile work

14   environment, the way they looked at you after you got an

15   award?

16       A    I'm saying that they did not want me to receive any

17   accolades for the work that I was doing. S I'm not getting it

18   on the performance evaluation and then when it's recognized in

19   the office, they were not happy for us, for me.

20       Q    And you base that conclusion solely on the way they

21   looked at you. Is that right?

22       A    Not solely on that. Donna Hoblet told me that they

23   did not want me to get that award.

24       Q    And how does she know?

25       A    Because she was a part of the committee deciding who

1  would get the award, so she said that.  You know, you

2  shouldn't have gotten it.  They didn't want you to have it.

3      Q    Is there --

4      A    And many times, many times, and even in evaluations,

5  in evaluation conference, Steve said, "Well, they don't like

6  you."

7      Q    Who said they don't like you?

8      A    Steve, Steve Brockhouse.

9      Q    Said to who?

10     A    To me.

11     Q    Who is they then?

12     A    He's talking about colleagues and, and people in the

13 executive office.  Oh, yes, he said that.

14     Q    Is there anything else that contributes to your

15 claim of hostile work environment?

16     A    Other than the e-mails and the attacks on me.  I

17 mean, there are many more.  It was so many I can't even of

18 them right now, but it was hostile.

19     Q    Okay.  Have you seen any doctors as a result of what

20 you -- what you're claiming is a hostile work environment or

21 the discrimination you claim you received?

22     A    During the time that I received my

23 diagnosis --

24     Q    Of thyroidism, correct?

25     A    Of thyroidism.


FREE STATE REPORTING, INC.