**IN UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CIVIL DIVISION**

| | |
|---|---|
| **PATRICIA KILBY-ROBB** ) | |
| **17001 SUMMERS LANE** ) | |
| **BADEN, MD 20613** ) | |
| ) | **Case No.: 05-2270** |
| **Plaintiff,** ) | **(JDB)** |
| ) | |
| **v.** ) | |
| ) | |
| **MARGARET SPELLINGS,** ) | |
| **SECRETARY, U.S. DEPARTMENT OF** ) | |
| **EDUCATION** ) | |
| **400 MARYLAND AVE., SW** ) | |
| **WASHINGTON, D.C. 20202** ) | |
| ) | |
| **Defendant.** ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Comes now Plaintiff Kilby-Robb, by and through counsel, and files this opposition to the Defendant's motion for summary judgment and in support thereof states as follows.

### Introduction

Plaintiff Patricia Kilby-Robb, an African American, GS-13 Program Officer at the U.S. Department of Education, and team leader for a $42 million dollar Department of Education program, filed this complaint of race and gender discrimination after she was subjected to disparate treatment in the terms and conditions of employment and a hostile work environment when she was required to work as an Acting Team Leader, beyond her grade 13 duties and position description, received an average performance appraisal, while Caucasian employees who did less work and lower level duties received higher

evaluations, and at least one male employee who did no work received the same performance appraisal as Ms. Kilby-Robb. The Agency has filed a motion for summary judgment. The Agency's motion is completely without merit and should be denied. A synopsis of the relevant facts are stated below.

1.      Plaintiff was hired as a GS-13 Program Specialist at the Department of Education, at working as an educator and principal for twenty five years. Ex A:

2.      Plaintiff was assigned to a team headed by Daisy Greenfield, an African American female. Id. at  . . .

3.      Greenfield was the team leader for the Parent Information and Resource Centers (PIRC) team, which included Greenfield, Plaintiff and Rachel Couch, an African American female. Id. at   An African American male, James Guitard, had been removed from the team before Ms. Kilby-Robb's arrival because he refused to work, an engaged in disruptive conduct detrimental to the team. Guitard was an author of three books and spent most of his time at work attending to his personal business, and Agency managers were aware that Guitard refused to perform any substantive work. Id.; Ex S.

4.      In the federal government, positions, not individuals are upgraded. The GS-13 position occupied by Greenfield was upgraded to grade 14 due in large part to the additional requirement of work as the PIRC team leader. Ex. D.   The Unique Position Requirements of the GS-14 position included: Oversees the operation of the Parental Assistance Program(PIRC). Serves as the Agency expert and Team Leader in the Area of Parental Assistance Program. Makes key decisions and recommendations regarding the Parental Assistance Program.  Id. at 3.

5.      The GS-14 program specialist served as: 1) the PIRC team leader; 2) the Contractor Officer's Representative; 3) the competition manager; and 4) the program administrator.  Ex. A.

6.      Prior to December 2002, Daisy Greenfield performed all of the GS-14 program specialist duties, and Plaintiff assisted her in performing some of the duties as a GS-13 program specialist. Ex. A:

7.      In 2002, there was a reorganization in the Parental Options and Information Office.

8.      After the reorganization, in addition to her GS-13 duties, Plaintiff Kilby Robb required to perform all of the duties on the GS-14 position description, formerly done by Greenfield, including serve as the 1) the PIRC team leader; 2) the Contractor Officer's Representative; 3) the competition manager; and 4) the program administrator.  Ex. G,  L, CC.  Plaintiff's GS-13 position description was almost identical to the job description of the GS-14 position held by Daisy Greenfield.  Compare Ex. C with Ex. D.

9.      As a result of the reorganization,  Fiegel supervised Steven Brockhouse and Brockhouse, Caucasian male, supervised six individuals,  Donna Hoblit, Richard Kress, Kay Wagner, all Caucasian and worked the Magnet Schools team, and Kilby Robb, Rachel Couch and James Guitard, all African American and worked on the PIRC team.

10.     Plaintiff met Dean Kearn, a Caucasian male, GS 14, when she was the acting team leader for PIRC and Kearn was a principal.  Kearn was asked to participate on one of her panels.  Plaintiff and Kearn had similar backgrounds of working as principals before joining the Department of Education.  Kearns was later hired by the Department of Education at a grade 14, while Plaintiff was hired as a grade 13.

11.     Daisy Greenfield declined to continue in her position as team leader for PIRC after the reorganization. Ex. A.

12.     As part of the reorganization, OII managers initially assigned James Guitard to a team lead by a Caucasian male, Jim Houser. Ex. M.  Guitard was reassigned because Houser would not allow him on his team.   In December 2002, Fiegel informed Plaintiff Kilby Robb that her team would consist of Rachael Couch and James Guitard, and she would report to the Deputy Director, Steven Brockhouse, Caucasian male.

13.     In the reorganization, Patricia Kilby Robb was assigned as the team leader for PIRC.  Prior to accepting the position, she was informed by the Director, John Fiegel that the PIRC team leader position would be announced at a grade 14.  Ex. A:

14.     From January 2003 through April 2003, James Guitard refused to do any work, and Plaintiff Kilby Robb was required to perform her duties as GS-13 program specialist, as well as acting PIRC team leader, COR and national expert.

15.     Steve Brockhouse did not perform any substantive work in the PIRC program and deferred to Kilby Robb for all work in the PIRC program.  Kilby Robb ran the $42 million dollar project from December 2002 through April with virtually little help.  Ex. EE.  Brockhouse was not even familiar with how with PIRC program was run in December 2002.  Ex.  FF.

16.     As of June 2003, Brockhouse had not even read the statement of work for the contractor PIRC.  Ex. U.

17.     Donna Hoblett and Richard Kress did dramatically less work and had lower level duties than Patricia Kilby Robb after January 2003.  Ex. N and Z.

18.    Plaintiff Kilby Robb was the acting team leader, COR and national expert; Hoblett and Kress were team members and not team leaders, and had no COR responsibilities.  Ex. N.

19.    Plaintiff Kilby Robb managed the PIRC program and received excellent reviews of her work, and received the Leadership Award for 2003.   Ex. K.

20.    In 2003, the Agency utilized a five tier scale for performance appraisals.   For the review of her work from January 2003 through April 2003, Plaintiff and the other two African Americans on her team, Couch and Guitard, received an average rating, or "successful" rating from Brockhouse.  Ex. B 11.  Hoblett and Kress received a "highly successful" ratings by Brockhouse.  Id.  The only Caucasian under Brockhouse who received a successful rating was Kay Wagner, who had previously announced that she was retiring from the Agency.

21.    The Agency issued performance based bonuses in September 2003.  Plaintiff received a $500 bonus.  Ex. P.  Kress received a $2000 bonus and Hoblett received a $2500 bonus.  Id.  The other team leaders, Kearns and Houser received $3000 bonuses. Id.

22.    After Plaintiff refused to sign her evaluation, submitted a rebuttal and filed an EEO complaint, John Fiegel and Steven Brockhouse created a hostile working environment for Plaintiff Kilby Robb.  Ex. N.

23.    Brockhouse and the Agency had a history of discriminating against African Americans.  According to Wanda Gill, an African American female, she was hired as a Senior Advisor to a senior level advisor to Dr. Art Cole, who was a supervisor to John Fiegel and Steven Brockhouse.  Ex. B.  According to Ms. Gill, she observed Brockhouse

and Fiegel's behavior and interaction with staff members.  Id. She recalled that on one

occasion, she had to leave the office earlier than usual one day.  Brockhouse attempted to

impress an Asian coworker by pointing to his watch.  Ms. Gill had to correct Brockhouse

and remind him that if either one of them was to monitor the arrival and departure of the

other, it would be the other way around.  Ms. Gill recalled that Fiegel withheld a position

she sought.  Id.   Ms. Gill commented that Agency management did not believe there

were qualified African American males.  She noted that Ms. Kilby Robb was hired at the

same time as a Caucasian female who had the same experience as principals of schools,

but the Caucasian female was hired as a GS-14 and Ms. Kilby Robb was hired at a 13.

Id. at 3. According to Ms. Gill, the Agency promoted the Caucasian female to grade 15 to

avoid having her report to Ms. Gill.  Id.  Finally, Ms. Gill noted that the Agency used a

ploy to get around promoting African Americans by requiring that applicants have private

school experience for a position in the Office of Non-Public Education into GS-13/14

positions.   EX. B at 3.

24.     The actions of Brockhouse was subject of a prior discrimination lawsuit which

resulted in a Class Action lawsuit by African American employees, which was settled by

the Department of Education.  Steve Brockhouse was the supervisor of the name Plaintiff

Valerie Grant, which was ultimately settled by the Department of Education and resulted

in promotions and other relief for African American employees. Ex. W.

25.     Brockhouse publicly admonished Kilby Robb in the presence of staff member and

managers.  Ex. U.

26.     Brockhouse directed another employee to criticize the work of the Plaintiff in a

staff meeting, so he would not have to.  Ex. N.   Brockhouse directed an employee to

exclude Plaintiff from consideration of a peer award because he was trying to terminate her and an award would make it more difficult to do so. Id.  Brockhouse commented that it was stupid that racial discrimination was once considered a civil rather than criminal offense.  Id.

27.    Fiegel told the Plaintiff that he would not submit the paperwork for a GS-14 PIRC team leader position because she file an EEO compliant, and later told her he did not like her personally and he wanted her off his team and also asked that she resign her position and leave the Department of Education. Ex. A.

28.    The Agency follows OPM staffing guidelines which require an employee to be compensated if they perform higher graded duties or are detailed to a higher graded position more than 120 days.  Ex. F.  Plaintiff has performed all duties in the GS-14 position description for four and one half years without compensation.

**Statement of Material Facts in Dispute**

Plaintiff submits that Defendant's Statement of Material Facts which it contends are not in dispute omits many relevant facts in the record, and there are disputed facts which remain for trial, critical of which is whether Plaintiff performed the GS-14 program specialist duties. Ex. D.

1.    No dispute.

2.    No dispute.

3.    No dispute

4.    No dispute

5.    No dispute

6.    Dispute.  Plaintiff was required to perform all duties previously performed by

Daisy Greenfield, the GS-14 program specialist, including 1) the PIRC team leader; 2) the Contractor Officer's Representative; 3) the competition manager; and 4) the program administrator. Ex. G, L, CC. Plaintiff's GS-13 position description was almost identical to the job description of the GS-14 position held by Daisy Greenfield. Compare Ex. C with Ex. D.

7.      Dispute. Team leader duties are established by the Agency and may include some duties which may be considered supervisory in nature. Ex F.

8.      Dispute. Plaintiff performed all duties performed by her GS-14 predecessor, and repeatedly requested an accretion in duties/desk audit from the time she began the position and she was told the position would be advertised as a 14. Ex. B generally.

9 and 10.      Not disputed that Plaintiff's evaluation was "successful," but disputes that it was not discriminatory. Plaintiff's supervisor, Brockhouse, who was not familiar with the work of the PIRC program had not even read the statement of work for the contractor PIRC received an Outstanding appraisal for his oversight the PIRC program in part. Ex. B at 11, U, FF. Donna Hoblett and Richard Kress, GS-13 program specialists, who did dramatically less work and had lower level duties than Patricia Kilby Robb after January 2003, received a higher rating that Kilby Robb. Ex. N and Z. Plaintiff Kilby Robb was the acting team leader, COR and national expert; Hoblett and Kress were team members and not team leaders, and no COR responsibilities. Ex. N. Plaintiff Kilby Robb managed the PIRC program and received excellent reviews of her work, and received the Leadership Award for 2003, but received the same evaluation as an employee on her team who did no work. Ex. K. For the review of her work from January 2003 through April 2003, Plaintiff and the other two African Americans on her team, Couch and

Guitard, received an average rating, or "successful" rating.  Ex. B 11.  Hoblett and Kress

received a "highly successful" ratings by Brockhouse.  Id.  The only Caucasian under

Brockhouse who received a successful rating was Kay Wagner, who had previously

announced that she was retiring from the Agency.

11.  Not disputed that Plaintiff received a cash award of $500 but disputes that the award

was not discriminatory.  Plaintiff received a $500 bonus.  Ex. P.  Kress and Hoblett

received $2500 bonuses.  Id.  The other team leaders, Kearns and Houser received $3000

bonuses.  Id.

**Background**

Plaintiff's Background Before Employment at the Department of Education

Prior to her employment at the Department of Education,  the Plaintiff had

educational experience and expertise at the federal, state, district, and local school level.

She had been a school administrator, including a Principal (Elementary-Middle-

Alternative High School and Adult Education Center), Assistant Principal, and

Community Education Director. During her tenure, she had been named "Principal of the

Year' and was considered distinguished and had received many honors.

Plaintiff possessed more than twenty-five years of management, supervisory, and

administrative experience in the field of education for K-12, adult, vocational, and

community education programs. Plaintiff demonstrated highly skilled leadership

capabilities: problem solving, strategic planning and analytical thinking; judgment,

organizational ability; decisiveness; sensitivity; consensus building and team

development; stress tolerance; oral and written communication; personal motivation and

related values. She had consulting expertise in turning around low-performing schools,

comprehensive educational reform models, and research at the local, district, and national levels. She developed excellent skills in community and clinical psychology with specialized training to effectively implement reform strategies to develop highly successful people as well as create high performance organizations.

Before and after becoming an employee at the Department of Education, the Office of Personnel Management (OPM) reviewed the Plaintiff's credentials for GS-14 and 15 level federal government positions certifying her at two grade levels above the GS-13 level. She had interviews for GS-15 positions.

Plaintiff's Initial Position at the Agency.

Plaintiff began employment at the Agency in 2001 as a GS-13 Program Specialist in the Parent Information and Resource Centers ("PIRC").

The Parent Information and Resource Centers are authorized to strengthen partnerships among parents and school personnel in meeting the educational needs of children (including children from birth through age 5); strengthen partnerships between parents and their children's school; coordinate activities with those funded under section 1118 of the Act; and provide a comprehensive approach to improving student learning through coordination and integration of Federal, State, and local services and programs.

The projects are awarded to nonprofit organizations and nonprofit organizations in consortium with local educational agencies.  The PIRCs were funded for up to 48 months and in 2003 changed to 36 months.  While there is some similarity in the types of services that the PIRCs are providing, each has been designed to meet the unique needs of the parents in their State and therefore, each has distinct characteristics relative to their organizational structure, service delivery strategies, target groups, etc.  All are required to

serve both urban and rural areas and to implement an early childhood parent education program.

The Department has funded PIRCs since 1995. Legislation reauthorizing the PIRCs was enacted in January 2002 significantly changing the focus of the program from addressing the needs of parents who have pre-school youngsters to addressing the needs of parents to effect their children's academic achievement in school. The Plaintiff's knowledge and experience in early childhood education as well as pedagogy were essential for managing and monitoring PIRC grants. Twenty-eight of the PIRCs were funded under the previous legislation and continued for an additional year under the new legislation. Many of the existing PIRCs were expected to reapply under the FY 2002 competition and will then implement a project under the new legislation. All of these PIRCs required assistance in transitioning to a different type of service under the new legislation. [Parent Information and Resource Centers: Fact Sheet provides information on background on funding history].

By 2002 under the leadership of Daisy Greenfield, PIRC Team Leader, there were 66 PIRCs in existence, located in every State, the District of Columbia, the Virgin Islands, Puerto Rico, and the outlying Pacific Islands. There were eight States that had two PIRCs. In 2003, under the leadership of Patricia Kilby-Robb, Acting PIRC Team Leader, the number grew to approximately almost 100 existing PIRCs, including PIRCs on no-cost extensions. The 2002 and 2003 funded PIRCs all were slated to end in 2006. The program had grown from $10 million to a $40 million dollar program. For 2006, 60 new grants were awarded for 60 months. In the beginning of this fiscal year, there were 99 PIRCs in operation including no cost extension PIRCs.

Due to the transition to the new legislation, No Child left Behind, Title V, Part D, Subpart 16, the Acting PIRC Team Leader had demands and challenges that were not presented under the tenure of Daisy Greenfield.

The NCLB authorizes the PIRCs to use the funds for one or more of the following:

1) to assist parents in participating effectively in their children's education and to help their children meet State and local standards;

2) to obtain information about the range of options, programs, services, and resources available at the national, State, and local levels to assist parents and school personnel who work with parents;

3) to help parents learn and use the technology applied in their children's education;

4) To plan, and implement activities for parents that coordinate the education of their children with other Federal, State, and local services and programs that serve their children or their families;

5) To provide support for State or local educational personnel, if the participation of such personnel will further the activities assisted under the grant; 6) to coordinate and integrate early childhood programs with school-age programs.

While the legislation provides a broad menu of possibilities from which PIRCs may choose, there are six purposes, fourteen statutory, and rigorous (numerical and effectiveness) data requirements that all PIRCs must fulfill.  Each center funded under the Parent Information and Resource Center program must serve both urban and rural areas, areas with high concentrations of low-income families, minority, limited English proficient parents, and parents who are economically and educationally disadvantaged. In addition, each center must also network with clearinghouses, other parent centers,

organizations and agencies, as well as use 30 percent of the grant funds to establish, expand, or operate the Parents As Teachers program, the Home Instructional Program for Preschool Youngsters, or another early childhood parent education program and 50 percent of the funds used to meet the needs of low-income, disadvantage parents living in high-poverty areas.

In addition to the law, a major priority was added for ED is to ensure that the PIRCs have accurate information and are able to assist parents in availing themselves of the rights that are afforded to them under Section 1116 of Title 1, Part A, that relates to supplemental services and public parental choice.

The PIRCs were mandated to play a critical role in supporting parents' involvement in effecting their children's academic achievement. To fulfill this function, the PIRCs need ready access to research-based strategies, resources, Federal and State laws and requirements, and modern technology that impacts project management and service delivery.

During Daisy Greenfield's tenure as the PIRC Team Leader and a seasoned contract officer's representative (COR), the PIRC program utilized the services of three contracts. To fulfill the requirements of the new law, in 2002, the PIRC Team under her leadership, one Contractor, RMC Research Corporation, was selected to provide more comprehensive and coordinated technical assistance to the PIRCs. RMC was designated to address the collective needs of PIRCs and strengthen the management and implementation of their projects. A major change to Contract deliverables was to synthesize and analyze PIRC effectiveness data through the compilation of Local Evaluation Reports. Even though the Scope of Work (SOW) and the selection occurred

under Daisy Greenfield, in 2002, John Fiegel informed the newly appointed Acting PIRC Team Leader as well as Daisy Greenfield, she was appointed to serve as the new government's contract officer's representative in her place. In 2006, the contract was awarded to establish a National Parental Information and Resource Coordination Center. The National Coordination Center is lead by Southwest Educational Development Laboratory in collaboration with Harvard Research Project. In addition to the requirements of the law, four new Departmental priorities were added to the grantee and contractor responsibilities: 1) statewide impact; 2) greater emphasis on Early Childhood component; 3) greater emphasis on Title I. Part A, Sec 1116 in providing information on state accountability systems, supplemental educational services and public school choice to parents in schools that are not making ayp; 4) greater emphasis on Title I. Part A, Sec 1118 in increasing parental involvement to improve academic achievement and school success. The Department also added a research priority: increased emphasis on quasi-experimental and experimental designs to ensure PIRCs were collecting credible, reliable, robust data. As the government's representative, the Acting PIRC Team Leader is working closely with the National PIRC Coordination Center with Harvard to provide technical assistance to move in program forward. [ Documentation: Sample Scope of Work for RMC Research Corporation and Sample deliverables; Scope of Work for National PIRC Coordination Center under the auspices of Southwest Educational Development Laboratory and Harvard, ]

Daisy Greenfield's Duties

    A document entitled (Goals) 2000/TLCF State Assignments provides a list of states for each member. Due to her role as PIRC Team Leader, Daisy Greenfield did not

have any States assigned to her.  In their capacity as education program specialists,

Rachael Couch was assigned RST 5, which included 9 states and the Plaintiff was

assigned RST 7, which included 8 states.  Daisy Greenfield's primary assignments dealt

specifically with the PIRC program with no State assignments. All three PIRC Team

members were assigned PIRCs to manage as program officers.


      The Plaintiff's position as a GS-13, education program specialist, in OESE was

equivalent in duties and responsibilities to Richard Kress's current position in POI/OII.

[Documentation: 2000/TLCF State Assignments and PIRC Assignments: Daisy

Greenfield; Rachael Couch; Patricia Kilby-Robb].

      When the Plaintiff was assigned to the PIRC Team in 2001, less than one year

before the transition from the Office of Elementary and Secondary Education (OESE) to

the Office of Innovation and Improvement (OII) and the reorganization, she replaced

Marcia Kingman ( Marcia Kingman, Caucasian female, has been promoted at least two

grade levels during this same time period-2002-present) in the Office of Goals 2000/

School Support and Technology Programs. The Team consisted of Daisy Greenfield

PIRC Team Leader, Rachael Couch (one year on team as a GS-12 but has been promoted

to the same grade level as the Plaintiff during this same time period 2003-present) and

newly assigned Patricia Kilby-Robb (no promotions, no QSIs, no in-grade step increases,

lowered evaluations). **James Guitard was not a member of the team when the**

**transfer and reorganization occurred**. His supervisor, Audrey Smith with the

recommendation from the Team Leader, Daisy Greenfield terminated him from the

Team. Dennis Koeppel was the program attorney and was quite familiar with James

Guitard's behavior and reputation. This employee's reputation was discussed as an open conversation.

The Plaintiff was new to the team and had never met James Guitard. There were rumors about an incident where he was disruptive and divisive and he took over the control of female employees to prevent work processes on Chuck Lovett's Team. The situation escalated and almost ended in a physical altercation.  When he was on Daisy Greenfield's Team, the Plaintiff and others were informed he gave erroneous information and was negative about the government to grantees and disappeared during critical events and many other incidents of disruptive counter-productive behavior. Cindy Cisneros, Caucasian female (GS-15) had collected 2 notebooks of documentation; his supervisor, Audrey Smith ended up in the EEO process in reference to James and discussed the serious situation with the Plaintiff to advise her. James had written or co-authored at least 3 books: Chocolate Thoughts, Mocha Love, and Blessed Assurances before the PIRC program physically moved to OII's location on the 4th floor. Pages of his materials would some times get mixed in with the Plaintiff's work on the printer. Both PIRC Directors as well as the RMC Research Corporation (Contractor) received complaints about James Guitard. Grantees begged for assistance and when Steve Brockhouse assigned him as a program officer they requested to be changed or relied on the Acting Team Leader for assistance- 100% of his assigned grantees received some if not all of the assistance. [Sharon Spann, Marcia Kingman, Joyce Murphy, Milagros Lanaze, Clara Keith (Georgia State Title I Director), Jim Houser, Chuck Lovett, and Cindy Cisneros; PIRC grantees from 1999, 2002 and 2003; Kate Gill Kressley/RMC Research Corporation].  James Guitard's reputation was echoed all over the Department, when the Plaintiff started her

counseling with IDRC, the Counselor asked her about James Guitard. Since moving to POI, Team members Rik Lanzendorfer, Richard Kress, and Donna Hoblit have gained knowledge about James Guitard. John Fiegel, and Steve Brockhouse have gained knowledge about this employee's work, but embraced and support James. Early in 2002, John Fiegel informed the Plaintiff that Audrey Smith and Daisy Greenfield shared information with him about James Guitard. Jim Houser also discussed issues with the Plaintiff about James Guitard. The Plaintiff saw the placement for each employee and James Guitard had been assigned to Jim Houser who had become as GS-15. Due to the volume of work, complexity of the program, and and magnitude of responsibility. The Plaintiff was grateful that James was not her Team, but that was short-lived because James Guitard was somehow assigned to her---all three African-Americans together and the only Team in OII with a Deputy Director. Since it was only 6 people, the Plaintiff observed that this was usual.

[Reorganization documentation identifying James' Guitard assignment approved by the Union]


In 2001, e-mails and assignment charts show that the Plaintiff served as a program officer and was in the learning mode. Since she was newly appointed to the PIRC program and she was learning how the process worked and the technical aspects of the assignment. Her supervisor, Audrey Smith, and Team Leader, Daisy Greenfield, referred her to courses and training opportunities. She took both grants management training courses as well as COR classes. Daisy Greenfield was the Team Leader. Daisy Greenfield assigned tasks. Daisy explained and implemented work processes. Daisy gave

the final approval for products.   [e-mails indicating GS-13 level of duties and responsibilities.]

When Greenfield was the PIRC Team Leader, she described her position to include four major areas: PIRC Team Leader with national expert visibility, PIRC Program Administration; Competition Manager; and Contract Officer's Representative (COR). The position required analytical acumen as well as management and organization skills.

As the national PIRC expert, Daisy Greenfield represented the PIRC, provided technical assistance, responded to telephone inquiries, e-mails, other request for information, and responded to follow-up questions from the public about the grant application package and the PIRC program. Daisy made presentation at conferences, institutes, sent information to all of the PIRC Directors, worked with national parental involvement organizations, and represented the program in senior staff meetings. The Plaintiff role was minimal, but she attended to assist Daisy.

In addition, Daisy Greenfield was the government contract officer's representative, COR. Based on the complexity and nature of the PIRC program, Contractors served as the nucleus for the program and the COR's role was paramount to the day-to-day functioning of the program administration. The COR dictated the major work and work processes of the PIRCs. As a GS-13, the Plaintiff was just a member of the PIRC Team and had assigned States to monitor. Rachael Couch had the longest tenure on the team.

 Daisy Greenfield's Desk Audit

The PIRC Team Leader position (GS-14) was classified through a desk audit in Human Resources conducted by Vicky Cosey, personnel specialist. The Agency has reported that they have lost the desk audit evaluation. Daisy Greenfield's desk audit classification of GS-14 was based primarily on PIRCs and on her work with the PIRC program. However, each government employee may be called upon to perform other duties voluntarily or as need basis. This is a standard practice.

Reorganization Announcement

In 2002, there was a reorganization in OII which affected the PIRC. When the reorganization was announced, Daisy Greenfield refused to go to OII. She met with the Plaintiff and discussed the reasons for not transferring and abdicated her position for not only the PIRC Team Leader, but also the COR. Plaintiff was appointed at the Acting PIRC Team Leader. After the appointment of the Plaintiff to the Acting PIRC Team Leader position Greenfield turned over all books and gave all of her duties and responsibilities to the Plaintiff. Initially, she continued to work with the Plaintiff as the COR until she provided sufficient orientation and training.

Plaintiff's Duties After the Reorganization

Because the Agency has attempted to minimize quantity and quality of work performed by the Plaintiff, the Plaintiff believes it is necessary to demonstrate to the court the amount of work she was required to perform. The excerpts below are taken from Exhibits H and I.

The PIRC program is complex and multifaceted. Since there are six purposes and fourteen assurances, the Team Leader should be well versed in parental involvement

theory and practices and have knowledge of pedagogy, schools and academic achievement.

Typically, a team leader assists the team through knowledge and application of leadership and team building skills such as group facilitation, consensus building, coordination, coaching, problem solving, interpersonal communication, integration of work processes and products, obtaining resources and liaison with the supervisor. They and the team are accountable for outcomes and results.

According to the Office of Personnel Management/U.S. Department of Education, the Team Leader position description is for employees who regularly and routinely spend 25 percent or more of their time leading a team of other GS employees in accomplishing two-grade interval work and meeting the minimum criteria below.

Provide feedback and opportunities for Team involvement/input and in the PIRC administration, grants management, and the review process, and national information.

_____1. Ensure that the organization's strategic plan, mission, vision, and values are communicated to the team and integrated into the team's strategies, goals, objectives, work plans and work products and services.

_____2. Articulate and communicate to the team the assignment, project, problem to be solved, actionable events, milestones, and/or program issues under review, and deadlines and time frames for completion.

_____3. Coach the team in the selection and application of appropriate problem solving methods and techniques, provide advice on work methods, practices and procedures, and assist the team and/or individual members in identifying the parameters of a viable solution;

_____4. Lead the team in: identifying, distributing and balancing workload and tasks among employees in accordance with established work flow, skill level and/or occupational specialization; making adjustments to accomplish the workload in accordance with established priorities to ensure timely accomplishment of



assigned team tasks; and ensuring that each employee has an integral role in developing the final team product;

____5. Train or arrange for the training of team members in methods and techniques of team building and working in teams to accomplish tasks or projects, and provide or arrange for specific administrative or technical training necessary for accomplishment of individual and team tasks

____6. Monitor and report on the status and progress of work, checking on work in progress and reviewing completed work to see that the supervisor=s instructions on work priorities, methods, deadlines and quality have been met;

____7. Serve as coach, facilitator and/or negotiator in coordinating team initiatives and in consensus building activities among team members;

____8. Maintain program and administrative reference materials, project files and relevant background documents and make available policies, procedures and written instructions from the supervisor; maintain current knowledge to answer questions from team members on procedures, policies, directives, etc.;

____9. Prepare reports and maintain records of work accomplishments and administrative information, as required, and coordinate the preparation, presentation and communication of work-related information to the supervisor;

____10.    Represent the team in dealings with the supervisor or manager for the purpose of obtaining resources (e.g., computer hardware and software, use of overtime or compensatory time), and securing needed information or decisions from the supervisor on major work problems and issues that arise;

____11.    Report to the supervisor periodically on team and individual work accomplishments, problems, progress in mastering tasks and work processes, and individual and team training needs;

____12.    Represent the team consensus and convey the team=s findings and recommendations in  meetings and dealings with other team leaders, program officials, the public and other customers on issues related to or that have an impact on the team=s objectives, work products and/or tasks;

____13.    Estimate and report to the team on progress in meeting established milestones and deadlines for completion of assignments, projects and tasks, and ensure that all team members are aware of and participate in planning for achievement of team goals and objectives;

____14.    Research, learn and apply a wide range of qualitative and/or quantitative methods to identify, assess, analyze and improve team effectiveness, efficiency and work products;

21

____15.    Lead the team in assessing its strengths and weaknesses and provide leadership to the team in exploring alternatives and determining what improvements can be made (e.g., in work methods, processes and procedures);

____16.    Approve emergency leave for up to three days; eight hours or less for medical appointments; and/or other types of leave as delegated by management;

____17.    Resolve simple, informal complaints of employees and refer others, such as formal grievances and appeals, to the supervisor or an appropriate management official;

____18.    Communicate team consensus and recommendations to the supervisor on actions affecting team and individual awards, rewards and recognition;

____19.    Inform employees of available employee benefits, services and work related activities;

____20.    Intercede with the supervisor on behalf of the team to inform the supervisor of performance management issues/problems and to recommend/request related actions, such as: assignments, reassignments, promotions, tour of duty changes, peer reviews and performance appraisals.

Plaintiff has submitted an official documentation of the differences between

Supervisor and Team Leader. Ex.  E.

The PIRC Team Leader/program administrator delivers quality products and services that address customer requirements. The PIRC Team Leader administers the program by:

a) **Coordinating the needs assessment for Continuous program improvement;**
b) **Approving Parental Information and Resource Center Director's Planning Committee;**
c) Approving National Parental Involvement Research and Evaluation Panel of experts;
d) Working with PIRC Directors collectively to determine technical assistance support.

e) **Needs Assessment and Strategy Development Plans and Implementation for PIRCs**

**The Team Leader/Program Administrator reviews Program Management and Organization Needs of PIRCs:**

a) Internal controls,
b) Use of technology to manage their projects and deliver services,
c) Project management strategies, including, but not limited to, hiring and retaining qualified key staff, implementing and evaluating key components of the project,
d) Staying current on relevant research, Federal programs, State and local educational issues, and
e) Data collection and evaluation
f) Serving as a network of technical assistance providers.

The Team Leader utilizes Contractors to develop plan for assessing PIRC needs in the context of the requirements set forth at sections 5563, 5564, and 5565 of the authorizing legislation.  The plan shall include:

- Methods of assessing and analyzing the needs of the PIRCs (data collection and analysis procedures)
- Methods for identifying available resources, gaps in resources and strategies to fill the gaps,
- Strategies for managing the technical assistance that is proposed to meet the needs of the PIRCs.  This should include a plan for service delivery that addresses proposed services, staff allocations and timelines.

Assists in the development of Summary of Needs Assessment Report to include: a prioritization of the needs, an examination of needs relative to regions of the country, types of services provided, methods of delivering services to urban vs. rural populations, types of services targeted to different populations, e.g., school personnel, parents, limited-English proficient, etc., variances of needs between new projects vs. continuation projects, identification of types of early childhood parenting components used, where they are used and for whom, similarities and difference among  projects that receive $300,000 or less and those that receive more than $300,000.  Data that is obtained in the needs assessment compiled in an electronic database that allows for cross-referencing and comparison of various data elements.

The Team Leader assists in program Implementation and in the determination of

best practices, Federal program legislation, and materials relevant to State and national

initiatives.  Provide information for new PIRCS to use PIRCs may use immediately in the

implementation of their projects or in providing direct services to their constituents.

The Team Leader assists in updating the Technical Assistance Plan that responds to the needs that were identified in the Final Summary Needs Assessment Report. The Technical Assistance Plan include the types of services to be provided, who will provide the services, timeline for service delivery, method services will be delivered and how services will be evaluated to determine the benefits received by participants.

The Team Leader develops the Compliance Monitoring (Program Officer) Plan for On-going Technical Assistance to grantees focused on performance and results while guarding against fraud, waste, and abuse.

Daisy Greenfield served as the lead for the Compliance Monitoring Plan for program officers. The Plaintiff was ONLY a program officer and did not have lead responsibility for development of the plan.  It is only the program officer duties that are the same as the GS-13 position. This was not a change in the Plaintiff's duties and responsibilities because the Plaintiff had been assigned States and PIRCs as an educational program specialist. However, the change included leading other staff in work processes. After assuming the position of Acting Team Leader, the Plaintiff not only monitored her grantees, but also assisted other Team members in critical situations esp. follow up with audit issues and OGC and state IG investigations.

Daisy Greenfield served as the lead in the preparation and coordination of PIRC Technical Assistance to PIRC Team and other Programs and the Acting Team Leader assumed this responsibility as well.  Information was provided to Team members for feedback and input.

*Third Major Responsibility Change: Director Appointed Plaintiff as Contractor Officer's Representative (COR)*

As the  Contractor Officer's Representative, Plaintiff initiated this work in October 2002.  She was officially appointed as the COR in January 2003 and she signed a Contractual Agreement in April 2003.

As the GS-13, the Plaintiff only assisted Daisy Greenfield on an as needed basis. It is the COR that writes the Scope of Work for the contractor; therefore, it is the Scope of Work that provides the structure for management delivery, service delivery, and implementation of best practices using evidence- based processes and research to the PIRCs.  The COR monitors and evaluates the work of the contract. It is the COR that sets the tone and direction of PIRC work and clarifies policy and the law. The COR plays a pivotal role in every facet of program administration, leadership, and management.

The Technical Assistance Coordination Center for the Parental information and Resource Centers (documented results) responsibilities all fell under Daisy Greenfield's purview:

- Monitor technical assistance efforts conducted contractor. Technical assistance is continuous and serves as the major work of the coordination center (provided on a daily basis). During this past year, PIRC directors call on a regular basis to the coordination center to request assistance and the key staff at the center make periodic telephone calls to the PIRCS to provide assistance.

- Informational Packets/PIRC website and PIRC MALL: PIRCs play a critical role in information dissemination on supplemental educational services, choice, state accountability systems as well as strategies designed to support parents' involvement in effecting their children's academic achievement.  To fulfill this function, the PIRCs needed ready access to research-based strategies, resources, Federal and State laws and requirements, and modern technology that impacted project management and service delivery.  As the Team Leader, the Plaintiff provides technical assistance to address the collective needs of all of the PIRCs to strengthen the management and implementation of their projects.

In 2002, Daisy Greenfield performed these duties and responsibilities and assigned

tasks based on Team availability.  The Plaintiff was given these same duties and

responsibilities for the Contractor. In the GS-13 position, this was all new to the Plaintiff.

This was a new contract that was assigned to the Plaintiff when she became the COR.

The Plaintiff has since served as the Contract Evaluation Chairperson and selected a new

contractor for 60 months. She is completing work assignment under the old contract and

monitoring the new contract as well.


The COR assumes the lead in the process of reviewing, evaluating, selecting, and
awarding the PIRC Technical Assistance Contract including: writing PIRC Technical
Review and Evaluation Plan, Statement of Work, Technical Review criteria, identifying
panel members, and overseeing the process through contract selection in accordance with
Department policies and procedures. The Plaintiff served as the Chairperson for the
Technical Evaluation Contract Review in 2006.

> Develop the PIRC Technical Contract Evaluation Review Plan in    accordance
> with the policies and procedures.

- Serve as the Chairperson of the PIRC contract review process
- Monitor the entire evaluation process- Send out notices to panel members,
  established and organize evaluation process.
- Coordinate planning/implementation meetings with the Contact Specialists/Office
- Establish schedule of activities, provided all materials relevant to the contract
  evaluation process, maintained contact, and provided continuous feedback to
  Contract Officer and other senior staff and officials.
- Provide information and requested input from Team members/Panel Monitors

This task order requires the Contractor to establish and operate a coordination center
for technical assistance to the Parental Information and Resource Centers (PIRCs) for the
Office of Innovation and Improvement (OII) as described in the project activity section.
The COR assess the contractor's performance for the following key tasks:

a. Task 2: Needs Assessment and Strategy Development
b. Task 3: Collect, Compile, Synthesize and Disseminate Information
c. Task 4: Create and Maintain an Electronic Network
d. Task 5:  Plan and Carryout New Grantee Director's Orientation Meeting
e. Task 6: Plan and Carryout Annual PIRC Director's National Conference
f. Task 7: Plan and Sponsor Three Regional Institutes
g. Task 8: Performance and Evaluation Measurement System

*New Grantee Orientation (documented results)*

- Planned/ commented/ and recommended approval of the New Grantee Orientation

The orientation of new grantees is designed to prepare the grantee for program implementation, grant administration/management, performance and evaluation of projects (EDGAR). This technical assistance opportunity is extremely valuable to guard against fraud, waste, and abuse of federal funds.

- Information was provided to Team members for feedback and input.
- Technical assistance and compliance monitoring opportunities were provided to PIRC Program Officers to meet with new grantees in small groups as well as individually.
- Coordinated participation of key ED national experts in OII, Title I, faith-based initiatives, GPOS, etc.
- Planned/ commented/ and recommended approval of the PIRC Institute Plan.

**Regional Institutes (documented results)**

The institutes were designed as technical assistance opportunities to facilitate intensive small group learning/working sessions that focused on the objectives and goals of the Strategic Plan/NCLB/and other ED initiatives.

- Review/comment/ approve the agenda (dates, location, themes, specific objectives, dates, and locations, agenda, and presenters for the Regional Institutes.   Submitted agenda for OII approval.
- Institutes focus on areas of study such as: priority (information on pubic school choice, supplemental educational services, and state standards contained in the PIRC application); the 14 statutory requirements in NCLB, performance (Annual and Final Performance Report draft document) and evaluation (local).
- Technical assistance and compliance monitoring opportunities are incorporated in the agenda for PIRC Program Officers for small group and individual appointments.
- In addition to the planning, coordination and monitoring role as the COR, the Plaintiff serves as a program officer and participated in small group technical assistance sessions and schedule individual compliance meetings with not only her grantees, but also the other Team members' grantees that need.
- Share  follow up information with Team members for feedback and input.

Based on meetings with OII (Deputy Associate Secretary, Director of

Communications, and other Contract representatives), the Plaintiff has the responsibility

to invite organizations that were recommended as possible participants in the National

Conference to the working sessions at the institutes. The national conference and

institutes are used to introduce the parent-focused organizations to the PIRCs. The

institute expanded linkages and improved communication among the ED, Technical

Assistance Coordination Center, the PIRCs, and the parent-focuses organizations

involved in improving parental and family involvement in education and public school

choice.

**National PIRC Directors' Conference (documented results)**
- Plan/ made revisions and recommend approval of the PIRC Directors' National Conference Plan.
- Coordinate participation of key ED national experts in OII, Title I, faith-based initiatives, GPOS, OELA and in the field of education.
- Review/comment/ approve the agenda draft/ submitted agenda for OII approval (dates, location, themes, specific objectives, dates, agenda, and presenters for the Conference) Approve the conference agenda, conference facility, and any and all conference speakers, topics, presentations, materials to be disseminated, and costs prior to the submission of the final Annual PIRC Director's National Conference Plan.  Work with the Contractors to carryout the conference in accordance with the approved Final Annual PIRC Directors' National Conference Plan and agenda.

- Technical assistance and compliance monitoring opportunities are incorporated in the agenda for PIRC Program Officers for small group and individual appointments.
- As a program officer, the Plaintiff participate in small group technical assistance sessions and scheduled individual compliance meetings with not only my grantees, but the other Team members' grantees needing assistance as well. (Requests for assistance based on lack of response from Team members)
- Approve research-based parent involvement strategies and relevant materials to assist PIRCs in implementing their projects as a part of technical assistance.

- COR must stay abreast of changes and updates in contract law and Department process, including technological changes. The COR attends Advanced training sessions and must receive recertification as Contract Officer's Representative (COR).
- COR responsibilities are vital to the work of the Parental Information and Resource Center program. The COR provides direction and focus to the program as well as management and Team members.
- The COR schedules ED/RMC meetings.

- The COR monitors and evaluates the contractor's performance to ensure compliance with technical requirements including review of deliverables and evaluation of reports and recommends final acceptance or rejection to the CO. The deliverables include:
  - All written reports and plans, including need assessment and strategy development; technical assistance, summary performance reports, and data analysis reports, monthly management reports, business reports, etc.
  - New Grantee Orientation (documented);
  - Regional Institutes (documented);
  - National Director's Conference (documented);
  - Performance Measurement System (Annual and Final Performance
  - Report document) and web-based data collection system (Documented);
    PIRC website (Public and Private) (documented); and
  - On-going technical assistance to PIRC Directors.
- Review progress and financial reports, invoices, vouchers, and recommended approval or disapproval of deliverables,
- Recommend changes in the statement of work (modification) based on priorities established in OII and PIRC objectives for the National Conference.

- Review and submit receipts for contract task completion:
  - Review monthly reports on the progress attained, problems that have been resolved or are in need of resolution, and a discussion of the work to be performed.
  - Review monthly financial reports that exhibit of expenditures delineating project costs by individuals and tasks monthly manpower reports summarizing the actual personnel assignments for the month with each named individual and the hours charged by task.
  - ***Enter receipts into the CPSS system for each voucher***
  - 

Daisy Greenfield was responsible for assisting in the development of budget materials and policy for the Parent Information and Resource Centers. In the GS-13 position, these duties and responsibilities were all new to the Plaintiff, but assumed by the Acting PIRC Team Leader.

- Determined/Recommended the budget for the Continuing grantees (2003-2006)
- Assisted in the budget determination for the Technical Assistance contractor (2002-2006)
- Submitted the contract modification for the National Director's Conference.

- Followed up on budget issues with previous contactor for payment (McFarland). Worked cohesively and imperiously with the OII /CO budget staff to get the job completed
- Schedule and attended meetings with 2 budget representatives for the PIRC program.
- Constant follow-up with OII's executive budget analyst.
- Provided input on PIRC Spending Plan

*Fourth Major Responsibility Change: Competition Manager*

In the GS-13 position, these duties and responsibilities were all new to the Plaintiff, but fell under the purview of Daisy Greenfield and she requested assistance on an as needed basis from the Plaintiff. After becoming the Acting Team Leader, the role of Competition Manager was assigned to the Plaintiff.

In 2002, Daisy Greenfield served as the Competition Manager for the grant review. She had six program staff working with her. During that review the program received less than 150 applications. However, in 2003 when the Plaintiff assumed the role of Competition Manager, there were more than 450 grant applications, the largest number received for the program, tripling the work load to 34 panels and panel monitors, consisting of more than 102 reviewers. The Plaintiff, an experienced manager and organizer, conducted such an outstanding review, she was highly applauded and complemented on a regular basis during the review process. She received telephone calls and e-mails from across the Agency. She performed to the highest level and was awarded the **first OII Peer Leadership Award.** Since her tenure at ED, it is documented that the Plaintiff has received awards for almost every Team she has participated on.

Daisy Greenfield was the lead in the development of the application process, including developing application materials, implementing priorities, selection criteria tied to Strategic Plan, ED initiatives and NCLB. NCLB was signed into law in 2001, but the

first review for the selection of new grantees was 2002.

- Complete the draft of the application package materials, including Table of Contents; general information, notices, program statute, application contents (priorities and selection criteria), application checklist, general instructions, budget form and related information, Assurances and Certifications; Response to GEPA Guidance.
- Participate in meetings and planning discussions about application priorities, selection criteria, and ED initiatives. (PIRC Team, OGC representative, Budget representative)
- Present draft of Application Package to PIRC Team for discussion and input

Daisy Greenfield served as the lead in the process of reviewing applications including: writing PIRC Technical Review Plan, identifying readers, and overseeing the process through grantee selection in accordance with Department policies and procedures.

- Develop the PIRC Technical Application Review Plan in accordance with the Administrative Communications System Handbook: Handbook for the Discretionary Grant Process and other electronic (e-Reader) policies and procedures.
- Serve as the Competition Manager of the PIRC grant review process
- Monitor the entire review process- Send out notices to identify reviewers, established and panels, organize panels.
- Coordinate planning/implementation meetings with the contactor and the E-Reader representative
- Establish schedule of activities, provided all materials relevant to the grant review process, maintained contact, and provided continuous feedback to the contractors.
- Develop the PIRC Reviewers' Grant Application Handbook, including e-Reader materials.
- Develop the PIRC Panel Monitors' Grant Application Handbook, including e-Reader materials.
- Schedule, coordinate, and participated in the grant review orientation session for Panel Monitors and sessions for the Panel Readers
- Identified potential readers and submitted names and resumes of potential PIRC review readers to Team members.
- Provided information and requested input from Team members/Panel Monitors/Peer Reviewers.

In the GS-13 position, these duties and responsibilities were all new to the

Plaintiff. Daisy Greenfield provided analytical support to the PIRC program and

coordinated the program process including: monthly report review that delineates the

status of implementation of the Technical Assistance Plan and specifies what

technical assistance services have been provided, who delivered the services, the timeline by which services were provided and to whom the services were provided. The process review identified any obstacles that impaired or prevented timely implementation of the Technical Assistance Plan and how those obstacles were addressed.

These duties and responsibilities were all new to the Plaintiff and fell under the purview of Daisy Greenfield. As the Acting Team Leader, the Plaintiff review draft reports that collected, compiled, synthesized and disseminated information to all of the funded PIRCs and developed strategies for analyzing information and disseminating it to PIRCs in a fashion that is factual, concise, and appropriate for end users. The information is analyzed to:

- support PIRCs in informing parents about their rights under the provisions of Sections 1116 of Title 1, Part A, relative to supplemental services and parental choice;
- support PIRCs in informing parents about the provisions of Sections 1118 and 1119 of Title I, Part A;
- support PIRCs in implementing their school-linked and school-based initiatives;
- focus on using research-based materials, Federal and State legislative mandates, initiatives, programs and services;
- foster the use of modern technology for project management and service delivery;
- focus on parental involvement strategies that contribute to improved student academic achievement.

The lead reviews relevant materials and other sources to include: PIRCs, Parent Training and Information (PTI) projects funded under the Individuals with Disabilities Act, the National Institute on Early Childhood Development and Education, the National Institute on the Education of At-Risk Students, the 21st Century Learning Centers, the Comprehensive Centers, the Partnership for Family Involvement in

Education, the Title I Parent Coalition, early childhood parenting programs such as

Parents As Teachers (PAT) and Home Instruction Program for Preschool Youngsters

(HIPPY), Head Start, and Early Head Start.

Daisy Green was responsible for reviewing  the PIRC Information Dissemination

Plan and monitoring the PIRC Electronic Network/listserv. In the GS-13 position, these

duties and responsibilities were all new to the Plaintiff.

The web based electronic network is geared to: 1) fostering communication

among PIRCs and between PIRCs and ED regarding the management, implementation,

and evaluation of PIRC projects, 2) collecting the annual performance report from each

PIRC, 3) and maintaining an accurate PIRC contact list.  The electronic network includes,

but is not limited to a web site with links to pertinent Federal agencies and programs,

other resources relevant to parent involvement issues, and a list serve.  The electronic

network is to serve as a single point of entry for the information needs of the PIRCs.  The

electronic network shall be developed such that all PIRCs and ED staff who have Internet

access may access and use the network.

- Specifications for the development and maintenance of a database of resources and information to serve as a single point of entry for the information needs of the PIRCs.  The database shall be compatible with software currently in use at ED;
- A web site that provides links to Federal web sites and web sites of other National and State agencies and organizations with information and resources relevant to parent involvement in education;
- A list serve that connects all of the PIRCs, ED, and the coordinating center;
- Specifications for the electronic collection of the PIRC annual/final performance reports including who will collect the annual performance reports, and a timeline that will ensure that the annual reports

The Team Leader receives Annual/Final Performance Reports. Daisy Greenfield

coordinated this activity.  The annual/final performance report is used to collect

information from PIRCs that will receive continuation grants (annual reports) as well as those who will conclude their grant performance periods (final reports). The same reporting-instrument is used for both groups. ED collects the annual performance reports to determine if the PIRC has made sufficient progress to merit a continuation award.

The COR approved the development of the software and procedures that is be used to disseminate and collect the annual/final performance reports. The software accommodates the submission of annual/final performance reports via the web or via diskette for those PIRCs that do not have Internet access. The software accommodates the input of partial data that may be saved, reopened and completed at a later time. It shall also accommodate the input of data from multiple sources, e.g., satellite center that may be compiled at the grantee's level before final submission identified those PIRCs that must submit an annual performance report and those that must submit a final performance report.

In the GS-13 position, these duties and responsibilities were all new to the Plaintiff. Daisy Greenfield did this and assigned tasks based on the assistance she needed. After the appointment of the Acting PIRC Team Leader, this area was expanded to include creating a national research and evaluation panel of parental involvement experts. This added a new area of increased responsibility in research and evaluation. [Report attached]

- Annual and Final Performance Report Document

- Receipt and report collection

- Monitor the Collection of the Annual Performance Reports from PIRCs

- Review/Comment/ and approve Final Summary of Performance Reports the 2002, 2003, 2004, 2005, and 21006 Statistical Summary Report fnd Local Evaluation reports were added in 2003 PIRC Data Collection

Daisy Greenfield had the responsibility to monitor the technological part of the contract and the performance measurement system, and the Acting Team Leader upgraded the system in the new 2006 contract. The PIRC Lead has the responsibility to monitor the development and utilization of Performance Measurement System that support the project management functions through a series of interrelated activities that include:

a. development and use of work-breakdown structures that define and organize the work,
b. use of a contractors' management control system that facilitated performance measurement within the work breakdown structure,
c. use of a reporting system to report task order status, and
d. procedures for mid-course corrections.

Even with team assignments, the Daisy Greenfield called upon other OESE /SSTP staff to support various facets of the program. There were 3 positions: GS-14, GS-13, and a GS-12 to carry out the day to day activities of PIRC work.

Discriminatory Treatment of the Plaintiff

As the team PIRC leader, it became Plaintiff's responsibility to take the lead for every assignment.  Ex. A. There was no organization/supervision for the PIRC team separate from that provided by the Plaintiff.  She had the same duties as other team leaders, who were employed at the GS-14 level and above, and she was given mandatory assignments usually given to GS-14 employees.  Id.  Steve Brockhouse (GS- 15) (Caucasian male), the named Assistant Director for POI, was identified by John Fiegel as

the supervisor but he did not have any experience/expertise with the PIRC program. Ex.

FF.   He had not worked with the PIRC program in the past. Id.  He depended totally on

Plaintiff she set the agenda for all meetings, the Regional Institutes, as well as the

national conferences. Plaintiff was responsible for the activities for all 90 to 102 PIRCs.

Id. Plaintiff provided the history to Brockhouse and informed him of what had to be done

to effectively carry out the PIRC program. Plaintiff was very cooperative  and highly

motivated and worked l 0- l 2 hours per day and many days long after her tour of duty

ended.  Plaintiff was held out as the resident expert for the PIRC program.

There was little or no organization or supervision outside of Plaintiff's leadership

for the PIRC program. Steve Brockhouse never informed Plaintiff that she was

performing less than "outstanding."  There was no implementation of the formal EDPAS

process nor was Plaintiff given any training/information on the EDPAS process. Plaintiff

was given a list of duties and performance areas and told to sign and return the EDPAS

statement.  No other options for clarifications were provided.

During a meeting in March 2003, Plaintiff gave John Fiegel a list of the personnel

standards for a Team Leader. He never discussed the areas that were relevant in his

office. Plaintiff performed the same duties as Madeline Baggett, Program Lead (GS- 14)

and Diane Austin, Program Lead (GS-14).  Plaintiff did not receive any acknowledgment

or feedback for time on task/amount of time for major areas of accomplishment or quality

and/or quantity of work in completing assignments from John Fiegel  or Steve

Brockhouse. Id.

In preparation for the evaluation process, Plaintiff assembled an incomplete list of

her accomplishments, and had to leave the office due to the illness and death of her

father.  In May 2003, John Fiegel informed Plaintiff that since her father had just passed away, he and Steve Brockhouse would put her performance indicators together for the evaluation.

In June 2003, when Plaintiff  reported to the evaluation conference, John Fiegel was seated at his desk and explained that no one could receive a high evaluation (dictate/mandate of this  administration) and used himself as an example. Brockhouse later joined the evaluation.  Plaintiff was issued a "successful" performance evaluation. Fiegel indicated that Brockhouse agreed on this evaluation. Plaintiff's evaluation justification only contained the short list of accomplishments that Plaintiff had put in an e-mail to Steve Brockhouse.  Plaintiff was denied the opportunity to complete the documentation of her work.  Plaintiff was  evaluated based on a partial list of accomplishments after Fiegel and Brockhouse failed to present an accurate statement of her accomplishments.

During the evaluation conference, Steve Brockhouse sat with his arms folded in an intimidating manner but was mute. When John Fiegel made incorrect statements, Plaintiff turned to Steve Brockhouse and asked him to bring clarification to the evaluation. Steve Brockhouse hunched his shoulders and did not speak. Id.

After Plaintiff's request for the truth was ignored, she became of overwrought with grief and started crying. Plaintiff informed John Fiegel that she could not sign anything she had not read and left the conference.  Plaintiff  had never been as overwhelmed with grief before in her more than 30 years as a professional, serving as an administrator/manager/principal.  As a dedicated and committed employee, Plaintiff had worked well beyond the "call of duty" under usual and extraordinary circumstances.

Based on Steve Brockhouse' s encouragement and urging, Plaintiff served as the leader, approved and made decisions for the PIRC program. Plaintiff made changes that elevated the program and Department of Education  colleagues and PIRC customers commented that the program had become highly successful and the conference the best and most organized they had ever attended.

The record contains evidence of the extent of Ms. Kilby-Robb's work, including the quantity and quality of her work.  Ex. K.   At her deposition, Ms. Kilby Robb explained in detail how her evaluation did not include all of the work she performed.  Ex. GG pages 62-91.

Before Plaintiff  received her evaluation, she had only received compliments for her performance, especially the New Grantee Orientation. In March 2003, after the conference, many Department of Education employees asked her for assistance because the program was so well received.  Id.

Several weeks after the performance evaluation conference, Plaintiff asked Steve Brockhouse why he evaluated her performance in the manner that he did. Plaintiff sent an a-mail and a copy to John Fiegel informing him she had boxes of documentation for her outstanding performance.  Plaintiff did not receive a response to the e-mail. In a meeting after she "fell apart emotionally" at the conference, Brockhouse stated that he was not her supervisor and blamed John Fiegel.  Plaintiff told Brockhouse that he could have warned her if her performance was average.

Plaintiff was informed by John Fiegel that Steve Brockhouse deserved the credit for the PIRC program and the work Plaintiff accomplished.  Other African American females had problems in working with Steve Brockhouse.

In June 2003, John Fiegel was still promising to submit a request to personnel for his 2 senior staff members (African American females) to receive compensation for the GS-14 position, Iris Lane for Voluntary Public School Choice program and  Plaintiff for the PIRC program.  John Fiegel gave Plaintiff as a average rating, but he did not view Plaintiff as just an average employee, because he promised to submit the position description for the PIRC Team Leader position.  John Fiegel informed Plaintiff he had a lot of work to do but that he was going to submit paperwork for Complainant's GS-14 position after his vacation.

Plaintiff  became ill in April 2003 and was hospitalized.  Plaintiff was diagnosed with hyperthyroidism with a myriad of symptoms including a serious life-threatening heart condition.   Id. Plaintiff received a chronic diagnosis at the time of hospitalization but had to follow-up with testing-scans-biopsies.  From the results of the biopsy, Plaintiff was informed that she had nodules with abnormal cells.  Plaintiff's medical team had to determine the best treatment and she has been undergoing treatment since that time. After much deliberation, it was determined that surgery would be postponed due to her unhealthy physical state and the nature of thyroid disease.

Plaintiff called John Fiegel from the hospital and in a follow-up meeting with Steve Brockhouse explained in great detail her health condition. She informed Steve Brockhouse that her medical team warned against stress and being overworked. Brockhouse laughed. Id.   Brockhouse was not supportive of her working from home.

Plaintiff refused to sign her evaluation in June 2003.  Less than two weeks after Plaintiff refused to sign her evaluation, on June 28, 2003, Steven Brockhouse sent an a-mail while she was attending a PIRC Institute warning her for using very poor judgment

which constituted unsatisfactory performance with respect to both effective communication and working cooperatively achieve the goals of the organization, because she advised callers in her absence to contact her supervisor.

The PIRC review was the largest review, 465 applications in OII. With no assistance, Plaintiff received and responded to more than 2,000 telephone calls and emails. When she was at the PIRC institute, she referred the calls to her supervisor. Brockhouse later reprimanded her for referring the calls to him in an effort to discredit her and justify a low evaluation.

After Plaintiff refused to sign her evaluation, Fiegel said he was not going to submit the paperwork for the GS-14 PIRC Team Leader position. Fiegel commented that everyone else was satisfied with their evaluation except the Plaintiff. In August 2003, in a fit of anger, Fiegel said he was not going to talk to Plaintiff about it anymore.

In August 2003, Plaintiff submitted an application for telework. Plaintiff did not receive the signed copy until October 2003. The contract indicated that Plaintiff needed a computer to telework and it was assigned. John Fiegel and Margo Anderson failed or refused to respond to the request for a computer. Michael Petrilli finally responded and said Plaintiff would not receive a computer. Margo Anderson later stated that if the Plaintiff was so sick "why did [she] need a computer."

In Plaintiff's discussions with Steve Brockhouse, she told him due to her health condition, she needed certain accommodations to execute her duties and responsibilities because she was at the Department of Education for 10 to 12 hours a day and still had to go in on weekends. Brockhouse signed the papers was because Plaintiff kept asking him to work from home during her disability and recuperative period and by that time she had

become visibly ill.  In a conversation, John Fiegel said he did not know anything about the Family and Medical Leave Act or the telework policies due to a medical disability. Plaintiff asked him to please check on it for her, but he did not provide any follow-up information.

Despite the health warnings, Plaintiff was put in a position to serve as a Competition Manager for the PIRC grant application review, another major responsibility for the GS-14 position.  Plaintiff also coordinated all of the PIRC Institutes, in-depth working sessions for the PIRC program.  This program was held in New Orleans and Plaintiff had a major role in the presentation, performance report development, and technical assistance meetings.

In 2005, Plaintiff was informed that she was not the acting PIRC team leader. Prior to the removal of her duties, Fiegel met with Nina Rees and the Plaintiff in December 2004 and Fiegel told Plaintiff in the presence of Rees that he did not like her and he wanted her out of his program.

Performance Appraisals and Bonuses

Richard Kress, GS-13, Caucasian Male, was employed as a team member on Brockhouse's team. In 2003, as a GS-13, during the same performance period that John Fiegel and Steve Brockhouse said was limited, Richard Kress received a Highly Successful rating and a $2,000 bonus when the Plaintiff received a Successful with a $500. In the area of Customer Service, Richard Kress received an Outstanding. Ex. O. The performance evaluation reflects that at the same grade level, 'the Caucasian male was a "very important member of staff"……… and participated in training and taken the lead for just one aspect of the program with Steve Brockhouse serving as the Team

Leader. For his Outstanding in the Customer Service area, "his work products require little substantative revision and he works extremely hard to continually improve his technical knowledge of educational issues by reading"  By comparison, the Plaintiff received only a Successful rating while continuing to complete all her assignments as GS-13 and in addition served as the Acting Team Leader with no assistance completing all of the duties and responsibilities assigned to Daisy Greenfield: COR; PIRC Team Leader; Lead in Program Administration; and served as a national PIRC expert. The disparity in the performance evaluation is blatant and the amount of reward for working in the best interest of the Agency to avoid waste of a $40 million program in the midst of confusion, chaos, and little or no supervision.

In 2004/05, Richard Kress received Highly Successful in both areas of Performance Evaluation and a bonus of $2,500, but still had not assumed the major duties and responsibilities parallel to the Plaintiff. Steve Brockhouse continued in that role without COR responsibilities. In 2005/06, Richard Kress was still classified as "assists in program administration"   and received Highly Successful in both Performance Evaluation Areas with a bonus of $2,500. Id.  The Plaintiff again received a Successful rating in the Customer Service Area with a $750 bonus. Ex. G.  In contrast to the quantity, quality, and level of duties and responsibilities of the Plaintiff, she was given less bonuses money, lower evaluations, no QSI, no in-grade steps and no promotion. In every area Richard Kress, with the same GS-13 position, with no comparability or compatibility with responsibility, was compensated at a much higher level.

Steve Brockhouse, Jim Houser and Dean Kern, all Caucasian men, were program leads/directors.  All three Caucasian males are GS-15s and GS-14s while the Plaintiff is a GS-13.The following comparative analysis demonstrates disparity in bonuses, QSI's, awards, promotions and evaluations with the Plaintiff.  With similar experiential backgrounds, specifically Dean Kern a Caucasian male employee who served as a charter school principal before employment in POI, received a higher grade, higher bonuses, in-step increases, and higher evaluations.  Ex. P.  A comparison between Dean Kern (CM) and Patricia Kilby-Robb (BF) is essential.  Dean Kern was one of the Plaintiffs grant peer reviewers for the PIRC program before coming to ED and POI.  After the same performance period in January 2003- April 30, 2003, John Fiegel and Steve Brockhouse gave the Plaintiff a "Successful" rating claiming that it was not enough time to evaluate her performance, but it was the same time frame for Dean Kern (GS-14) and Jim Houser (GS-15) to be evaluated, both were newly appointed Caucasian males to their programs and the Plaintiff had similar responsibility leading her program and serving as senior staff.  Under the same program supervisors, John Fiegel gave Dean Kern (CM), Highly Successful Performance Rating, $3,000 (6 times more bonus money) in 2003, $3,000 in 2004, and $3,000 in 2005 while at the same time; Dean was eligible for in-grade steps. The Plaintiff slipped further behind in compensation, in 2003, the Plaintiff received $500, in 2004, $2500 and $750 in comparison to Dean's $9,000. The Plaintiff received only $3,700 with no opportunity for in-grade steps in comparison to Dean's $9,000 in bonus in addition to in-grade step increases. Both were former principals with similar duties and responsibilities, but disparate treatment.

Jim Houser, GS-15, CM, received a QSI which elevated his pay for the rest of his career for 2003 when the Plaintiff received $500 and in 2005 received $3,500 (7 times more bonus money) with in-grade step increases. During the 2003 performance evaluation the same time frame as Plaintiff received Successful, Steve Brockhouse received an Outstanding rating. In 2005, he received Highly Successful with a bonus of $3,500 (7 times the bonus of the Plaintiff). The Agency did not provide information on Steve Brockhouse's bonus for 2003 but the assumption is it was much higher than 2005 for his Outstanding rating. [Grade, Performance Evaluation, and Bonuses, 2003, 2004, and 2005 provided.]

At his deposition (Ex. N), Kress testified that based on his observations and in working with Plaintiff and Brockhouse, Plaintiff performed duties comparable to Brockhouse.

Question: (by Ms. Braswell): One of Ms. Kilby-Robb's claim in this case is that she was performing work duties at the GS-14 level and was not getting compensated at that level. Do you have any knowledge, any personal knowledge concerning that claim?

Answer: Based on my observations, the level of responsibility that she had equated to the responsibilities Mr. Brockhouse had, both when he was a 14 and when – after he became a 15 in terms of the Magnet Schools Program.  He had the same sorts of responsibilities with hers.   Ex. N at 8:17-25

According to Kress , he was informed that the intent was for the Volunteer Public School Choice Program, the PIRC program and the Magnet Schools Program to have a lead that would be a 14 and that those positions would be advertised.   Kress noted that he was asked to assume the responsibility of the Magnet team leader position which he had not been performing and he declined to do so.  Ex. N at 9:  13-23. Kress was later told by John Fiegel that the Agency had decided to merge the Voluntary Public School Choice position and the PIRC position and the successful applicant would lead both programs.   Id. at 11: 1-5.

According to Kress, he observed that the Plaintiff assumed all duties previously performed by Daisy Greenfield, and Plaintiff was performing duties that were at the same level as Steve Brockhouse was performing as the Magnet program lead and to some extend that he was performing for magnet schools.  Id. at 13:13-25 and 14: 1-6. Specifically, Kress notes that Plaintiff served as the COR for the contract associated with the PIRC program, and he observed Brockhouse do for magnet schools what  he saw Plaintiff do for PIRC.   Ex. 14:7-18.

Kress worked in Magnet Schools with Kay Wagner and Donna Hoblit, all Caucasians.  Ex. N at 17: 3-6.

Kress described several incidents of a hostile work environment directed at Ms. Kilby Robb.  According to Kress, at a staff meeting, John Fiegel stated that certain staff members had been communicating with other departments without  a "cc" on the email

to Fiegel and Brockhouse and Fiegel had seen people dragged out of the building in handcuffs for this type of action, and after the meeting, Donna Hoblit informed him that Fiegel was referring to Patricia Kilby Robb.  Ex N at 19: 6-25-20: 1-12.

On a separate occasion, Kress was informed by Donna Hoblit that she was directed by Brockhouse to attend a staff meeting where a topic of discussion would be the national PIRC performance report, and Brockhouse specifically instructed Hoblit to "criticize, admonish, respond negatively to the contents of the report" and to specifically criticize Patricia Kilby Robb's role in putting the report together. Ex. N at 22:15-23; 24:1-10.  Kress attempted to convince Hoblit that she should not engage in this conduct, but Hoblit stated that Brockhouse was her supervisor and she would do what he said. Kress recalls at the meeting that Hoblit was "demeaning in her, in her comments and, you know, like someone scolding a child."  Ex N at 24:9-22.

In a separate incident, Kress sat on a peer award review committee and Hoblett was the lead person on the committee.  Ms. Kilby Robb had been nominated for an award.  During the meeting, the committee reviewed a nomination for Ms. Kilby Robb and Hoblit stated the supervisor-Brockhouse- had asked that the committee not give a favorable recommendation for this particular nomination because the work performance of the employee was poor and Brockhouse was trying to get enough documentation to get Ms. Kilby Robb removed and that this person getting an award would hamper that effort.  Ex. 27: 21-25, 28, 29:1-14.

Kress noted that Ms. Kilby Robb is not given the resources necessary to perform her job, and other occasions Ms. Kilby Robb had responsibility for a particular area but decisions were made without her being consulted.  Ex. N at 30-33.  For example,

Brockhouse met with an applicant after the paneling had occurred but prior to making an award, without Ms. Kilby Robb.  Ex N at 33: 1-13.

   According to Kress, Brockhouse and Fiegel made statements that suggested that have some discomfort with diversity.  Ex. 34:11-21.   Kress recalled that he once mentioned to Brockhouse in a casual conversation that during the French Revolution, there was a time when racial discrimination was a criminal rather than a civil offense and Brockhouse responded that "he was not surprised that the French would do something stupid like that."  Ex N at 35:17-25 and 36:1-11.   Kress mentioned that he was present at a staff meeting and there was a general discussion about contractors, and Brockhouse and Fiegel allowed and or supported attacks on minority owned firms.  Ex N at 36-40.  After an employee who was present complained about Brockhouse and Fiegel's actions, Brockhouse announced that he would find out who the employee was and there would be retribution against the employee.  Ex 42: 16-21.

   Kress worked on the same team as Donna Hoblit and noted that she was just a team member.  Initially, she had grants and then she later had responsibility for the DC Voucher program  and at one point was the COR for the Magnet evaluation contracts.  According to Kress, before Hoblit had the contracts, Hoblit's level of responsibility was volume of word was dramatically less than Ms. Kilby Robb and after she got the contracts, her level of responsibility was less than Ms. Kilby Robb because she was not the team leader of anything.  Ex N at 54: 17-25 and 55:1-25.

   After Plaintiff filed her EEO complaint, Steve Brockhouse announced in a meeting that Plaintiff was being put on the same level with Richard Kress, Caucasian male, but no duties and responsibilities would change. He said the positions would be

parallel- Magnet School Lead and PIRC lead.  It was demeaning and hostile and tantamount to a demotion, but he announced it without informing the Plaintiff privately before the announcement that he was demoting her. So in essence John Fiegel, Program Director, appointed the Plaintiff as the Acting PIRC Team Leader and Steve Brockhouse attempted to nullify the appointment. John Fiegel appointed the Plaintiff as the COR and Steve Brockhouse undermined the Plaintiff and tried to nullify the position, but put the Plaintiff in the position to work at the same level performing the same duties and responsibilities.

Brockhouse was the lead for the Magnet School Program, not Richard Kress and all documents confirm. During this meeting, Steve Brockhouse looked at the Plaintiff and laughed and continued with the charade. Kress and the Plaintiff were unlike GS-13's with no compatibility or comparability for educational background, experience or expertise, and no compatibility or comparability as a national expert, COR, Team Lead, Competition Manager or in PIRC program administration. All of these duties and responsibilities were assumed by Steve Brockhouse, except the fact that he was not a COR. As the lead, the Plaintiff was asked to train other staff. Richard Kress had to be trained to perform the duties and responsibilities as he moved into his parallel position with the Plaintiff.   Donna Hoblit acknowledged that she was canceling out the Plaintiff and that Richard Kress was being used as a decoy figure-head.

## ARGUMENT

### A.    Employment Discrimination–Disparate Treatment

Ms. Kilby-Robb's claim is that she was individually discriminated against by the agency on the basis of her race and gender. Her claim is one of disparate treatment.[1]

A disparate treatment claim is analyzed under the three-stage framework set forth in McDonnell-Douglas Corp. v. Green.[2]  "Under the McDonnell-Douglas framework, the complainant must first establish a prima facie case of prohibited discrimination. Once he has done so, the burden then shifts to the employer to articulate legitimate, nondiscriminatory reasons for the challenged employment decisions. Should the employer succeed in presenting such reasons, the burden then shifts back to the complainant, who then has an opportunity to discredit the employer's explanation."[3]

---

[1]Most claims of racial discrimination may be classified as either claims of disparate treatment (i.e., a claim that a person was treated adversely because of his membership in a protected class) or disparate impact (i.e., a claim that an employer's use of a race-neutral rule has a disproportionately negative impact on members of a protected class). The legal standard and burdens of proof for a disparate treatment claim under Title VII are articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, S.Ct. 1817, 36 L.Ed.2d 668 (1973). For a disparate treatment claim, see Griggs v. Duke Power Co., 401 U.S. 424 (1971).

[2]411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

[3]Aka v. Washington Hosp. Center, 156 F.3d 1284, 1288 (D.C.Cir. 1998) (internal citations omitted). The rationale for this three-part back-and-forth analysis is that once the plaintiff establishes a prima facie case of discrimination, the presumption arises that the defendant's adverse employment actions against the plaintiff were caused by illegal discrimination, which "compels the employer to 'produc[e] evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'"  If the defendant does articulate such a legitimate, nondiscriminatory reason for the adverse employment actions, "'the presumption [of discrimination] raised by the prima facie case is rebutted' and 'drops from the case.'"  Id. at 1289, quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Throughout this analysis, the burden of proof never shifts to the employer, but always remains with the employee.[4]

Thus, in this matter, Ms. Kilby-Robb has the initial burden to make out a prima facie case that the agency discriminated against her on the basis of her race and/or gender. Once she has done so, the burden of production–but not of persuasion–shifts to the agency, and the agency must articulate a legitimate, nondiscriminatory reason for the adverse actions it took against Ms. Kilby-Robb. If the agency does so, Ms. Kilby-Robb must then make a showing that the reasons articulate by the agency are not the true reasons, but are rather a pretext.

The standard for reviewing a motion for summary judgment requires the court to view the evidence in the light most favorable to the non-moving party. To decide a motion for summary judgment in an employment discrimination case, "assuming ... that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus ... will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation of its actions; and (3) any further evidence of

---

After the defendant-employer has articulated legitimate, nondiscriminatory reasons for its adverse employment actions, "the plaintiff has 'the full and fair opportunity to demonstrate, through presentation of his own case and through cross-examination of the defendant's witnesses, that the proffered reason was not the true reason for the employment decision, and that race [or some other discriminatory basis] was." Aka v. Washington Hosp. Center, 156 F.3d 1284, 1289 (D.C.Cir. 1998), quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507-08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), quoting Texas Department of Community Afairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

[4]Aka v. Washington Hosp. Center, 156 F.3d 1284, 1288-89 (D.C.Cir. 1998) (citing Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 102 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)."[5]

**B. Plaintiff has established claims of disparate treatment based on race and gender.**

Plaintiff has established that she was required to perform her GS-13 duties, as well as the GS-14 program specialist/PIRC Team Leader position, which has four additional components:1) PIRC Team Leader/national expert; 2) Contractor Officer's Representative; 3) Competition Manager; and 4) Contract Administrator.  Plaintiff performed the program specialist duties as outlined in the GS-14 position description. Ex. D.  Regardless of how the Agency classified the work Plaintiff has performed over the past four and one half years, under Agency/OPM guidelines, the Agency is required to compensate an employee if the employee is given higher graded duties for more than 120 days.  The Agency's guidelines are as follows:

> 2.  Types and Length of Details
>
> a.  Details to the same or lower grade position may be approved initially or extended subsequently in 120 day increments up to a maximum period of one year .  Extensions beyond one year will require the approval of OPM.
>
> **b.  Details to higher-grade positions may be approved for a period not to exceed one year during a major reorganization (a major reorganization means an organizational change including transfer of function, the elimination, addition, or redistribution of functions or responsibilities affecting a major segment of a departmental component).  However, if an**

---

[5]Aka v. Washington Hosp. Center, 156 F.3d 1284, 1289 (D.C.Cir. 1998).

**employee's services are needed in a higher-grade position for more than brief periods (60 days for bargaining unit and 120 days for non-bargaining unit) managers and supervisors are encouraged to make temporary promotions instead.**

c.  Details to positions at a higher grade or with known promotion potential and which are expected to exceed 60 days for bargaining unit employees or 120 days for non-bargaining unit employees must be made under the competitive procedures of the Department's merit promotion plan.

d.  Details to unclassified duties may be approved for a maximum period of 120 days.  In unusual situations, OPM may grant an extension.  (See PMI 300-4 Details to Unclassified Duties.)

Ex. H.  The Agency may not require the Plaintiff to perform the additional duties without compensation.

An inference of discrimination is raised when an employer violates its own personnel regulations in making employment decisions. It is generally recognized that an employer's failure for follow personnel regulations is evidence of pretext.  See Kolstad v. American Dental Association, 108 F.3d 1431 (D.C. Cir. 1997), rev'd on other ground, 139 F.3d 958 (D.C. Cir. 1998); Vitarelli v. Seaton, 359 U.S. 535, 539-40 (1959); Watson v. National Linen Service, 686 F.2d 877 (11th Cir. 1962).

The Agency contends that Plaintiff's claim that she was not compensated, rewarded or recognized for doing higher level work than her currently assigned grade level of a GS-13 must fail because there is no evidence that performing Team Leader duties warrants being paid at the GS-14 level.  To the contrary, the GS-14 position description lists precisely what duties warrant being paid at the GS-14 level.  Ex. D.

Plaintiff performed all duties within Ex. D and the Agency does not dispute this.  As noted, the Agency's regulations provide that if an employee is detailed into a higher graded position for more than 120 days, the employee must be compensated.  Moreover, all team leader positions are at the 14 level or above.  When Daisy Greenfield was in the team leader position, she was compensated at the 14 level.  Houser, Kearn and Brockhouse are all in team leader positions and are compensated  at the 14or above level.

The Agency's argument that  there is no comparable employee of a different race and/or gender who was in a GS-13 level but was paid at the GS-14 level for performing GS-14 level duties, is immaterial.

Ms. Kilby-Robb served as acting team leader with all responsibilities with this leadership position as well as the Program Officer for 22 States. As the Acting Team Leader for PIRC, Ms. Kilby-Robb successfully ran a $42 million dollar program, as well as performed her duties as a GS-13 Program Officer.  The record contains the deposition testimony of Daisy Greenfield.  Ms. Greenfield described her duties as the PIRC team leader.  According to Ms. Greenfield she performed the following duties: Developed the notice of closing when it was time for a competition, cleared application packages through the Office of Management and Budge, identified application reviewers, went through the process of having those reviews approved at the department, arranged to have the reviewers brought in to participate in the technical review process, administered the technical review process, setting up the panels, assigning the applications, ensuring that the whole process went according to the technical review plan, developed the technical review plan, wrote a statement of work to have a contract for the technical assistance to

the grantees, served as the contracting officer's representative to administer the contract.

13-14.  In addition, Ms. Greenfield served as the competition manager.

By comparison, Ms. Kilby-Robb's performance plan required her to perform the same duties as the PIRC team leader as Ms. Greenfield:

1.      In years where funds are available for Parent Information and Resource Center grant competitions, leads the development of the application process, including: developing application materials, priorities, and selection criteria that are tied to the Strategic Plan and Department policies and initiatives.

2.      In years when funds are available for Parent Information and Resource Center grant competitions, leads the process of reviewing applications, including: writing the technical review plan, identifying readers, and overseeing the process through grantee selection in accordance with Department policies and procedures.

3.      Leads the implementation of the program monitoring plan, providing technical assistance to grantees focused on performance and results while guarding against fraud, waste and abuse.

4.      Serves as the contract officer's representative for Parent Information and Resource Centers contracts.

5.      Assists in the development of budget materials and policy for the Parent Information and Resource Centers.

6.      Serves as a Department-wide resource on  Parent Information and Resource Centers.

7.      Participates in improvements to work processes including GAPS and e.gov initiatives.

Moreover, Plaintiff was assigned a problem employee to her team, even though Agency management knew this employee did not perform any work. With the original reorganization approval plan, James Guitard was assigned to Jim Houser. When Houser refused to accept Guitard, he was dumped on Plaintiff's team.

Thus, Plaintiff was doing the same GS-14 work as her predecessor, Ms. Greenfield, with less resources, and in fact the program had grown since Ms. Greenfield's departure. More importantly and undeniably, the PIRC program was an absolute success. According to the undisputed evidence in the record, the PIRC program was larger and more successful under Ms. Kilby-Robb than it had ever been in the past. Steven Brockhouse, who received an Outstanding rating as the Supervisor of the Plaintiff based in part on the success of the PIRC program, acknowledged that Plaintiff ran the PIRC program on a daily basis and he deferred to her on all major decisions for the program. Ex.    Brockhouse admitted that he had not even read all of the regulations for the program at the time he supported an average evaluation for the Plaintiff.

The Agency maintains that the performance appraisal was first given to the Plaintiff under a new system and everyone in her PIRC program received the same rating. Plaintiff disputes that two Caucasians got a successful rating. Only one Caucasian employee working under Brockhouse received a successful rating, and that was Kay Wagner, who had announced that she was retiring from the Agency. Ex. BB 11. The Agency can not present any rational justification for giving Plaintiff a lower rating that Caucasian employees who performed less work and had lower levels of responsibility.

Donna Hoblit, a Caucasian female, received a "Highly Successful" performance evaluation, which was higher than the "Successful" rating issued to Ms. Kilby-Robb. Hoblit admitted at her deposition that she had significantly less responsibility than Complainant and that she was a program specialist for a single program—magnet schools. Ex. p. 11. Hoblit did not have any team lead responsibilities. Id. at 12. Hoblit did not serve as a competition manager. Id. at 14. Hoblit did not have any responsibility for setting the budget for the magnet program. Id at 14. Hoblit only served as a COR for two contracts. Id. at 23.

James Guitard, an African American male, was a program officer on the PIRC team and received the same evaluation as Ms. Kilby-Robb. Guitard made it known that he did not intend to do any work on the PIRC team. Brockhouse, Fiegel and Daisy Greenfield indicated that Guitard had serious performance issues. F-2, F-3.

Kress and Hoblit performed less work and lower levels of work but received higher evaluations, even though they were the same grade as the Plaintiff, Guitard did no work and received the same evaluation as Plaintiff.

Other Evidence of Race Discrimination

According to Shelton Allen, the Agency management has a history of not favoring African American applicants. Mr. Allen's sworn testimony is that "Complainant was basically performing the work of a GS-14 along with her previous duties as a GS-13, but was not given the GS-14 position nor compensated for the work." Ex. B at 2-3.

African American female, Wanda Gill provided testimony that Brockhouse displayed open hostility toward African American women.  She described Brockhouse as "abrasive" and "short." Ex B F-4.

All of the African Americans working under Brockhouse received the same rating.  Despite the fact that Ms. Kilby Robb served as a program officer and the team leader without additional compensation, she received the same rating at Rachael Couch and James Guitard, who were team members.  Moreover, Donna Hoblit, a Caucasian female program officer, who was not a team leader, received a Highly Successful rating. Had the Agency felt that Ms. Kilby Robb was only performing at the Successful level, it could have removed the additional PIRC team leader responsibilities.

The record also contains evidence that the Agency has non-competitively hired 17 Caucasian employees.  Agency Ex. 10. This has occurred despite the fact that the Agency has recently settled a class action promotion discrimination lawsuit. Agency Ex. 14.


### C.        Plaintiff has established a Hostile Work Environment Claim

The Agency argues that Plaintiff's hostile work environment claim was limited to being required to perform certain extra duties, her performance did not receive recognition, and she was admonished for referring callers to her boss.  The evidence in the record goes far beyond what the Agency has mentioned.

Ms. Kilby Robb complained that after she refused to sign the average performance appraisal, she was subjected to a hostile work environment.  First, Fiegel and Brockhouse refused to issue to her a new position description for the GS-14 position she acted in and refused to process the paperwork for a GS-14 Team Leader for the PIRC

program.  Ms. Kilby-Robb also documented efforts to reprimand her because she refused to accept a discriminatory performance appraisal, the hostile treatment she received, interference with her efforts to obtain a computer to work at home when she was ill, and other actions.  Ex. B; IR F-1. The Agency has not raised any argument other than its claim that actions of the Agency do not constitute a hostile work environment.

Richard Kress confirmed Ms. Kilby-Robb's fears that Brockhouse was out to sabotage her efforts and get her terminated.  Plaintiff's supervisor, Brockhouse, refused to acknowledge her work even though he knew she did her own job, the GS-14 duties and the duties of Guitard; solicited another employee to criticize Plaintiff's work at a staff meeting so he would not have to; tried to prevent her from receiving an award because it would hamper his efforts to terminate her; sent her harshly worded and demeaning emails; and waited three years to tell her she was not the Acting PIRC Team Leader, when she ran the PIRC team and she had sent countless emails identifying herself as the Acting PIRC Team Leader.

A classic example of the hostile work environment is an email sent by Brockhouse.  In an email, Ms. Kilby Robb indicated that she would be hand delivering draft copies of the 2003-2004 Annual Parental Information and Resource Center Performance Report Summary at a staff meeting and she would provide additional information and orientation materials.  Brockhouse responded harshly:  "In the future, if you want something put on the agenda, you will get it cleared by me and you will do so in advance of the meeting.  . . . There is no 'PIRC TEAM."  . . . You are not serving in the role of acting team leader.  Your position description does not and has not included a

"team leader" addendum and you are not detailed, delegated, or assigned such responsibilities."

When Steve Brockhouse became the supervisor for the three new African-Americans, he evaluated them same. Regardless of work, work processes, or level of performance. He used strategic tactics to elevate Richard Kress over the Plaintiff overtly but covertly schemed with Donna Hoblit to discredit and terminate the Plaintiff. As management's representative, Donna told the Plaintiff on several occasions, Steve Brockhouse could do anything he wanted to her even use PIRC dollars however he wanted, implement the PIRC contract however he wanted and remove her if he wanted.

Although Brockhouse indicated that the Plaintiff was not the PIRC Team Leader, Brockhouse admitted that as of June 24, 2003, he had not even read the PIRC technical assistance contract and could not state what was within the scope of work.

Steve Brockhouse purported he attended PIRC meetings as the supervisor, and when the work and decisions of the supervisor were essential he said "no" he was not the supervisor. This is the way he operated to keep the employees controlled and confused under his management. He would assign tasks and then complete them himself and make a joke out of the work the employee had done. Shelton Allen shared that he did that with other African Americans but initially he did understand enough about the PIRC program to do that to the Plaintiff until she trained him. He is not a Team player. He uses "Got Cha" tactics and laughs about it. He agrees on critical issues in face-to-face interactions and change positions in front of others. He would share part information but not enough information to make work processes work smoothly. When an employee talks with him,

in other forums he pretends he does not remember so he can set the employee up for

failure.  As the Acting PIRC Team Leader, COR and national PIRC expert, the Plaintiff

lead every facet of program and provided orientation and training to him and the other

Team members, but relied on his to supervise the employees assigned to him. In stead, he

used it as an opportunity to advance himself to the detriment to the life, health, and career

of the Plaintiff.  Steve Brockhouse reported information to John Fiegel that further

flamed the fires of discontent that created a situation of chaos and confusion.  The

Plaintiff relied on him to be honest, reliable, and transparent, but it became evident that

he was strategically misleading the Plaintiff to her detriment. He assisted with

assignments because one Team member was destructive and disruptive to learn how the

processes worked. Steve Brockhouse interacted and participated on the Team under the

guise of assessing and substituting for the GS-12s lack of performance and said, "he was

working for the Plaintiff, but later John Fiegel reported that the Plaintiff relied on his

assistance. He stated, in his opinion Steve Brockhouse did all of the work. It was the

Plaintiff that planned, coordinated, developed, and created and led all project assignments

not Steve Brockhouse. The plaintiff relied on him as the supervisor to report accurate

information. He was covert in his actions but sabotaged the work by telling the Plaintiff

he knew exactly what the Team member was doing, but punished the Plaintiff and held

her accountable with no authority for supervision. He did not ask Sylvia Wright (Previous

Program Director who had been Steve Brockhouse's supervisor in the past), Audrey

Smith (Previous Supervisor), and Daisy Greenfield, about the PIRC program and how to

make it work effectively and efficiently.

John Fiegel promised over and over to compensate the Plaintiff, but refused to do so because the Plaintiff filed the EEO complaint and voiced that as the reason stating forget it, he was not going to "submit it" {meaning the information for compensation/PD]. Both John Fiegel and Steve Brockhouse both knew the truth. At the same time, Steve Brockhouse was supporting the other Team member in his lack of performance. When this Team member wrote his books and conducted book signings on work time and the Plaintiff discussed it with John and Steve, John said it was illegal for the Plaintiff to document such occurrences. When book signings were held during meeting time, Steve asked the Plaintiff to change the meeting time to accommodate the employee. This is the way the Team worked, preferential treatment to the male to accomplish Steve Brockhouse secret clandestine motives- to retaliate against this African American who asked only for "equal pay for equal work" and "to protect her civil rights" by filing an EEO complaint.

He disarmed the Plaintiff by saying one thing to her face, sharing information, and volunteering to fill in for the Team member. The Plaintiff did not discover until after the performance evaluation that Steve Brockhouse gave incorrect or partial misleading information to others, he shared information but was not forth coming or that he would deny that the information or discussion occurred, in other words, if it was not in writing the conversation did not happen or it was not discussed, and that he took all of the credit for the Plaintiff's work. The work was so voluminous that the Plaintiff could only accomplish the goals of the program. The federal government in general and more specifically, the Office of Personnel Management hold supervisors accountable for work

and monitoring and evaluating employees in a fair and equable manner. The Agency failed to do this for the Acting PIRC Team Leader.

Steve Brockhouse pits one employee against another. He used John Fiegel on many incidents to get his mission accomplished. John Fiegel would become angry with and would not speak to the Plaintiff. He sent e-mails to Margo Anderson and Michael Petrilli that created chaos and did not shed a good light on the Plaintiff. He did what the Agency calls throwing an "unpopular employee in a leadership role under the political bus". Steve's e-mails did just that. Another tactic he used was attending meetings or sending Donna Hoblit to speak on behalf of the Acting PIRC Team Leader giving the appearance that the Plaintiff was incompetent and not doing her job. In this role, both Steve and Donna failed or refused to support the work of the program. Neither could replace the national PIRC expert because that required some analytical acumen.   The Agency failed to notify the Plaintiff of meetings to keep her in the dark and jeopardize her ability to perform optimally as the Team Leader.

In 2003, the Complainant received the first OII Peer Leadership Award. She received praise and support from OESE and OII colleagues. It is well known that Steve Brockhouse and Donna Hoblit breached peer award rules and regulations by discussing the award (supervisor and employee together), ignited a plan to thwart the Complainant's selection, and deny compensation. Donna confided in Richard Kress, a member of the Committee, that her supervisor, Mr. Brockhouse, put her up to it. She openly discussed that the Complainant was having problems with Mr. Brockhouse and that management did not want the Plaintiff to receive the award so that it would be easier to fire me.

For the record, it is critical to note John Fiegel/Steve Brockhouse were negative to the Plaintiff about receiving the award and frowned and grimaced at her when she went up to get it. Steve Brockhouse had already started using systematic tactics to discredit the Plaintiff's work and put Donna Hoblit, a Caucasian female, with no experience in parental involvement or pedagogy over her. Donna Hoblit followed the Plaintiff around and made small talk about clothes and jewelry as she checked the Plaintiff's work station on a regular basis. She traveled to institutes for training. She informed the Plaintiff that it was not African Americans that were discriminated against in POI but Caucasian females. Sheldon Allen mentioned the topic of racial prejudice towards hiring African American males in an OII at an all-hands meeting and Donna criticized Shelton for making such as statement. She shared her outrage with the Plaintiff, Iris Lane and Joan Scott-Ambrosio. She went as far as stating as a Caucasian she was canceling out the Plaintiff. After she told Iris, the Plaintiff discussed this issue with her. Donna was closely aligned with Steve Brockhouse and became management's representative for providing information to the Plaintiff and moving forward on her threat to "cancel out the Plaintiff". Donna is management's representative that explained the merger of the PIRC Team and Magnet team for racial reasons. The Plaintiff the Acting PIRC Team Leader was not involved in any discussions, part of the decision-making or given advance notice about the merger. Donna's involvement came to surface with the grantees and the African Americans raised issues when she took over at the end of an institute in Atlanta, Georgia and announced a reorganization for the PIRCs with new personnel and stated, "you can still have Patricia". In the presence of Contractors, the grantees were and acted as if they were offended because they only viewed Donna as the lady that made jewelry for door

prizes and not a meaning participant in providing technical assistance. They respected the Plaintiff as the Acting Team Leader. Most of the grantees started whispering about the demotion in public and made statement that it was cruel and unjust to the Plaintiff and asked if the Plaintiff if she knew about it. The Plaintiff had not been informed and did not respond. The African Americans suggested that Donna's comment was racially inflamatory and demeaning to people of color and was unprofessional in regards to the position of Acting Team Leader.

The environment was hostile. Steve Brockhouse used Donna Hoblit to intervene to retaliate and "get rid of the Complainant" due to the EEO complaint. Steve denied giving the Complainant a low performance rating due to discrimination, but a few months later used another employee to deny the Complainant an equal opportunity for a peer leadership award. His unmerciful treatment and unconscionable treatment of the Complainant took place during the same time her father was critically ill, laying in the shadows of death, and passed away. The Complainant did not do anything to provoke such tyrannical actions from management: initially from career employees, John Fiegel, Steve Brockhouse and ultimately Margo Anderson; and finally the politicals, Nina Rees, Michael Petrilli.

It is documented that the Agency did not process Steve Brockhouse's official assignment as a supervisor until February 27, 2004. Steve Brockhouse assured the Plaintiff as late as April 2003 that he was not her supervisor. For the entire performance-rating period, the Agency failed to provide a supervisor to the three African- Americans. This is a critical fact because James Guitard who needed a great deal of supervision could have been supervised under Jim Houser's program, but instead all three newly assigned

African Americans were put together by making changes to the approved ED/ Union a program roster. The Agency acknowledged through discovery that James Guitard was assigned on the ED/Union approved roster to Jim Houser's program, but has yet, to present evidence to rebut or explain why or who made this critical decision to put all three African Americans together. The Agency failed the newly appointed PIRC Team Leader by using race as the criteria for Team decision-making. This action based on race was discriminatory and undermined the work of the Acting Team Leader and the work of the government's $40 million dollar program; the only program that reaches directly to minority, limited English proficient and low-income parents across the nation.

In 2002, when the Acting PIRC Team Leader was appointed, the Agency provided documents identify 7 major differences between the Supervisor and the Team Leader. Without adequate supervision, all of the major 7 roles of the supervisor, including to approving leave, counseling employees on behavior and initiate disciplinary actions, if required, making fair and equitable work assignments, evaluating the work of the employee were not provided to the African American Team and especially the Team Leader. By reputation one Team member was considered problematic, disruptive, dangerous, but assigned to a newly appointed Acting Team Leader, GS-13, rather than Jim Houser, Caucasian male, GS-15 without appropriate supervision. The Agency failed to provide supervision and Steve Brockhouse who had full knowledge, serving as the government's representative as the decision maker watched it happen. The Agency failed the Plaintiff because the supervisors did not receive adequate diversity training and training to adequately address differences between the role of Supervisors and Team Leaders.

On the other hand, the Plaintiff a veteran administrator took the training and worked with Daisy Greenfield to meet the challenges of the Team Leadership and in all areas exceeded all expectations in performing her duties and responsibilities, except with the acknowledgement of John Fiegel and Steve Brockhouse. Steve Brockhouse was the one who benefited most from the work of the Acting PIRC Team Leader. The program would have floundered and wasted the government's 40 million dollars for the last five years with out PIRC Team Leader, but the Team leader had a work ethic that was established as a principal and continued to work on behalf of the government through a discriminatory period. The Agency failed to provide the protection of equal pay for equal work and adhere to the guidelines established in Department's Merit Plan to protect all employees.

It is one thing to get the work accomplished but another when supervisors work against the leader. Steve Brockhouse undermined the Team Leader at every opportunity. When the Plaintiff discussed James Guitard he threatened that she had no one to turn to because John Fiegel and Margo Anderson had blind trust and would do anything he told them to do. On several occasions he became angry when the Team Leader reported information on the Team. He stomped on the floor and jumped to knock his chair and she decided that day it was useless to say anything. She saw this behavior and statements as threats or at a minimum a strong warnings. When the Plaintiff asked him to go on the computer to see James' book signing schedule when PIRC Team meetings had to be cancelled and other ED employees shared that information with the Plaintiff; He refused. When the Plaintiff and Leslie Harris (a volunteer from another program assisted the Plaintiff in the screenings of applications), worked late into the evening and the Plaintiff

went back to her desk in the dark. The Plaintiff was so frightened because she heard

noises in the dark and ran to Steve Brockhouse to ask for assistance. The Plaintiff had

become very nervous during that time and asked Steve Brockhouse to go with her to get

her materials. She told him that someone was in James' cubicle and there were strange

noises of two people. He refused to accompany her. She immediately informed Leslie

and Yvonne Hicks who was also working that night. The next day James was wearing the

same clothes and reported that he had worked all night on PIRC work. The next day

Steve Brockhouse gave the Plaintiff a nonsensical report that did not assist in the PIRC

application screening as justification for situation that occurred.  From January 1-April

30, 2002, James Guitard did not produce any credible work assignments.

According to the seven differences between supervisors and team leaders and the

Team Leader checklist, the Plaintiff was following Departmental policies. Steve

Brockhouse was notified. He would get very angry when she followed guidelines and

considered her a "complainer". Donna Hoblit informed the Plaintiff that Steve

Brockhouse did not like her because he thought she "complained" too much. In actuality,

the Acting Team Leader was meeting the demands of her position. The problem was the

Plaintiff was doing all of the work. It is documented in testimony that even though John

Fiegel appointed the Plaintiff as the Team Leader, he nor Steve Brockhouse respected a

distinguished African American female with superior qualifications nor did they

demonstrate any willingness  to respect the position of Team Leader, or the PIRC

program itself.

The Agency denied Plaintiff's request to use a computer to complete work processes. It was in October when John Fiegel appointed the Acting PIRC Team Leader. The Plaintiff was transitioning to the position before the December launching of OII. On December 19, 2002, the Plaintiff's father was hospitalized due to complications with his prostate illness that led to a stroke. The Doctors pronounced him terminal and informed the family he was in the "shadows of death". They informed the family death was eminent on or before Christmas day. The Plaintiff explained confidential information to Steve Brockhouse as her immediate supervisor. The Plaintiff 's daughter who is a doctor, acting on behalf of the Plaintiff's mother, recommended a radical surgery to save him life. The surgery was successful and the Plaintiff lived but had lost many bodily functions.

The Plaintiff gave up her social life as well as Church responsibilities (Director of Christian Education and the Board that provided Christian education training and preparation to every fact of church life) to devote all of her time to completing voluminous work processes and tasks related to her serving in her newly assigned PIRC Team Leader and COR positions and supporting her mother and father in his struggle to live. The Plaintiff's husband (who has been through many work crises in the CIA –more than 40 years) took on all of her home responsibilities with the assistance of their children.  The Plaintiff put in long hours including evenings and weekends and carried work home- any means possible to get the work assignments completed.

The Plaintiff informed Steve Brockhouse that her husband had a computer but it was not conducive for her to work on.  On late evenings, the Plaintiff's husband worked

on his full time job and then came to ED to assist her and went to ED with her after church on Sundays or visits to her father several hours away from D.C. The stress was taking its toll and the Plaintiff who asked Steve Brockhouse about Flexi-place. Of course, he was not helpful so Joyce Murphy assisted to help the Plaintiff. Many kind African American and Caucasian started supporting the Plaintiff. Steve Brockhouse said complete paper work and then he and John Fiegel both went to training with the Plaintiff. The Director of Flexi-place said she had never had to male supervisors to go with an employee for training but she tried to expedite the process.

Before any thing could be done about Flexi-place, the Plaintiff's health started to drastically deteriorate. On April 9th, 2003, the Plaintiff was sitting at her computer and her whole body went into shock and she was in "cardiac afib". Her private physician worked frantically, but could not stop her heart from racing out of her chest-no medicine worked. She was sent directly to the hospital. She was not released until April 14th. In light of the fact the Plaintiff's father's terminal illness was stressful, the Doctors called it extreme stress- they asked if the Plaintiff wanted to let the U.S. Department of Education cause her death (something the Plaintiff could control) including change the negative impact Steve Brockhouse had on the Plaintiff. The Plaintiff was given a diagnosis of hyperthyroidism and put her on 13 pills a day to control her heart due to the stree of eminent death of her father. The Plaintiff went back to work while taking Lovenox injections in her stomach and was later put on coumadin. The Plaintiff informed Steve Brockhouse about the diagnosis, the prognosis and the need to reduce stress. He laughed and created more stress.

The Plaintiff's father had another stroke on or before April 18th and the Doctors said that was it and hospice took over. The Plaintiff's father passed away on May 2nd. The plaintiff needed time to grieve and continued to pursue Flexi-place. After completing the Grant Review process which is an extremely process in itself after her father's passing, the 13 pills were attacking her body. Again she was in a physical crisis and had started hemorrhaging extensively, was nauseous and throwing up at work, she became dizzy at times, her heart felt strange, and her hair was falling out. The Plaintiff's daughter intervened and took over the decision-making role on the Plaintiff medical Team. She moved her family back home to counsel and work with the Plaintiff to get through the tramatic situation. Following the advice of all of her Drs. , the Plaintiff met with John Fiegel and Steve Brockhouse together and discussed the need for leave and Flexi-place, a computer [sworn testimony of the Plaintiff] explained the symptoms of hyperthyroidism and the need to come off of some of the medicine which had become toxic.

The Plaintiff turned over work materials to Steve Brockhouse for assignment and went on leave until the Flexi-place was approved. Denouncing the seriousness of the health condition, John Fiegel called the Plaintiff at home and said she was a renegade   In retaliation for complaining, Steve Brockhouse did not talk to the Plaintiff and implemented tactics to discredit and embarrass the Plaintiff. He used the time when the Plaintiff's was in the shadow of her fathers' death and dealing with her own health crisis to create greater hardship. The Plaintiff tried to talk to him but he was unwilling to be her supervisor.

Flexi-place was approved, but the Agency denied the computer which Steve Brockhouse knew was critical to get the work completed. It was stated on the approved form that the Plaintiff need a computer, but importantly the assistance of the Agency to set up the computer. The Plaintiff's husband purchased a computer, added in a new telephone line, and is paying DSL on a monthly basis for a one day a week Flexi-place. The Plaintiff's family had to add thousands of dollars to a household budget when laptops are used every day for ED work. Steve Brockhouse thought this would be a barrier and hardship the Plaintiff could not overcome during extremely stress, but her family sacrificed to assist.

### Conclusion

For the reasons stated herein, the motion for summary judgment should be denied.

Respectfully submitted,

/s/
David A. Branch
Law Offices of David A. Branch, P.C.
1825 Connecticut Avenue, NW #690
Washington, D.C.  20009
(202) 785-2805

### Certificate of Service

I hereby certify this 9th day of May 2007 that a copy of the foregoing Plaintiff's Opposition to Motion for Summary Judgment was sent to counsel for Defendant listed below.

MARINA UTGOFF BRASWELL
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W. - Civil Division
Washington, D.C. 20530
(202) 514-7226

_____/s/_____
David A. Branch

IN UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

### CIVIL DIVISION

| | |
|---|---|
| **PATRICIA KILBY-ROBB** ) | |
| **17001 SUMMERS LANE** ) | |
| **BADEN, MD  20613** ) | |
| ) | **Case No.: 05-2270** |
| **Plaintiff,** ) | **(JDB)** |
| ) | |
| **v.** ) | |
| ) | |
| **MARGARET SPELLINGS,** ) | |
| **SECRETARY, U.S. DEPARTMENT OF** ) | |
| **EDUCATION** ) | |
| **400 MARYLAND AVE., SW** ) | |
| **WASHINGTON, D.C. 20202** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

### Plaintiff's Exhibits in Support of Opposition to Motion for Summary Judgment

| Ex. No. | Description |
|---|---|
| A | Declaration of Patricia Kilby Robb |
| B | Report of Investigation |
| C | Plaintiff's Position Description |
| D | Daisy Greenfield Position Description |
| F | Classification Handbook |
| G | Kilby Robb Performance Appraisals |
| H | Personnel Manual |
| I | Contract Officer Representative Manual |
| J | Email re Promotion |
| K | Comments on Leadership Award |

| L | Kilby Robb appointment as COR |
| M | Approved Staffing Plan |
| N | Kress Deposition Transcript |
| O | Kress Performance Appraisals |
| P | Bonus/Awards for all Staff |
| Q | Team Leaders |
| R | Accertion of Duties |
| S | Email re Guitard does not travel |
| T | Kilby Robb Qualified for GS 14/15 |
| U | Brockhouse email on PIRC Regulations |
| V | Brockhouse email scolding Kilby Robb |
| W | Education Settlement with African Americans |
| X | Greenfield duties to Kilby Robb |
| Y | Greenfield Desk Audit |
| Z | Hoblit Transcript |
| AA | Kilby Robb work Completed |
| BB | |
| CC | Brockhouse transcript |
| DD | Lane Transcript |