**IN UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CIVIL DIVISION**

| | |
|---|---|
| **PATRICIA KILBY-ROBB** ) | |
| **17001 SUMMERS LANE** ) | |
| **BADEN, MD  20613** ) | |
| ) | **Case No.: 05-2270** |
| **Plaintiff,** ) | **(JDB)** |
| ) | |
| **v.** ) | |
| ) | |
| **MARGARET SPELLINGS,** ) | |
| **SECRETARY, U.S. DEPARTMENT OF** ) | |
| **EDUCATION** ) | |
| **400 MARYLAND AVE., SW** ) | |
| **WASHINGTON, D.C. 20202** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Comes now Plaintiff Kilby-Robb, by and through counsel, and files this opposition to the Defendant's  motion for summary judgment and in support thereof states as follows.

### Introduction

Plaintiff Patricia Kilby-Robb, an African American, GS-13 Program Specialist at the U.S. Department of Education, and team leader for a $42 million dollar Department of Education program, filed this complaint of race and gender discrimination after she was subjected to disparate treatment in the terms and conditions of employment and a hostile work environment when she was required to work as an Acting Team Leader, beyond her grade 13 duties and position description, received an average performance appraisal, while Caucasian employees who did less work  and lower level duties received

1

higher evaluations, and at least one male employee who did no work received the same performance appraisal as Ms. Kilby-Robb.  The Agency has filed a motion for summary judgment.  The Agency's motion is completely without merit and should be denied.

**Background**

1.      Plaintiff was hired as a GS-13 Program Specialist at the Department of Education in 2000, after working as an educator and principal for twenty five years.  Ex DD:8.  Prior to her employment at the Department of Education,  the Plaintiff had educational experience and expertise at the federal, state, district, and local school level. She had been a school administrator, including a Principal (Elementary-Middle-Alternative High School and Adult Education Center), Assistant Principal, and Community Education Director. Ex. A:1.  During her tenure, she had been named "Principal of the Year' and was considered distinguished and had received many honors. Before and after becoming an employee at the Department of Education, the Office of Personnel Management (OPM) reviewed the Plaintiff's credentials for GS-14 and 15 level federal government positions, and certified her at two grade levels above the GS-13 level, and she had interviews for GS-15 positions. Ex. T.

2.      Plaintiff was assigned to the Parental Information Resource Information Center (PIRC) team headed by Daisy Greenfield, an African American female in 2001. Ex. A:2.

3.      The Parent Information and Resource Centers are authorized to strengthen partnerships among parents and school personnel in meeting the educational needs of children (including children from birth through age 5); strengthen partnerships between parents and their children's school; coordinate activities with those funded under section

1118 of the Act; and provide a comprehensive approach to improving student learning through coordination and integration of Federal, State, and local services and programs. Ex. A:3.

4.      The projects are awarded to nonprofit organizations and nonprofit organizations in consortium with local educational agencies.  The PIRCs were funded for up to 48 months and in 2003 changed to 36 months.  While there is some similarity in the types of services that the PIRCs are providing, each has been designed to meet the unique needs of the parents in their State and therefore, each has distinct characteristics relative to their organizational structure, service delivery strategies, target groups, etc.  All are required to serve both urban and rural areas and to implement an early childhood parent education program.  Ex. A:4.

5.      The Department has funded PIRCs since 1995. Legislation reauthorizing the PIRCs was enacted in January 2002 significantly changing the focus of the program from addressing the needs of parents who have pre-school youngsters to addressing the needs of parents to effect their children's academic achievement in school.  The Plaintiff's knowledge and experience in early childhood education as well as pedagogy were essential for managing and monitoring PIRC grants. Twenty-eight of the PIRCs were funded under the previous legislation and continued for an additional year under the new legislation.  Many of the existing PIRCs were expected to reapply under the FY 2002 competition and will then implement a project under the new legislation.  All of these PIRCs required assistance in transitioning to a different type of service under the new legislation. Ex. A:5.

6.      By 2002 under the leadership of Daisy Greenfield, PIRC Team Leader, there were 66 PIRCs in existence, located in every State, the District of Columbia, the

Virgin Islands, Puerto Rico, and the outlying Pacific Islands. There were eight States that had two PIRCs. In 2003, under the leadership of Patricia Kilby-Robb, Acting PIRC Team Leader, the number grew to approximately almost 100 existing PIRCs, including PIRCs on no-cost extensions. The 2002 and 2003 funded PIRCs all were slated to end in 2006. The program had grown from $10 million to a $40 million dollar program. For 2006, 60 new grants were awarded for 60 months. In the beginning of the 2007 fiscal year, there were 99 PIRCs in operation. Ex. A:6.

7. Greenfield was the team leader for the Parent Information and Resource Centers (PIRC) team, which included Greenfield, Plaintiff and Rachel Couch, an African American female. Id. at 7. An African American male, James Guitard, had been removed from the team before Ms. Kilby-Robb's arrival because he refused to work, an engaged in disruptive conduct detrimental to the team. Guitard was an author of three books and spent most of his time at work attending to his personal business, and Agency managers were aware that Guitard refused to perform any substantive work. Id.; Ex S.

8. Due to her role as PIRC Team Leader, Daisy Greenfield did not have any States assigned to her. Ex. A:8. In their capacity as education program specialists, Rachael Couch was assigned RST 5, which included 9 states and the Plaintiff was assigned RST 7, which included 8 states. Daisy Greenfield's primary assignments dealt specifically with the PIRC program with no State assignments. All three PIRC Team members were assigned PIRCs to manage as program officers. Id.

9. When the Plaintiff was assigned to the PIRC Team in 2001, less than one year before the transition from the Office of Elementary and Secondary Education (OESE) to the Office of Innovation and Improvement (OII) and the reorganization, she

replaced Marcia Kingman.  Marcia Kingman, Caucasian female, has been promoted at least two grade levels during this same time period-2002-present in the Office of Goals 2000/ School Support and Technology Programs. The Team consisted of Daisy Greenfield, PIRC Team Leader, Rachael Couch and newly assigned Patricia Kilby-Robb. Ex. A:9.

10.    When Greenfield was the PIRC Team Leader, she described her position to include four major areas: PIRC Team Leader with national expert visibility, PIRC Program Administration; Competition Manager; and Contract Officer's Representative (COR). Ex. CC: 12-14.  The position required analytical acumen as well as management and organization skills.

11.    As the national PIRC expert, Daisy Greenfield represented the PIRC, provided technical assistance, responded to telephone inquiries, e-mails, other request for information, and responded to follow-up questions from the public about the grant application package and the PIRC program. Ex. A:11. Daisy Greenfield made presentations at conferences, institutes, sent information to all of the PIRC Directors, worked with national parental involvement organizations, and represented the program in senior staff meetings. Id.

12.    In addition, Daisy Greenfield was the government contract officer's representative, COR. Id. at 12.  Based on the complexity and nature of the PIRC program, Contractors served as the nucleus for the program and the COR's role was paramount to the day-to-day functioning of the program administration. The COR dictated the major work and work processes of the PIRCs. Id.

13.     In the federal government and at the Agency, positions, not individuals, may be upgraded through an accretion of duties.  Ex. F at page 4 ("Accretion- this is also a non-competitive action initiated by management for promotion beyond the recognized full performance  target grade of a **position** when the criteria in the ED accretion promotion policy are met.")  The GS-13 position occupied by Greenfield was upgraded to grade 14 due in large part to the additional requirement of work as the PIRC team leader. Ex. D; Y.   The Unique Position Requirements of the GS-14 position included: Oversees the operation of the Parental Assistance Program (PIRC). Ex. D at 3. Serves as the Agency expert and Team Leader in the Area of Parental Assistance Program.  Makes key decisions and recommendations regarding the Parental Assistance Program.   Id. at 3. The PIRC Team Leader position (GS-14) was classified through a desk audit in Human Resources conducted by Vicky Cosey, personnel specialist. Ex. Y.  Daisy Greenfield's desk audit classification of GS-14 was based primarily on PIRCs and on her work with the PIRC program.  Id.

14.     The GS-14 program specialist served as: 1) the PIRC team leader; 2) the Contractor Officer's Representative; 3) the competition manager; and 4) the program administrator.  Ex. D at 3; CC:13-14.

15.     Prior to December 2002, Daisy Greenfield performed all of the GS-14 program specialist duties, and Plaintiff assisted her in performing some of the duties as a GS-13 program specialist. Ex. A: 15.

16.     In 2002, there was a reorganization in the Parental Options and Information Office which affected the PIRC.  When the reorganization was announced, Daisy Greenfield refused to go to OII. Ex. A: 16.  She met with the Plaintiff and

discussed the reasons for not transferring and abdicated her position for not only the

PIRC Team Leader, but also the COR.  Id.  Plaintiff was appointed at the Acting PIRC

Team Leader.  After the appointment of the Plaintiff to the Acting PIRC Team Leader

position Greenfield turned over all books and gave all of her duties and responsibilities to

the Plaintiff. Initially, she continued to work with the Plaintiff as the COR until she

provided sufficient orientation and training.

17.    After the reorganization, in addition to her GS-13 duties, Plaintiff Kilby

Robb required to perform all of the duties on the GS-14 position description, formerly

done by Greenfield, including serve as the 1) the PIRC team leader; 2) the Contractor

Officer's Representative; 3) the competition manager; and 4) the program administrator.

Ex. A:17; G, I, L, L-1.  Plaintiff's GS-13 position description was almost identical to the

job description of the GS-14 position held by Daisy Greenfield.  Compare Ex. C and G

with Ex. D.

18.    As a result of the reorganization,  Fiegel supervised Steven Brockhouse

and Brockhouse, Caucasian male, supervised six individuals,  Donna Hoblit, Richard

Kress, Kay Wagner, all Caucasian and worked the Magnet Schools team, Ex. N: 13-14,

and Kilby Robb, Rachel Couch and James Guitard, all African American and worked on

the PIRC team.  Ex. A:18.

19.    The Plaintiff was new to the team and had never met James Guitard. Ex.

A:19.  There were rumors about an incident where he was disruptive and divisive and he

took over the control of female employees to prevent work processes on Chuck Lovett's

Team. Id.  The situation escalated and almost ended in a physical altercation.  When he

was on Daisy Greenfield's Team, the Plaintiff and others were informed he gave

erroneous information and was negative about the government to grantees and disappeared during critical events and many other incidents of disruptive counter-productive behavior. Cindy Cisneros, Caucasian female (GS-15) had collected 2 notebooks of documentation; his supervisor, Audrey Smith ended up in the EEO process in reference to Guitard and discussed the serious situation with the Plaintiff to advise her. Guitard had written or co-authored at least 3 books: Chocolate Thoughts, Mocha Love, and Blessed Assurances before the PIRC program physically moved to OII's location on the 4th floor. Pages of his materials would some times get mixed in with the Plaintiff's work on the printer. Both PIRC Directors as well as the RMC Research Corporation (Contractor) received complaints about James Guitard. Grantees begged for assistance and when Steve Brockhouse assigned him as a program officer they requested to be changed or relied on the Acting Team Leader for assistance- 100% of his assigned grantees received some if not all of the assistance. [Sharon Spann, Marcia Kingman, Joyce Murphy, Milagros Lanaze, Clara Keith (Georgia State Title I Director), Jim Houser, Chuck Lovett, and Cindy Cisneros; PIRC grantees from 1999, 2002 and 2003; Kate Gill Kressley/RMC Research Corporation]. James Guitard's reputation was echoed all over the Department, when the Plaintiff started her counseling with IDRC, the Counselor asked her about James Guitard. Since moving to POI, Team members Rik Lanzendorfer, Richard Kress, and Donna Hoblit have gained knowledge about James Guitard. John Fiegel, and Steve Brockhouse have gained knowledge about this employee's work, but embraced and supported Guitard. Early in 2002, John Fiegel informed the Plaintiff that Audrey Smith and Daisy Greenfield shared information with him about James Guitard. Jim Houser also discussed issues with the Plaintiff about James

Guitard. The Plaintiff saw the placement for each employee and James Guitard had been assigned to Jim Houser who had become as GS-15.  Due to the volume of work, complexity of the program, and magnitude of responsibility, the Plaintiff was grateful that James Guitard was not her Team, but that was short-lived because James Guitard was somehow assigned to her, and  all three African-Americans were together and the same team.

20.     Plaintiff met Dean Kearn, a Caucasian male, GS 14, when she was the acting team leader for PIRC and Kearn was a school principal.  Ex. A:20.  Kearn was asked to participate on one of her panels.  Plaintiff and Kearn had similar backgrounds of working as principals before joining the Department of Education.  Id. Kearns was later hired by the Department of Education at a grade 14, while Plaintiff was hired as a grade 13.  Id.

21.     As part of the reorganization, OII managers initially assigned James Guitard to a team lead by a Caucasian male, Jim Houser under the Approved Staffing Plan. Ex. M.  Guitard was reassigned because Houser would not allow him on his team. In December 2002, Fiegel informed Plaintiff Kilby Robb that her team would consist of Rachael Couch and James Guitard, and she would report to the Deputy Director, Steven Brockhouse, Caucasian male.  Ex. A:21.

22.     In the reorganization, Patricia Kilby Robb was assigned as the team leader for PIRC.  Prior to accepting the position, she was informed by the Director, John Fiegel that the PIRC team leader position would be announced at a grade 14.  Ex. A:22.

23.     From January 2003 through April 2003, James Guitard refused to do any work, and Plaintiff Kilby Robb was required to perform her duties as GS-13 program

specialist, as well as acting PIRC team leader, COR and national expert. Ex. A:23, G and I.

24.    Steve Brockhouse did not perform any substantive work in the PIRC program and deferred to Kilby Robb for all work in the PIRC program. Ex. A: 24. Kilby Robb ran the $42 million dollar project from December 2002 through April with virtually little help. Id.

25.    Brockhouse was not even familiar with how with PIRC program was run in December 2002. Ex. U and BB. As of June 2003, Brockhouse had not even read the statement of work for the contractor PIRC. Ex. U.

26.    Richard Kress, Caucasian male, worked in the Magnet Schools program with Kay Wagner and Donna Hoblit, all Caucasians, and they all reported to Steve Brockhouse. Ex. N at 17: 3-6. At his deposition, Richard Kress testified that based on his observations and in working with Plaintiff and Brockhouse, Plaintiff performed duties comparable to Brockhouse. According to Kress, he observed that the Plaintiff assumed all duties previously performed by Daisy Greenfield, and Plaintiff was performing duties that were at the same level as Steve Brockhouse was performing as the Magnet program lead. Id. at 13:13-25 and 14: 1-6. Specifically, Kress notes that Plaintiff served as the COR for the contract associated with the PIRC program, and he observed Brockhouse do for Magnet Schools what he saw Plaintiff do for PIRC.  Ex. 14:7-18.

Question: (by Ms. Braswell): One of Ms. Kilby-Robb's claim in this case is that she was performing work duties at the GS-14 level and was not getting compensated at that level. Do you have any knowledge, any personal knowledge concerning that claim?

Answer: Based on my observations, the level of responsibility that she had equated to the responsibilities Mr. Brockhouse had, both when he was a 14 and when – after he became a 15 in terms of the Magnet Schools Program.  He had the same sorts of responsibilities with hers.   Ex. N at 8:17-25

27.    According to Kress, he was informed that the intent was for the Volunteer Public School Choice Program, the PIRC program and the Magnet Schools Program to have a lead that would be a 14 and that those positions would be advertised. Kress noted that he was asked to assume the responsibility of the Magnet team leader position which he had not been performing and he declined to do so.  Ex. N at 9:  13-23.

28.    As the team PIRC leader, it became Plaintiff's responsibility to take the lead for every assignment.  Ex. A:26. There was no organization/supervision for the PIRC team separate from that provided by the Plaintiff.  She had the same duties as other team leaders, who were employed at the GS-14 level and above, and she was given mandatory assignments usually given to GS-14 employees.  Id.  Steve Brockhouse (GS-15) (Caucasian male), the named Assistant Director for POI, was identified by John Fiegel as the supervisor but he did not have any experience/expertise with the PIRC program. Ex. U and BB.   He had not worked with the PIRC program in the past. Id.  He depended totally on Plaintiff she set the agenda for all meetings, the Regional Institutes, as well as the national conferences. Plaintiff was responsible for the activities for all 90 to 102 PIRCs.  Id. Plaintiff provided the history to Brockhouse and informed him of what had to be done to effectively carry out the PIRC program. Plaintiff was very cooperative

and highly motivated and worked l 0- l 2 hours per day and many days long after her tour of duty ended.  Plaintiff was held out as the Agency expert for the PIRC program.

29.     There was little or no organization or supervision outside of Plaintiff's leadership for the PIRC program.  Ex. A:29.

30.     During a meeting in March 2003, Plaintiff gave John Fiegel a list of the personnel standards for a Team Leader. Ex. A:30.  He never discussed the areas that were relevant in his office. Plaintiff performed the same duties as Madeline Baggett, Program Lead (GS- 14) and Diane Austin, Program Lead (GS-14).  Plaintiff did not receive any acknowledgment or feedback for time on task/amount of time for major areas of accomplishment or quality and/or quantity of work in completing assignments from John Fiegel  or Steve Brockhouse. Id.

31.     In preparation for the evaluation process, Plaintiff assembled an incomplete list of her accomplishments, and had to leave the office due to the illness and death of her father.  Ex. A:31.  Plaintiff  became ill in April 2003 and was hospitalized. Plaintiff was diagnosed with hyperthyroidism with a myriad of symptoms including a serious life-threatening heart condition.   Id. Plaintiff received a chronic diagnosis at the time of hospitalization but had to follow-up with testing-scans-biopsies.  From the results of the biopsy, Plaintiff was informed that she had nodules with abnormal cells.  Plaintiff's medical team had to determine the best treatment and she has been undergoing treatment since that time.  After much deliberation, it was determined that surgery would be postponed due to her unhealthy physical state and the nature of thyroid disease. Plaintiff called John Fiegel from the hospital and in a follow-up meeting with Steve Brockhouse explained in great detail her health condition. She informed Steve

Brockhouse that her medical team warned against stress and being overworked.
Brockhouse laughed. Id.  Brockhouse was not supportive of her working from home.  In
May 2003, John Fiegel informed Plaintiff that since her father had just passed away, he
and Steve Brockhouse would put her performance indicators together for the evaluation.

32.    In June 2003, when Plaintiff  reported to the evaluation conference, John
Fiegel was seated at his desk and explained that no one could receive a high evaluation
(dictate/mandate of this  administration) and used himself as an example. Brockhouse
later joined the evaluation.  Ex. A:32.  Plaintiff was issued a "successful" performance
evaluation.  Fiegel indicated that Brockhouse agreed on this evaluation.  ID. Plaintiff's
evaluation justification only contained the short list of accomplishments that Plaintiff had
put in an e-mail to Steve Brockhouse.  Id.  Plaintiff was denied the opportunity to
complete the documentation of her work.  Plaintiff was  evaluated based on a partial list
of accomplishments after Fiegel and Brockhouse failed to present an accurate statement
of her accomplishments.

33.    During the evaluation conference, Steve Brockhouse sat with his arms
folded in an intimidating manner but was mute. Ex. A:33.  When John Fiegel made
incorrect statements, Plaintiff turned to Steve Brockhouse and asked him to bring
clarification to the evaluation. Steve Brockhouse hunched his shoulders and did not
speak. Id.

34.    After Plaintiff's request for the truth was ignored, she became of
overwrought with grief and started crying. Ex. A:34.  Plaintiff informed John Fiegel that
she could not sign anything she had not read and left the conference.  Plaintiff  had never
been as overwhelmed with grief before in her more than 30 years as a professional,

serving as an administrator/manager/principal.  As a dedicated and committed employee, Plaintiff had worked well beyond the "call of duty" under usual and extraordinary circumstances. Based on Steve Brockhouse' s encouragement and urging, Plaintiff served as the leader, approved and made decisions for the PIRC program. Plaintiff made changes that elevated the program and Department of Education  colleagues and PIRC customers commented that the program had become highly successful and the conference the best and most organized they had ever attended.

35.    The record contains evidence of the volume of Ms. Kilby-Robb's work, including the quantity and quality of her work.  Ex. AA   At her deposition, Ms. Kilby Robb explained in detail how her evaluation did not include all of the work she performed.  Ex. DD pages 62-91.

36.    Before Plaintiff  received her evaluation, she had only received compliments for her performance, especially the New Grantee Orientation. In March 2003, after the conference, many Department of Education employees asked her for assistance because the program was so well received.   Ex. A:36.

37.    Several weeks after the performance evaluation conference, Plaintiff asked Steve Brockhouse why he evaluated her performance in the manner that he did.   Ex. A:37.  Plaintiff sent an a-mail and a copy to John Fiegel informing him she had boxes of documentation for her outstanding performance.  Plaintiff did not receive a response to the e-mail. In a meeting after she "fell apart emotionally" at the conference, Brockhouse stated that he was not her supervisor and blamed John Fiegel.  Plaintiff told Brockhouse that he could have warned her if her performance was average.

14

38.     Plaintiff was informed by John Fiegel that Steve Brockhouse deserved the credit for the PIRC program and the work Plaintiff accomplished.   Ex. A:38.

39.     In June 2003, John Fiegel was still promising to submit a request to personnel for his 2 senior staff members (African American females) to receive compensation for the GS-14 position, Iris Lane for Voluntary Public School Choice program and  Plaintiff for the PIRC program.  Ex. A:39.  John Fiegel gave Plaintiff an average rating, but he did not view Plaintiff as just an average employee, because he promised to submit the position description for the PIRC Team Leader position.  Id. John Fiegel informed Plaintiff he had a lot of work to do but that he was going to submit paperwork for Plaintiff's GS-14 position after his vacation.  Id.

40.     Plaintiff refused to sign her evaluation in June 2003.  Ex. A:40.   Less than two weeks after Plaintiff refused to sign her evaluation, on June 28, 2003, Steven Brockhouse sent an a-mail while she was attending a PIRC Institute warning her for using very poor judgment which constituted unsatisfactory performance with respect to both effective communication and working cooperatively achieve the goals of the organization, because she advised callers in her absence to contact her supervisor.  Id.

41.     In 2003, the PIRC review was the largest review, 465 applications in OII. Ex. A:41.   With no assistance, Plaintiff received and responded to more than 2,000 telephone calls and emails.  When she was at the PIRC institute, she referred the calls to her supervisor.  Brockhouse later  reprimanded her for referring the calls to him in an effort to discredit her and justify a low evaluation.  Id.

42.     After Plaintiff refused to sign her evaluation, Fiegel said he was not going to submit the paperwork for the GS-14 PIRC Team Leader position.  Ex. A:42.  Fiegel

commented that everyone else was satisfied with their evaluation except the Plaintiff. Id. In August 2003, in a fit of anger, Fiegel said he was not going to talk to Plaintiff about it anymore. Id.

43.    In August 2003, Plaintiff submitted an application for telework. Ex. A:43. Plaintiff did not receive the signed copy until October 2003. The contract indicated that Plaintiff needed a computer to telework and it was assigned. John Fiegel and Margo Anderson failed or refused to respond to the request for a computer. Michael Petrilli finally responded and said Plaintiff would not receive a computer. Margo Anderson later stated that if the Plaintiff was so sick "why did [she] need a computer." Id.

44.    In Plaintiff's discussions with Steve Brockhouse, she told him due to her health condition, she needed certain accommodations to execute her duties and responsibilities because she was at the Department of Education for 10 to 12 hours a day and still had to go in on weekends. Ex. A:44. Brockhouse signed the papers was because Plaintiff kept asking him to work from home during her disability and recuperative period and by that time she had become visibly ill. In a conversation, John Fiegel said he did not know anything about the Family and Medical Leave Act or the telework policies due to a medical disability. Plaintiff asked him to please check on it for her, but he did not provide any follow-up information.

45.    In 2005, Plaintiff was informed that she was not the acting PIRC team leader. Ex. V. Prior to the removal of her duties, Fiegel met with Nina Rees and the Plaintiff in December 2004 and Fiegel told Plaintiff in the presence of Rees that he did not like her and he wanted her out of his program. Ex. A:45.

46.     Donna Hoblit and Richard Kress, both Caucasian GS-13 program specialists under Brockhouse, did dramatically less work and had lower level duties than Patricia Kilby Robb after January 2003.  Ex. N: 54-55.

47.     Plaintiff Kilby Robb was the acting team leader, COR and national expert; Hoblit and Kress were team members and not team leaders, and had no COR, program administration or competition manager responsibilities.  Ex. N: 54-55.

48.     Plaintiff Kilby Robb managed the PIRC program and received excellent reviews of her work, and received the Leadership Award for 2003.   Ex. K.

49.     In 2003, the Agency utilized a five tier scale for performance appraisals. For the review of her work from January 2003 through April 2003, Plaintiff and the other two African Americans on her team, Couch and Guitard, received an average rating, or "successful" rating from Brockhouse.  Ex. B:11.  Hoblit and Kress received a "highly successful" ratings by Brockhouse.  Id.  The only Caucasian under Brockhouse who received a successful rating was Kay Wagner, who had previously announced that she was retiring from the Agency.  Ex. A: 49.

50.     The Agency issued performance based bonuses in September 2003. Plaintiff received a $500 bonus.  Ex. P.  Kress received a $2000 bonus and Hoblit received a $2500 bonus.  Id.  The other team leaders, Kearns and Houser, received $3000 and a quality step increase (QSI), respectively.  Id.

51.     Richard Kress, GS-13, Caucasian Male, was employed as a team member on Brockhouse's team. In 2003, as a GS-13, during the same performance period that John Fiegel and Steve Brockhouse said was limited, Richard Kress received a Highly Successful rating and a $2,000 bonus.  By comparison, the Plaintiff received only a

Successful rating and a $500 bonus while continuing to complete all her assignments as GS-13 and in addition served as the Acting Team Leader with no assistance completing all of the duties and responsibilities assigned to Daisy Greenfield: COR; PIRC Team Leader; Lead in Program Administration; and served as a national PIRC expert.

52.    In 2004/05, Richard Kress received Highly Successful in both areas of Performance Evaluation and a bonus of $2,500, but still had not assumed the major duties and responsibilities parallel to the Plaintiff. Steve Brockhouse continued in that role without COR responsibilities. Ex. D.  In 2005/06, Richard Kress was still classified as "assists in program administration"  and received Highly Successful in both Performance Evaluation Areas with a bonus of $2,500. Id.  The Plaintiff again received a Successful rating in the Customer Service Area with a $750 bonus. Ex. G.  In contrast to the quantity, quality, and level of duties and responsibilities of the Plaintiff, she was given less bonuses money, lower evaluations, no QSI, no in-grade steps and no promotion. In every area Richard Kress, with the same GS-13 position, with no comparability or compatibility with responsibility, was compensated at a much higher level.

53.    Steve Brockhouse, Jim Houser and Dean Kern, all Caucasian men, were program leads/directors.  All three Caucasian males are GS-15s and GS-14s while the Plaintiff is a GS-13. The following comparative analysis demonstrates disparity in bonuses, QSI's, awards, promotions and evaluations with the Plaintiff. Ex. P.  With similar experiential backgrounds, specifically Dean Kern, a Caucasian male employee who served as a charter school principal before employment in POI, received a higher grade, higher bonuses, in-step increases, and higher evaluations.  Ex. P.  A comparison

between Dean Kern (CM) and Patricia Kilby-Robb (BF) is essential. Dean Kern was one of the Plaintiffs grant peer reviewers for the PIRC program before coming to ED and POI. After the same performance period in January 2003- April 30, 2003, John Fiegel and Steve Brockhouse gave the Plaintiff a "Successful" rating claiming that it was not enough time to evaluate her performance, but it was the same time frame for Dean Kern (GS-14) and Jim Houser (GS-15) to be evaluated, both were newly appointed Caucasian males to their programs and the Plaintiff had similar responsibility leading her program and serving as senior staff. Under the same program supervisors, John Fiegel gave Dean Kern (CM), Highly Successful Performance Rating, $3,000 (6 times more bonus money) in 2003, $3,000 in 2004, and $3,000 in 2005 while at the same time; Dean was eligible for in-grade steps. The Plaintiff slipped further behind in compensation, in 2003, the Plaintiff received $500, in 2004, $2500 and $750 in comparison to Dean's $9,000. The Plaintiff received only $3,700 with no opportunity for in-grade steps in comparison to Dean's $9,000 in bonus in addition to in-grade step increases. Both were former principals with similar duties and responsibilities, but disparate treatment.

54.     Jim Houser, GS-15, CM, received a QSI which elevated his pay for the rest of his career for 2003 when the Plaintiff received $500 and in 2005 received $3,500 (7 times more bonus money) with in-grade step increases. Ex. P. During the 2003 performance evaluation the same time frame as Plaintiff received Successful, Steve Brockhouse received an Outstanding rating. In 2005, he received Highly Successful with a bonus of $3,500 (7 times the bonus of the Plaintiff). The Agency did not provide information on Steve Brockhouse's bonus for 2003 but the assumption is it was much higher than 2005 for his Outstanding rating.

55.            After Plaintiff refused to sign her evaluation, submitted a rebuttal and filed an EEO complaint, John Fiegel and Steven Brockhouse created a hostile working environment for Plaintiff Kilby Robb.  Ex. A:48.  According to Richard Kress, Brockhouse directed another employee to criticize and admonish Plaintiff and her work in a staff meeting, so he would not have to; Brockhouse directed an employee to exclude Plaintiff from consideration of a peer award because he was trying to terminate her and an award would make it more difficult to do so; and Brockhouse commented that it was stupid that racial discrimination was once considered a civil rather than criminal offense in France. Ex. N:19-33.

56.      Kress described in detail several incidents of a hostile work environment directed at Ms. Kilby Robb.  According to Kress, at a staff meeting, John Fiegel stated that certain staff members had been communicating with other departments without  a "cc" on the email to Fiegel and Brockhouse and Fiegel had seen people dragged out of the building in handcuffs for this type of action, and after the meeting, Donna Hoblit informed him that Fiegel was referring to Patricia Kilby Robb.  Ex N at 19: 6-25-20: 1-12.

57.   On a separate occasion, Kress was informed by Donna Hoblit that she was directed by Brockhouse to attend a staff meeting where a topic of discussion would be the national PIRC performance report, and Brockhouse specifically instructed Hoblit to "criticize, admonish, respond negatively to the contents of the report" and to specifically criticize Patricia Kilby Robb's role in putting the report together. Ex. N at 22:15-23; 24:1-10.  Kress attempted to convince Hoblit that she should not engage in this conduct, but Hoblit stated that Brockhouse was her supervisor and she would do what he said.

Kress recalls at the meeting that Hoblit was "demeaning in her, in her comments and, you know, like someone scolding a child." Ex N at 24:9-22.

58.    In a separate incident, Kress sat on a peer award review committee and Hoblit was the lead person on the committee. Ms. Kilby Robb had been nominated for an award. During the meeting, the committee reviewed a nomination for Ms. Kilby Robb and Hoblit stated the supervisor-Brockhouse- had asked that the committee not give a favorable recommendation for this particular nomination because the work performance of the employee was poor and Brockhouse was trying to get enough documentation to get Ms. Kilby Robb removed and that this person getting an award would hamper that effort. Ex. N:27: 21-25, 28, 29:1-14.

59.    Kress noted that Ms. Kilby Robb is not given the resources necessary to perform her job, and other occasions Ms. Kilby Robb had responsibility for a particular area but decisions were made without her being consulted. Ex. N at 30-33. For example, Brockhouse met with an applicant after the paneling had occurred but prior to making an award, without Ms. Kilby Robb. Ex N at 33: 1-13.

60.    According to Kress, Brockhouse and Fiegel made statements that suggested that have some discomfort with diversity. Ex. N:34:11-21. Kress recalled that he once mentioned to Brockhouse in a casual conversation that during the French Revolution, there was a time when racial discrimination was a criminal rather than a civil offense and Brockhouse responded that "he was not surprised that the French would do something stupid like that." Ex N at 35:17-25 and 36:1-11. Kress mentioned that he was present at a staff meeting and there was a general discussion about contractors, and Brockhouse and Fiegel allowed and or supported attacks on minority

owned firms.  Ex N at 36-40.  After an employee who was present complained about Brockhouse and Fiegel's actions, Brockhouse announced that he would find out who the employee was and there would be retribution against the employee.  Ex 42: 16-21.

61.    Kress worked on the same team as Donna Hoblit and noted that she was just a team member.  Initially, she had grants and then she later had responsibility for the DC Voucher program  and at one point was the COR for the Magnet evaluation contracts.  According to Kress, before Hoblit had the contracts, Hoblit's level of responsibility was volume of word was dramatically less than Ms. Kilby Robb and after she got the contracts, her level of responsibility was less than Ms. Kilby Robb because she was not the team leader of anything.  Ex N at 54: 17-25 and 55:1-25.

62.    Brockhouse and the Agency had a history of discriminating against African Americans.  According to Wanda Gill, an African American female, she was hired as a Senior Advisor to a senior level advisor to Dr. Art Cole, who was a supervisor to John Fiegel and Steven Brockhouse.  Ex. B:147-149.  According to Ms. Gill, she observed Brockhouse and Fiegel's behavior and interaction with staff members.  Id. She recalled that on one occasion, she had to leave the office earlier than usual one day. Brockhouse attempted to impress an Asian coworker by pointing to his watch as she departed.  Ms. Gill had to correct Brockhouse and remind him that if either one of them was to monitor the arrival and departure of the other, it would be the other way around. Ms. Gill recalled that Fiegel withheld a position she sought.  Id.   Ms. Gill commented that Agency management did not believe there were qualified African American males. She noted that Ms. Kilby Robb was hired at the same time as a Caucasian female who had the same experience as principals of schools, but the Caucasian female was hired as a

GS-14 and Ms. Kilby Robb was hired at a 13.  Id. at 3. According to Ms. Gill, the

Agency promoted the Caucasian female to grade 15 to avoid having her report to Ms.

Gill.  Id.  Finally, Ms. Gill noted that the Agency used a ploy to get around promoting

African Americans by requiring that applicants have private school experience for a

position in the Office of Non-Public Education into GS-13/14 positions.   Id.

63.     Brockhouse and the Agency were the subject of a prior discrimination

lawsuit which resulted in a Class Action lawsuit by African American employees, which

was settled by the Department of Education.  Ex. W.  In the class action, Steve

Brockhouse was the supervisor of the name Plaintiff Valerie Grant, which was ultimately

settled by the Department of Education and resulted in promotions and other relief for

African American employees. Ex. W.

64.     Brockhouse publicly admonished Kilby Robb in the presence of staff

members and managers when she did her job.  Ex. U.

65.      Fiegel told the Plaintiff that he would not submit the paperwork for a GS-

14 PIRC team leader position because she filed an EEO compliant, and later told her he

did not like her personally and he wanted her off his team and also asked that she resign

her position and leave the Department of Education. Ex. A:42.

66.     The Agency follows OPM staffing guidelines which require an employee

to be compensated if they perform higher graded duties or are detailed to a higher graded

position more than 120 days.

67.     Plaintiff has performed all duties in the GS-14 position description for

four and one half years without compensation.

**<u>Defendant's Statement of Material Facts to Which it contends there is no Genuine Dispute</u>**

Plaintiff submits that Defendant's Statement of Material Facts which it contends are not in dispute omits many relevant facts in the record, and there are disputed facts which remain for trial, critical of which is whether Plaintiff performed the GS-14 program specialist duties. Ex. D.

1.      No dispute.

2.      No dispute.

3.      No dispute

4.      No dispute

5.      No dispute

6.      Dispute.  Plaintiff was required to perform all duties previously performed by Daisy Greenfield, the GS-14 program specialist, including 1) the PIRC team leader; 2) the Contractor Officer's Representative; 3) the competition manager; and 4) the program administrator.  Ex. G,  L, CC.  Plaintiff's GS-13 position description was almost identical to the job description of the GS-14 position held by Daisy Greenfield.  Compare Ex. C with Ex. D.

7.      Dispute.  Team leader duties are established by the Agency and may include some duties which may be considered supervisory in nature.  Ex C.

8.      Dispute.  Plaintiff performed all duties performed by her GS-14 predecessor, and repeatedly requested an accretion in duties/desk audit from the time she began the position and she was told the position would be advertised as a 14.  Ex. A:44.  Not disputed that Plaintiff's evaluation was "successful," but disputes that it was not

discriminatory. Plaintiff's supervisor, Brockhouse, who was not familiar with the work of the PIRC program had not even read the statement of work for the PIRC contractor, but received an Outstanding performance appraisal, in part, for his oversight the PIRC program in part. Ex. B at 11, U, BB. Donna Hoblit and Richard Kress, GS-13 program specialists, who did dramatically less work and had lower level duties than Patricia Kilby Robb after January 2003, received a higher rating that Kilby Robb. Ex. N: 19-33. Plaintiff Kilby Robb was the acting team leader, COR and national expert; Hoblit and Kress were team members and not team leaders, and no COR, competition manager or program administration responsibilities. Id. Plaintiff Kilby Robb managed the PIRC program and received excellent reviews of her work, and received the Leadership Award for 2003, but received the same evaluation as an employee on her team who did no work. Ex. K. For the review of her work from January 2003 through April 2003, Plaintiff and the other two African Americans on her team, Couch and Guitard, received an average rating, or "successful" rating. Ex. B:11. Hoblit and Kress received a "highly successful" ratings by Brockhouse. Id. The only Caucasian under Brockhouse who received a successful rating was Kay Wagner, who had previously announced that she was retiring from the Agency.

11. Not disputed that Plaintiff received a cash award of $500 but disputes that the award was not discriminatory. Plaintiff received a $500 bonus. Ex. P. Kress and Hoblit received $2000 and $2500 bonuses. Id. The other team leaders, Kearns and Houser received a $3000 bonus and QSI. Id.

## ARGUMENT

### A.    Employment Discrimination–Disparate Treatment

Ms. Kilby-Robb's claim is that she was individually discriminated against by the agency on the basis of her race and gender. Her claim is one of disparate treatment.[1]

A disparate treatment claim is analyzed under the three-stage framework set forth in McDonnell-Douglas Corp. v. Green.[2] "Under the McDonnell-Douglas framework, the complainant must first establish a prima facie case of prohibited discrimination. Once he has done so, the burden then shifts to the employer to articulate legitimate, nondiscriminatory reasons for the challenged employment decisions. Should the employer succeed in presenting such reasons, the burden then shifts back to the complainant, who then has an opportunity to discredit the employer's explanation."[3]

---

[1] Most claims of racial discrimination may be classified as either claims of disparate treatment (i.e., a claim that a person was treated adversely because of his membership in a protected class) or disparate impact (i.e., a claim that an employer's use of a race-neutral rule has a disproportionately negative impact on members of a protected class). The legal standard and burdens of proof for a disparate treatment claim under Title VII are articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, S.Ct. 1817, 36 L.Ed.2d 668 (1973). For a disparate treatment claim, see Griggs v. Duke Power Co., 401 U.S. 424 (1971).

[2] 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

[3] Aka v. Washington Hosp. Center, 156 F.3d 1284, 1288 (D.C.Cir. 1998) (internal citations omitted). The rationale for this three-part back-and-forth analysis is that once the plaintiff establishes a prima facie case of discrimination, the presumption arises that the defendant's adverse employment actions against the plaintiff were caused by illegal discrimination, which "compels the employer to 'produc[e] evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" If the defendant does articulate such a legitimate, nondiscriminatory reason for the adverse employment actions, "'the presumption [of discrimination] raised by the prima facie case is rebutted' and 'drops from the case.'" Id. at 1289, quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Throughout this analysis, the burden of proof never shifts to the employer, but always remains with the employee.[4]

Thus, in this matter, Ms. Kilby-Robb has the initial burden to make out a prima facie case that the agency discriminated against her on the basis of her race and/or gender. Once she has done so, the burden of production–but not of persuasion–shifts to the agency, and the agency must articulate a legitimate, nondiscriminatory reason for the adverse actions it took against Ms. Kilby-Robb. If the agency does so, Ms. Kilby-Robb must then make a showing that the reasons articulate by the agency are not the true reasons, but are rather a pretext.

The standard for reviewing a motion for summary judgment requires the court to view the evidence in the light most favorable to the non-moving party. To decide a motion for summary judgment in an employment discrimination case, "assuming ... that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus ... will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation of its actions; and (3) any further evidence of

---

After the defendant-employer has articulated legitimate, nondiscriminatory reasons for its adverse employment actions, "the plaintiff has 'the full and fair opportunity to demonstrate, through presentation of his own case and through cross-examination of the defendant's witnesses, that the proffered reason was not the true reason for the employment decision, and that race [or some other discriminatory basis] was." Aka v. Washington Hosp. Center, 156 F.3d 1284, 1289 (D.C.Cir. 1998), quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507-08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), quoting Texas Department of Community Afairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

[4]Aka v. Washington Hosp. Center, 156 F.3d 1284, 1288-89 (D.C.Cir. 1998) (citing Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 102 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)."[5]

**B. Plaintiff has established claims of disparate treatment based on race and gender.**

Plaintiff has established that she was required to perform her GS-13 duties, as well as the GS-14 program specialist/PIRC Team Leader position, which has four additional components:1) PIRC Team Leader/national expert; 2) Contractor Officer's Representative; 3) Competition Manager; and 4) Contract Administrator.  Ex. C, D, E, G, I L, L-1, X and AA.  Plaintiff performed the program specialist duties as outlined in the GS-14 position description.  Ex. D.

The record confirms that Plaintiff performed the grade 14 work.  Ex. AA, I, L.

The PIRC program is complex and multifaceted. Since there are six purposes and fourteen assurances, the Team Leader should be well versed in parental involvement theory and practices and have knowledge of pedagogy, schools and academic achievement.  Ex. A:40.

Typically, a team leader assists the team through knowledge and application of leadership and team building skills such as group facilitation, consensus building, coordination, coaching, problem solving, interpersonal communication, integration of work processes and products, obtaining resources and liaison with the supervisor.  Ex. A:51.They and the team are accountable for outcomes and results.

---

[5]Aka v. Washington Hosp. Center, 156 F.3d 1284, 1289 (D.C.Cir. 1998).

According to the Office of Personnel Management/U.S. Department of Education, the Team Leader position description is for employees who regularly and routinely spend 25 percent or more of their time leading a team of other GS employees in accomplishing two-grade interval work.  Ex. A:52.  The PIRC Team Leader/program administrator delivers quality products and services that address customer requirements. Id.  The PIRC Team Leader administers the program by:

a) Coordinating the needs assessment for Continuous program improvement;
b) Approving Parental Information and Resource Center Director's Planning Committee;
c) Approving National Parental Involvement Research and Evaluation Panel of experts;
d) Working with PIRC Directors collectively to determine technical assistance support.
e) Needs Assessment and Strategy Development Plans and Implementation for PIRCs

The Team Leader/Program Administrator reviews Program Management and Organization Needs of PIRCs:

a) Internal controls,
b) Use of technology to manage their projects and deliver services,
c) Project management strategies, including, but not limited to, hiring and retaining qualified key staff, implementing and evaluating key components of the project,
d) Staying current on relevant research, Federal programs, State and local educational issues, and
e) Data collection and evaluation
f) Serving as a network of technical assistance providers.

The Team Leader utilizes Contractors to develop plan for assessing PIRC needs in the context of the requirements set forth at sections 5563, 5564, and 5565 of the authorizing legislation.  The plan shall include:
- Methods of assessing and analyzing the needs of the PIRCs (data collection and analysis procedures)
- Methods for identifying available resources, gaps in resources and strategies to fill the gaps,
- Strategies for managing the technical assistance that is proposed to meet the needs of the PIRCs.  This should include a plan for service delivery that addresses proposed services, staff allocations and timelines.

The Team Leader assists in program Implementation and in the determination of best practices, Federal program legislation, and materials relevant to State and national initiatives, and provides information for new PIRCS to use PIRCs may use immediately in the implementation of their projects or in providing direct services to their constituents. Ex. A:53.

The Team Leader assists in updating the Technical Assistance Plan that responds to the needs that were identified in the Final Summary Needs Assessment Report.  Ex. A:54.  The Technical Assistance Plan include the types of services to be provided, who will provide the services, timeline for service delivery, method services will be delivered and how services will be evaluated to determine the benefits received by participants.

The Team Leader develops the Compliance Monitoring (Program Officer) Plan for On-going Technical Assistance to grantees focused on performance and results while guarding against fraud, waste, and abuse.     Ex. A:55.

Daisy Greenfield served as the lead for the Compliance Monitoring Plan for program officers. Ex. A:56.  The Plaintiff was only a program officer and did not have lead responsibility for development of the plan.  After assuming the position of Acting Team Leader, the Plaintiff not only monitored her grantees, but also assisted other Team members in critical situations especially follow up with audit issues and OGC and state IG investigations.

Daisy Greenfield served as the lead in the preparation and coordination of PIRC Technical Assistance to PIRC Team and other Programs and the Acting Team Leader

assumed this responsibility as well.  Ex. A:56.   Information was provided to Team members for feedback and input.

Plaintiff was officially appointed as the Contractor Officer Representative in January 2003 and she signed a Contractual Agreement in April 2003. Ex. A:58.  It is the COR that writes the Scope of Work for the contractor; therefore, it is the Scope of Work that provides the structure for management delivery, service delivery, and implementation of best practices using evidence- based processes and research to the PIRCs.  Id.   The COR monitors and evaluates the work of the contract. It is the COR that sets the tone and direction of PIRC work and clarifies policy and the law. The COR plays a pivotal role in every facet of program administration, leadership, and management.  Id.

Plaintiff assumed the Technical Assistance Coordination Center for the Parental information and Resource Centers responsibilities, which all fell under Daisy Greenfield's purview, including:

- Monitor technical assistance efforts conducted contractor. Technical assistance is continuous and serves as the major work of the coordination center (provided on a daily basis). During this past year, PIRC directors call on a regular basis to the coordination center to request assistance and the key staff at the center make periodic telephone calls to the PIRCS to provide assistance.

- Informational Packets/PIRC website and PIRC MALL: PIRCs play a critical role in information dissemination on supplemental educational services, choice, state accountability systems as well as strategies designed to support parents' involvement in effecting their children's academic achievement.  To fulfill this function, the PIRCs needed ready access to research-based strategies, resources, Federal and State laws and requirements, and modern technology that impacted project management and service delivery.  As the Team Leader, the Plaintiff provides technical assistance to address the collective needs of all of the PIRCs to strengthen the management and implementation of their projects.  Ex. A:59.

The COR assumes the lead in the process of reviewing, evaluating, selecting, and awarding the PIRC Technical Assistance Contract including: writing PIRC Technical Review and Evaluation Plan, Statement of Work, Technical Review criteria, identifying panel members, and overseeing the process through contract selection in accordance with Department policies and procedures. Ex. A:60. The Plaintiff served as the Chairperson for the Technical Evaluation Contract Review in 2006.

In addition, Plaintiff was responsible for New Grantee Orientation, which meant that she:

- Planned/ commented/ and recommended approval of the New Grantee Orientation. The orientation of new grantees is designed to prepare the grantee for program implementation, grant administration/management, performance and evaluation of projects (EDGAR). This technical assistance opportunity is extremely valuable to guard against fraud, waste, and abuse of federal funds.
- Information was provided to Team members for feedback and input.
- Technical assistance and compliance monitoring opportunities were provided to PIRC Program Officers to meet with new grantees in small groups as well as individually.
- Coordinated participation of key ED national experts in OII, Title I, faith-based initiatives, GPOS, etc.
- Planned/ commented/ and recommended approval of the PIRC Institute Plan. Ex. A:61.

Furthermore, as the PIRC Team Leader, Plaintiff had responsibility for Regional Institutes. The institutes were designed as technical assistance opportunities to facilitate intensive small group learning/working sessions that focused on the objectives and goals of the Strategic Plan/NCLB/and other ED initiatives, and required Plaintiff to:

- Review/comment/ approve the agenda (dates, location, themes, specific objectives, dates, and locations, agenda, and presenters for the Regional Institutes. Submitted agenda for OII approval.

- Institutes focus on areas of study such as: priority (information on pubic school choice, supplemental educational services, and state standards contained in the PIRC application); the 14 statutory requirements in NCLB, performance (Annual and Final Performance Report draft document) and evaluation (local).
- Technical assistance and compliance monitoring opportunities are incorporated in the agenda for PIRC Program Officers for small group and individual appointments.
- In addition to the planning, coordination and monitoring role as the COR, the Plaintiff serves as a program officer and participated in small group technical assistance sessions and schedule individual compliance meetings with not only her grantees, but also the other Team members' grantees that need.
- Share  follow up information with Team members for feedback and input.  Ex. A:62.

Based on meetings with OII (Deputy Associate Secretary, Director of

Communications, and other Contract representatives), the Plaintiff has the responsibility

to invite organizations that were recommended as possible participants in the National

Conference to the working sessions at the institutes. Ex. A:63.  The national conference

and institutes are used to introduce the parent-focused organizations to the PIRCs. Id.

The institute expanded linkages and improved communication among the ED, Technical

Assistance Coordination Center, the PIRCs, and the parent-focuses organizations

involved in improving parental and family involvement in education and public school

choice.

Plaintiff also had responsibility for the National PIRC Directors' Conference**.**  Ex.

A:64.  She

was required to:

- Plan/ made revisions and recommend approval of the PIRC Directors' National Conference Plan.
- Coordinate participation of key ED national experts in OII, Title I, faith-based initiatives, GPOS, OELA and in the field of education.
- Review/comment/ approve the agenda draft/ submitted agenda for OII approval (dates, location, themes, specific objectives, dates, agenda, and

presenters for the Conference) Approve the conference agenda, conference facility, and any and all conference speakers, topics, presentations, materials to be disseminated, and costs prior to the submission of the final Annual PIRC Director's National Conference Plan.  Work with the Contractors to carryout the conference in accordance with the approved Final Annual PIRC Directors' National Conference Plan and agenda.

- Technical assistance and compliance monitoring opportunities are incorporated in the agenda for PIRC Program Officers for small group and individual appointments.
- As a program officer, the Plaintiff participated in small group technical assistance sessions and scheduled individual compliance meetings with not only my grantees, but the other Team members' grantees needing assistance as well. (Requests for assistance based on lack of response from Team members)
- Approve research-based parent involvement strategies and relevant materials to assist PIRCs in implementing their projects as a part of technical assistance.

- COR must stay abreast of changes and updates in contract law and Department process, including technological changes. The COR attends Advanced training sessions and must receive recertification as Contract Officer's Representative (COR).  Ex. A:65.
- COR responsibilities are vital to the work of the Parental Information and Resource Center program. The COR provides direction and focus to the program as well as management and Team members.
- The COR schedules ED/RMC meetings.
- The COR monitors and evaluates the contractor's performance to ensure compliance with technical requirements including review of deliverables and evaluation of reports and recommends final acceptance or rejection to the CO. The deliverables include:
  - All written reports and plans, including need assessment and strategy development; technical assistance, summary performance reports, and data analysis reports, monthly management reports, business reports, etc.
  - New Grantee Orientation (documented);
  - Regional Institutes (documented);
  - National Director's Conference (documented);
  - Performance Measurement System (Annual and Final Performance
  - Report document) and web-based data collection system (Documented);
    PIRC website (Public and Private)  (documented); and
  - On-going technical assistance to PIRC Directors.
- Review progress and financial reports, invoices, vouchers, and recommended approval or disapproval of deliverables,

- Recommend changes in the statement of work (modification) based on priorities established in OII and PIRC objectives for the National Conference.

- Review and submit receipts for contract task completion:
  - Review monthly reports on the progress attained, problems that have been resolved or are in need of resolution, and a discussion of the work to be performed.
  - Review monthly financial reports that exhibit of expenditures delineating project costs by individuals and tasks monthly manpower reports summarizing the actual personnel assignments for the month with each named individual and the hours charged by task.
  - Enter receipts into the CPSS system for each voucher. Id.

Daisy Greenfield was responsible for assisting in the development of budget materials and policy for the Parent Information and Resource Centers. Ex. A:66. In the GS-13 position, these duties and responsibilities were all new to the Plaintiff, but assumed by the Acting PIRC Team Leader.

- Determined/Recommended the budget for the Continuing grantees (2003-2006)
- Assisted in the budget determination for the Technical Assistance contractor (2002-2006)
- Submitted the contract modification for the National Director's Conference.
- Followed up on budget issues with previous contactor for payment (McFarland). Worked cohesively and imperiously with the OII /CO budget staff to get the job completed
- Schedule and attended meetings with 2 budget representatives for the PIRC program.
- Constant follow-up with OII's executive budget analyst.
- Provided input on PIRC Spending Plan. Id.

Plaintiff's fourth major responsibility change was appointment as competition manager. Ex. A:67. In 2002, Daisy Greenfield served as the Competition Manager for the grant review. She had six program staff working with her. During that review the program received less than 150 applications. However, in 2003 when the Plaintiff assumed the role of Competition Manager, there were more than 450 grant applications, the largest number received for the program, tripling the work load to 34 panels and panel

monitors, consisting of more than 102 reviewers. The Plaintiff, an experienced manager and organizer, conducted such an outstanding review, she was highly applauded and complemented on a regular basis during the review process. She received telephone calls and e-mails from across the Agency. She performed to the highest level and was awarded the first OII Peer Leadership Award. Since her tenure at ED, it is documented that the Plaintiff has received awards for almost every Team she has participated.  Id.

In the GS-13 position, these duties and responsibilities were all new to the Plaintiff. Daisy Greenfield provided analytical support to the PIRC program and coordinated the program process including: monthly report review that delineates the status of implementation of the Technical Assistance Plan and specifies what technical assistance services have been provided, who delivered the services, the timeline by which services were provided and to whom the services were provided.  The process review identified any obstacles that impaired or prevented timely implementation of the Technical Assistance Plan and how those obstacles were addressed.    Id.

The Agency has attempted to minimize the quantity and quality of work performed by the Plaintiff.  Plaintiff believes it is necessary to demonstrate to the court the volume of work she was required to perform.  Exhibit AA includes work assignments and duties completed from December 2002 through April 2003, which were previously performed by the GS-14 program specialist.  Ex. AA.

Regardless of how the Agency classified the work Plaintiff has performed over the past four and one half years, under Agency/OPM guidelines, the Agency is required to compensate an employee if the employee is given higher graded duties for more than 120 days.  The Agency's guidelines are as follows:

2.  <u>Types and Length of Details</u>

      a.  Details to the same or lower grade position may be approved initially or extended subsequently in 120 day increments up to a maximum period of one year .  Extensions beyond one year will require the approval of OPM.

      **b.  Details to higher-grade positions may be approved for a period not to exceed one year during a major reorganization (a major reorganization means an organizational change including transfer of function, the elimination, addition, or redistribution of functions or responsibilities affecting a major segment of a departmental component).  However, if an employee's services are needed in a higher-grade position for more than brief periods (60 days for bargaining unit and 120 days for non-bargaining unit) managers and supervisors are encouraged to make temporary promotions instead.**

      c.  Details to positions at a higher grade or with known promotion potential and which are expected to exceed 60 days for bargaining unit employees or 120 days for non-bargaining unit employees must be made under the competitive procedures of the Department's merit promotion plan.

      d.  Details to unclassified duties may be approved for a maximum period of 120 days.  In unusual situations, <u>OPM</u> may grant an extension.

See PMI 300-4 Details to Unclassified Duties.  The Agency may not require the Plaintiff to perform the additional duties without compensation.

      An inference of discrimination is raised when an employer violates its own personnel regulations in making employment decisions. It is generally recognized that an employer's failure for follow personnel regulations is evidence of pretext.  See <u>Kolstad v. American Dental Association</u>, 108 F.3d 1431 (D.C. Cir. 1997), rev'd on other ground,

139 F.3d 958 (D.C. Cir. 1998); <u>Vitarelli v. Seaton</u>, 359 U.S. 535, 539-40 (1959); <u>Watson v. National Linen Service</u>, 686 F.2d 877 (11th Cir. 1962).

The Agency contends that Plaintiff's claim that she was not compensated, rewarded or recognized for doing higher level work than her currently assigned grade level of a GS-13 must fail because there is no evidence that performing Team Leader duties warrants being paid at the GS-14 level. To the contrary, the GS-14 position description lists precisely what duties warrant being paid at the GS-14 level. Ex. D at 3. Plaintiff performed all duties within Ex. D—overseeing the PIRC program, serving as the Agency expert and team leader, and making decisions and recommendations on the PIRC program-- and the Agency does not dispute this. As noted, the Agency's regulations provide that if an employee is detailed into a higher graded position for more than 120 days, the employee must be compensated. Moreover, all team leader positions are at the 14 level or above. When Daisy Greenfield was in the team leader position, she was compensated at the 14 level. Houser, Kearn and Brockhouse are all in team leader positions and are compensated at the 14or above level.

The Agency's argument that  there is no comparable employee of a different race and/or gender who was in a GS-13 level but was paid at the GS-14 level for performing GS-14 level duties, is immaterial. There were no employees at the Grade 13 level who were required to perform Grade 14 duties Plaintiff was required to perform.

Ms. Kilby-Robb served as acting team leader with all responsibilities with this leadership position as well as the Program Officer for 22 States. As the Acting Team Leader for PIRC, Ms. Kilby-Robb successfully ran a $42 million dollar program, as well as performed her duties as a GS-13 Program Officer. The record contains the deposition

testimony of Daisy Greenfield. Ms. Greenfield described her duties as the PIRC team

leader. According to Ms. Greenfield she performed the following duties: Developed the

notice of closing when it was time for a competition, cleared application packages

through the Office of Management and Budget, identified application reviewers, went

through the process of having those reviews approved at the department, arranged to have

the reviewers brought in to participate in the technical review process, administered the

technical review process, setting up the panels, assigning the applications, ensuring that

the whole process went according to the technical review plan, developed the technical

review plan, wrote a statement of work to have a contract for the technical assistance to

the grantees, served as the contracting officer's representative to administer the contract.

Ex. CC: 13-14. In addition, Ms. Greenfield served as the competition manager.

By comparison, Ms. Kilby-Robb's performance plan required her to perform the same

duties as the PIRC team leader as Ms. Greenfield:

1.      In years where funds are available for Parent Information and Resource Center
grant competitions, leads the development of the application process, including:
developing application materials, priorities, and selection criteria that are tied to the
Strategic Plan and Department policies and initiatives.
2.      In years when funds are available for Parent Information and Resource Center
grant competitions, leads the process of reviewing applications, including: writing the
technical review plan, identifying readers, and overseeing the process through grantee
selection in accordance with Department policies and procedures.
3.      Leads the implementation of the program monitoring plan, providing technical
assistance to grantees focused on performance and results while guarding against fraud,
waste and abuse.
4.      Serves as the contract officer's representative for Parent Information and
Resource Centers contracts.
5.      Assists in the development of budget materials and policy for the Parent
Information and Resource Centers.
6.      Serves as a Department-wide resource on  Parent Information and Resource
Centers.
7.      Participates in improvements to work processes including GAPS and
e.gov initiatives.

Ex. G at 1-2.

Moreover, Plaintiff was assigned a problem employee to her team, even though Agency management knew this employee did not perform any work.  With the original reorganization approval plan, James Guitard was assigned to Jim Houser.  Ex. M.  When Houser refused to accept Guitard, he was dumped on Plaintiff's team.

Thus, Plaintiff was doing the same GS-14 work as her predecessor, Ms. Greenfield, with less resources, and in fact the program had grown since Ms. Greenfield's departure.  More importantly and undeniably, the PIRC program was an absolute success and this was attributable to Plaintiff's leadership of the program.  Ex. K.    According to the undisputed evidence in the record, the PIRC program was larger and more successful under Ms. Kilby-Robb than it had ever been in the past.   Steven Brockhouse, who received an Outstanding rating as the Supervisor of the Plaintiff based in part on the success of the PIRC program, acknowledged that Plaintiff ran the PIRC program on a daily basis and he deferred to her on all major decisions for the program.  Ex. EE:14-16.  Brockhouse admitted that he had not even read all of the regulations for the program at the time he supported an average evaluation for the Plaintiff.  Ex. U.

The Agency maintains that the performance appraisal was first given to the Plaintiff under a new system and everyone in her PIRC program received the same rating.  Plaintiff disputes that two Caucasians got a successful rating.  Only one Caucasian employee working under Brockhouse received a successful rating, and that was Kay Wagner, who had announced that she was retiring from the Agency.  Ex. BB:11.

The Agency cannot present any rational justification for giving Plaintiff a lower rating than Caucasian employees who performed less work and had lower levels of responsibility.

Donna Hoblit, a Caucasian female, received a "Highly Successful" performance evaluation, which was higher than the "Successful" rating issued to Ms. Kilby-Robb. Hoblit admitted at her deposition that she had significantly less responsibility than Plaintiff and that she was a program specialist for a single program—magnet schools. Ex. Z:11. Hoblit did not have any team lead responsibilities. Id. at 12. Hoblit did not serve as a competition manager. Id. at 14. Hoblit did not have any responsibility for setting the budget for the magnet program. Id at 14. Hoblit only served as a COR for two contracts. Id. at 23.

James Guitard, an African American male, was a program officer on the PIRC team and received the same evaluation as Ms. Kilby-Robb. Guitard made it known that he did not intend to do any work on the PIRC team. Brockhouse, Fiegel and Daisy Greenfield indicated that Guitard had serious performance issues.

Kress and Hoblit performed less work and lower levels of work but received higher evaluations, even though they were the same grade as the Plaintiff, Guitard did no work and received the same evaluation as Plaintiff.

Other Evidence of Race Discrimination

According to Shelton Allen, the Agency management has a history of not favoring African American applicants. Mr. Allen's sworn testimony is that "Complainant was basically performing the work of a GS-14 along with her previous

duties as a GS-13, but was not given the GS-14 position nor compensated for the work." Ex. B at 152-54.

African American female, Wanda Gill provided testimony that Brockhouse displayed open hostility toward African American women.  She described Brockhouse as "abrasive" and "short and generally described his discriminatory conduct." Ex B: 147-49.

All of the African Americans working under Brockhouse received the same rating.  Despite the fact that Ms. Kilby Robb served as a program officer and the team leader without additional compensation, she received the same rating at Rachael Couch and James Guitard, who were team members.

### C.    Plaintiff has established a Hostile Work Environment Claim

The Agency argues that Plaintiff's hostile work environment claim was limited to being required to perform certain extra duties, her performance did not receive recognition, and she was admonished for referring callers to her boss.  The evidence in the record goes far beyond what the Agency has mentioned.

Ms. Kilby Robb complained that after she refused to sign the average performance appraisal, she was subjected to a hostile work environment.  First, Fiegel and Brockhouse refused to issue to her a new position description for the GS-14 position she acted in and refused to process the paperwork for a GS-14 Team Leader for the PIRC program.  Ms. Kilby-Robb also documented efforts to reprimand her because she refused to accept a discriminatory performance appraisal, the hostile treatment she received, interference with her efforts to obtain a computer to work at home when she was ill, and other actions.

Richard Kress confirmed Ms. Kilby-Robb's fears that Brockhouse was out to sabotage her efforts and get her terminated.  According to Kress, Plaintiff's supervisor, Brockhouse, reprimanded her publicly as someone would scold a child (Ex. N. 24:9-22); solicited another employee to criticize Plaintiff's work at a staff meeting so he would not have to; tried to prevent her from receiving an award because it would hamper his efforts to terminate her; and did not provide her necessary resources to perform her job.  Ex. N:19-29.   Plaintiff noted the requirement that she perform her GS-13 job, the GS-14 duties and the duties of James Guitard, while receiving a lower performance appraisal; that Brockhouse was openly hostile toward her and sent her harshly worded and demeaning emails; and waited three years to tell her she was not the Acting PIRC Team Leader, when she ran the PIRC team and she had sent countless emails identifying herself as the Acting PIRC Team Leader.

A classic example of the hostile work environment is an email sent by Brockhouse.  In an email, Ms. Kilby Robb indicated that she would be hand delivering draft copies of the 2003-2004 Annual Parental Information and Resource Center Performance Report Summary at a staff meeting and she would provide additional information and orientation materials.  Brockhouse responded harshly:  "In the future, if you want something put on the agenda, you will get it cleared by me and you will do so in advance of the meeting.   . . . There is no 'PIRC TEAM."   . . . You are not serving in the role of acting team leader.  Your position description does not and has not included a "team leader" addendum and you are not detailed, delegated, or assigned such responsibilities."  Ex. V.

A jury could conclude that Plaintiff was subjected to a hostile work environment based on her race and gender based on these actions and the disparate treatment confirmed in the evidence in the record.

### Conclusion

For the reasons stated herein, the motion for summary judgment should be denied.


Respectfully submitted,

/s/
David A. Branch
Law Offices of David A. Branch, P.C.
1825 Connecticut Avenue, NW #690
Washington, D.C.  20009
(202) 785-2805

### Certificate of Service

I hereby certify this 9th day of May 2007 that a copy of the foregoing Plaintiff's Opposition to Motion for Summary Judgment was sent to counsel for Defendant listed below.


MARINA UTGOFF BRASWELL
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W. - Civil Division
Washington, D.C. 20530
(202) 514-7226

_____/s/_____
David A. Branch