UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PATRICIA KILBY-ROBB,

Plaintiff,

v.

MARGARET SPELLINGS, SECRETARY
OF EDUCATION,

Defendant.

Civil Action No. 05-2270 (JDB)

## MEMORANDUM OPINION

Plaintiff Patricia Kilby-Robb, a GS-13 employee of the United States Department of Education, brings this action against Margaret Spellings in her official capacity as the Secretary of Education. Plaintiff claims she was subjected to race and gender discrimination in the terms, conditions, and privileges of her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Specifically, plaintiff alleges that: (1) she performed the duties of a grade 14 employee without additional compensation or promotion; (2) she received an erroneously low performance evaluation; and (3) she was subjected to a hostile work environment. Currently before the Court is defendant's motion for summary judgment, which the Court now grants in its entirety.

## BACKGROUND

Plaintiff is an African-American female who is currently employed as an Education Program Specialist, grade 13, step 10, at the U.S. Department of Education ("DOE"). Statement of Undisp. Facts ("Statement") ¶ 1. From 2001 to 2002, plaintiff worked at DOE as a member of

the Parental and Local Family Information Centers ("PIRC") team, which resided in the Office of Elementary and Secondary Education ("OESE"). Pl.'s Opp. ¶¶ 2, 9. The PIRC team consisted of Rachel Couch (GS-12), plaintiff (GS-13), and the Team Leader, Daisy Greenfield (GS-14), an African-American female. Def.'s Mot. at 7.

In December 2002, a new office was created within DOE: the Office of Innovation and Improvement ("OII"). Statement ¶ 2. At that time, the PIRC team function was transferred to the jurisdiction of OII's Parental Options and Information ("POI") area, headed by John Fiegel (GS-15), and the membership of the PIRC team changed slightly. Id. ¶ 3. The members of the PIRC team in OII were James Guitard (GS-12), Rachel Couch (GS-12), and plaintiff (GS-13). Pl.'s Opp. ¶ 18. Greenfield maintained her grade 14 position in OESE and did not transfer to OII. Statement ¶ 6; Def.'s Ex. 5, Dep. of John Fiegel ("Fiegel Dep.") 15:13-15. Since Greenfield was no longer the PIRC Team Leader, the PIRC team initially faced a "leadership vacuum" until plaintiff and Steven Brockhouse (GS-15) took over Greenfield's former PIRC responsibilities. Def.'s Mot. at 8. In particular, Brockhouse, Deputy Director of POI, assumed Greenfield's supervisory role and became responsible for the day-to-day activities of the PIRC team while plaintiff was asked to take on the duties of Acting Team Leader. Def.'s Ex. 5, Fiegel Dep. 16:13-18, 17:5-10; Statement ¶ 6.

When plaintiff accepted the Acting Team Leader position, she claims that she was required to perform grade 14 duties in addition to her regular grade 13 duties. Pl.'s Opp. ¶ 17. According to plaintiff, Fiegel told her the PIRC Team Leader position would eventually be announced as a grade 14 position and that he would request grade 14 compensation for plaintiff while she held the position in an acting capacity. Id. ¶¶ 22, 39.

Fiegel denies telling plaintiff he would request grade 14 compensation for her as Acting Team Leader, although he admits that he hoped eventually to advertise a new grade 14 position in the PIRC program if funding became available. Def.'s Ex. 7, John Fiegel's Statement and Resp. to Interrogs. ("Fiegel Statement") ¶¶ 8, 13. Ultimately, no funding materialized, and no position was advertised. Id. Instead, DOE merged the PIRC team with the Magnet Schools team and placed both teams under the leadership of Brockhouse. Pl.'s Ex. Z, Dep. of Donna Hoblit ("Hoblit Dep.") 24:4-19.

At the start of the calendar year in 2003, DOE adopted a new appraisal performance system, changing from a pass/fail rating system to one that used a rating scale of unacceptable, minimally successful, successful, highly successful, and outstanding. Def.'s Mot. at 9. The initial rating period was a transitional one of only 120 days -- covering January 1, 2003, through April 30, 2003. Id. In preparation for the evaluation process, plaintiff began assembling a list of her accomplishments, but she was unable to complete her list before she took time off due to the illness and death of her father. Pl.'s Opp. ¶ 31. Plaintiff later became ill herself in April 2003, was diagnosed with hyperthyroidism, and underwent treatment for her condition. Id.

When plaintiff met with Brockhouse and Fiegel in June 2003 to discuss her performance evaluation, she was issued a "successful" performance rating. Def.'s Ex. 12, Kilby-Robb Performance Evaluation at 3. Plaintiff was apparently devastated at this result and immediately expressed her disappointment and belief that the rating was too low. Plaintiff left the meeting distraught and refused to sign her evaluation. Pl.'s Opp. ¶ 40. During this first rating period,"outstanding" evaluations were given to three individuals (two Caucasian males and one African-American female); "highly successful" evaluations were given to four individuals (one

Caucasian female and three Caucasian males); and "successful" evaluations were given to seven individuals, including plaintiff (four African-American females, one African-American male, and two Caucasian females).  Def.'s Ex. 7, Fiegel Statement ¶ 7.

Shortly thereafter, plaintiff was out of the office for a period of time to attend the PIRC institute.  Pl.'s Opp. ¶ 41.  During her absence, plaintiff referred all of her calls and e-mails to Brockhouse without telling him she had done so.  Id.  Upon her return to the office, Brockhouse sent plaintiff an e-mail stating as follows: "I am writing to advise you that the action you took -- to refer all of your telephone calls and e-mail messages to me without prior consultation regarding alternative[s] that were available for handling this work during your absence -- represents very poor judgment and constitutes unsatisfactory performance with respect to both effective communication and working cooperatively to achieve the goals of the organization."  Pl.'s Ex. B, Investigation Report, Brockhouse E-mail at 42.  Brockhouse then requested plaintiff consult with him prior to leaving referral messages in the future.  Id.

Around this time in June 2003, plaintiff claims Fiegel told her that he was not going to submit the paperwork requesting that she be promoted or compensated at the grade 14 level.  Pl.'s Opp. ¶ 42.  Plaintiff thereafter sought EEO counseling on July 26, 2003, regarding her 2003 performance appraisal, her claim of non-sexual harassment, and her claim that she was performing grade 14 duties without being properly compensated.  Def.'s Ex. 15, Counselor's Report at 1-2.

In August 2003, plaintiff submitted an application for telework and requested a computer to work from home.  Pl.'s Opp. ¶ 43.  Margo Anderson, the OII Executive Officer, reviewed plaintiff's request for a computer and denied it based upon DOE's policy and economic considerations.  Def.'s Ex. 9, Dec. of Margo Koines Anderson ("Anderson Dec.") at 4-5.

According to Anderson, plaintiff did not indicate that her desire to obtain a computer for telework was "part of or for a reasonable accommodation request as to any particular, identifiable disability." Id. at 4. Plaintiff "was allowed to take some time off and was told by her supervisor at the time, John Fiegel, to take more time off if she wished, but she declined to do so." Id.

On November 24, 2003, plaintiff filed a formal EEO complaint of discrimination. Def.'s Ex. 16. In her complaint, she alleged discrimination based upon her 2003 performance evaluation and her claim that she was performing grade 14 duties without proper compensation. Id. Plaintiff also alleged that she was subjected to a hostile work environment when she did not receive a grade 14 position description, when her request for a computer was denied, when she was told that she had exercised poor judgment in failing to sign her performance evaluation, when she was told that her supervisor of record was not who she previously thought it was, and when she did not have the opportunity to have a follow up progress review conference with management. Id.

Although DOE claims plaintiff was only the Acting Team Leader from January through April 2003, plaintiff continued to call herself the Acting Team Leader until February 2005. Def.'s Ex. 5, Fiegel Dep. 14:5-20. Around that time, plaintiff sent an e-mail to seven people addressing them as the "PIRC TEAM." Pl.'s Ex. V, Kilby-Robb E-mail at 1. In that e-mail, plaintiff indicated she would be hand-delivering draft copies of a report and that she would provide additional information at a meeting scheduled for the next day. Id. In plaintiff's signature block, she identified herself as the Acting PIRC Team Leader. Id. In response, Brockhouse sent an e-mail to plaintiff expressing his frustration with her action of amending a meeting agenda without permission to do so. In his e-mail Brockhouse clearly stated: "There is no 'PIRC TEAM.'" "You are not serving in the role of acting team leader. Your position description does not and has not

included a 'team leader' addendum and you are not detailed, delegated or assigned such responsibilities." Id.

Nine months later, on November 23, 2005, plaintiff filed the instant action alleging that DOE discriminated against her by failing to promote her or compensate her at the grade 14 level and by giving her an improperly low performance evaluation. Plaintiff also asserted that she had been subjected to a hostile work environment. DOE has moved for summary judgment, arguing that plaintiff was never given grade-controlling duties that warranted promotion or compensation at the grade 14 level, that plaintiff's performance evaluation was legitimate and nondiscriminatory, and that plaintiff's hostile work environment allegations, "even if true, hardly constitute the kind of pervasive intimidation, ridicule and insult that must be shown to sustain a hostile work environment claim." Def.'s Mot. at 3-4. The Court agrees that summary judgment for DOE is warranted on plaintiff's disparate treatment and hostile work environment claims.

## STANDARD OF REVIEW

### I.    Summary Judgment Standard

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

Id. (quoting Fed. R. Civ. P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## II.    The McDonnell Douglas Framework

Plaintiff claims discrimination under Title VII, which makes it unlawful for a federal government employer to discriminate "based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  The Court analyzes plaintiff's disparate treatment and hostile work environment claims under Title VII pursuant to the familiar burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, a plaintiff has the burden of establishing a prima facie case of discrimination by a preponderance of the evidence.  Id. at 802; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  In order to make out a prima facie case of discrimination, a plaintiff must show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting

Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999)).  If the plaintiff establishes a prima facie

case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason

for its actions.  McDonnell Douglas, 411 U.S. at 802.  The employer's burden, however, is merely

one of production.  Burdine, 450 U.S. at 254-55.  The employer "need not persuade the court that

it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence

raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Id.

     If the employer is successful, the burden shifts back to the plaintiff to show that the

employer's stated reason was a pretext for discrimination or retaliation.  Reeves v. Sanderson

Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).  The plaintiff "may attempt to establish that he

was the victim of intentional discrimination 'by showing that the employer's proffered explanation

is unworthy of credence.'"  Id. (quoting Burdine, 450 U.S. at 256).  But "[p]roof that the

defendant's explanation is unworthy of credence is simply one form of circumstantial evidence

that is probative of intentional discrimination."  Id. at 147.  Thus, the trier of fact may also

"consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn

therefrom . . . on the issue of whether the defendant's explanation is pretextual.'"  Id. (quoting

Burdine, 450 U.S. at 255 n.10).  "Whether judgment as a matter of law is appropriate in any

particular case will depend on a number of factors . . . includ[ing] the strength of the plaintiff's

prima facie case, the probative value of the proof that the employer's explanation is false, and any

other evidence that supports the employer's case and that properly may be considered on a motion

for judgment as a matter of law."  Id. at 148-49.  As the D.C. Circuit has explained:

> Assuming then that the employer has met its burden of producing a
> nondiscriminatory reason for its actions, the focus of proceedings at trial (and at
> summary judgment) will be on whether the jury could infer discrimination from
> the combination of (1) the plaintiff's prima facie case; (2) any evidence the

plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc); see also

Waterhouse v. District of Columbia, 298 F.3d 989, 992-993 (D.C. Cir. 2002).

Although the "intermediate evidentiary burdens shift back and forth" under the McDonnell-Douglas framework, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 253). Once the defendant has proffered a legitimate non-discriminatory reason for its action, then, the question is whether that proffered reason is a pretext for discrimination, and at this point the McDonnell Douglas shifting burdens framework disappears, the sole remaining issue is discrimination vel non, and "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves, 530 U.S. at 142-43.

## DISCUSSION

### I.    Disparate Treatment Claims

#### A.    Failure to Promote

Although plaintiff raises a failure to promote claim, she does not challenge DOE's failure to promote her to a specific vacant position. Instead, plaintiff alleges that she was discriminated against on the basis of her race and gender when DOE failed to promote her or compensate her at a grade 14 level for the duties she was performing as the Acting Team Leader. Because "the

traditional <u>McDonnell Douglas</u> test does not fit" such a case, the courts adjust the <u>McDonnell Douglas</u> formula accordingly. <u>Cones v. Shalala</u>, 199 F.3d 512, 517 (D.C. Cir. 2000). In order to make out a prima facie case of discriminatory refusal to promote in this circumstance, plaintiff must show that she sought and was denied a promotion for which she was qualified, and that "other employees of similar qualifications . . . were indeed promoted at the time the plaintiff's request for promotion was denied." <u>Taylor v. Small</u>, 350 F.3d 1286, 1294 (D.C. Cir. 2003) (quoting <u>Bundy v. Jackson</u>, 641 F.2d 934, 951 (D.C. Cir.1981)). Put somewhat differently, a "plaintiff must show that (1) he belongs to a protected group; (2) he was qualified for and applied for a promotion; (3) he was considered for and denied the promotion; and (4) other employees who were not members of the protected group were indeed promoted at the time plaintiff's request for a promotion was denied." <u>Marshall v. Shalala</u>, 16 F. Supp. 2d 16, 19 (D.D.C. 1998). The Court concludes that plaintiff is unable to meet the second and fourth elements necessary to establish a prima facie case of discrimination.

First, plaintiff is unable to establish that she was in fact qualified for a promotion to grade 14 based upon her responsibilities. Even assuming that she performed all of the duties she claims to have performed as Acting Team Leader of the PIRC team -- a matter that is contested by DOE -- plaintiff has not demonstrated that such duties alone were sufficient to support a promotion in grade or salary. Plaintiff presented an overwhelming number of exhibits with her opposition, but the bulk of her exhibits were meant "to demonstrate to the court the volume of work she was required to perform." Pl.'s Opp. at 36. Mere volume of work, however, does not establish that a grade promotion was warranted.

To argue that she was qualified to receive a promotion or compensation at the grade 14

level, plaintiff mainly relies on the fact that her predecessor as PIRC Team Leader, Daisy Greenfield, was a grade 14. Id. ¶ 17. According to DOE, however, plaintiff failed to take on the tasks that supported Greenfield's promotion to a GS-14 in 1997. Def.'s Mot. at 7-9. Although the memorandum requesting Greenfield's 1997 desk audit for a promotion does reference Greenfield's activities as PIRC Team Leader, the memorandum clearly states that the desk audit was requested for her as a "member[] of the Goals 2000/Technology Literacy Challenge Fund Office to determine if [her] current tasks warrant[ed] promotion to the GS-14 level." Def.'s Ex. 10, Accretion of Duties Memorandum at 7. The memorandum listed Greenfield as responsible for three different programs, only one of which was the PIRC. Id. at 7-8. Thus, DOE contends that Greenfield's promotion was due in large part "to her various responsibilities and assumption of duties and national expertise in a number of areas related to the Goals 2000 Office" and that the PIRC Team Leader component alone did not justify the promotion. Def.'s Mot. at 7.

Plaintiff fails to respond and establish that she took over Greenfield's grade 14 responsibilities. For example, plaintiff focuses on the fact that she assumed Greenfield's duties as the Contract Officer's Representative (COR) for the PIRC team. According to plaintiff, "the COR's role was paramount to the day-to-day functioning of the program administration," Pl.'s Opp. ¶ 12, and she argues that her new COR duties supported a promotion to a grade 14. Fiegel and Donna Hoblit testified, however, that COR duties do not constitute grade 14 duties. According to Fiegel, GS-8s and GS-9s can be CORs because it is a "technical job" that is not on a "supervisory" or "decision-making level." Def.'s Ex. 5, Fiegel Dep. 19:15-20:3. Hoblit adds that she herself was certified as a COR while she was a grade 13. Pl.'s Ex. Z, Hoblit Dep. 12:16-20. As a grade 13, moreover, she was asked to take on additional COR duties outside of her group.

-11-

Id. 13:19-14:12.  After Hoblit performed the additional COR duties from 2002 to 2003, she did not receive a cash award, a promotion, or a quality step increase.  Id. 13:13-18.

Plaintiff also never makes any argument that she took over Greenfield's duties regarding the Goals 2000/Technology Literacy Challenge Fund Office.  Pl.'s Opp. ¶ 16.  Plaintiff assumed some of Greenfield's duties as Acting Team Leader and continued to hold her own GS-13 job description and perform her own GS-13 tasks.  Id. ¶ 17.  Thus, plaintiff does not argue that all of her responsibilities were GS-14 responsibilities, and she has not established that she was similarly situated to Greenfield, performing the same tasks to support a similar promotion to a grade 14.

Plaintiff also attempts to establish her qualifications by comparing herself to Brockhouse (GS-15), Jim Houser (GS-15), and Dean Kearn (GS-14), but she is unable to demonstrate that she is similarly situated to any of these three individuals.  According to plaintiff, "Steve Brockhouse, Jim Houser and Dean Kearn, all Caucasian men, were program leads/directors."  Id. ¶ 53.  In this statement alone, plaintiff acknowledges that these men were not Acting Team Leaders, as plaintiff was, but instead were directors within DOE.  Plaintiff concedes that Brockhouse was a grade 15, "the named Assistant Director for POI," and her supervisor.  Id. ¶ 28.  According to plaintiff herself, Brockhouse supervised six individuals and two teams -- the Magnet Schools team and the PIRC team.  Id. ¶ 18.  With respect to Kearn, plaintiff admits that he was "hired by the Department of Education as a grade 14," whereas she was hired as a grade 13.  Id. ¶ 20.  Kearn also holds a more advanced job description as the Director of Charter Schools.  Def.'s Ex. 5, Fiegel Dep. 45:12-14.  Lastly, plaintiff asserts that she is similarly situated to Houser, but she provides no explanation of how they are comparable.  Fiegel testified at his deposition that Houser came to DOE as a grade 15 and that Houser has two programs -- the Credit Enhancement for

Charter Schools Facilities program and the State Per Pupil Incentive Funds for Charter Schools

Facilities program -- both of which are highly complicated financial management programs.  Id.

44:3-22.[1]

      Thus, plaintiff's attempts to establish her qualifications are unsuccessful because she

cannot demonstrate that she was similarly situated to the comparators she provides who worked at

or above a grade 14 level.  See Nails v. England, 311 F. Supp. 2d 116, 122 (D.D.C. 2004)

(holding that plaintiff could not establish a prima facie case of discrimination because she was

unable to present evidence that she was qualified for the position); see also Taylor, 350 F.3d at

1295 (determining that the proffered comparables were not similarly situated to plaintiff because,

unlike plaintiff, "[t]hree were archivists who had spent over ten years in grade GS-11 before [the

employer] promoted them; the other was a supervisory archivist 'in a career ladder position GS-

11/GS-12'"); Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995)

(explaining that the plaintiff could only establish that she was similarly situated to a male

associate by demonstrating "that all of the relevant aspects of her employment situation were

'nearly identical' to those of the male associate").

      Plaintiff's reliance on the deposition testimony of other employees also fails to establish

that she was in fact performing duties that supported or required a promotion to grade 14.  Richard

Kress, grade 13, testified that in his opinion "the duties that Patricia Kilby-Robb was performing

---

[1]Plaintiff also asserts that she "performed the same duties as Madeline Baggett, Program
Lead (GS-14) and Diane Austin, Program Lead (GS-14)."  Pl.'s Opp. ¶ 30.  However, plaintiff
provides no evidence to support this assertion.  "In deciding whether there is a genuine issue of
material fact, the court must assume the truth of all statements proffered by the non-movant
except for conclusory allegations lacking any factual basis in the record."  District Intown Prop.
L.P. v. Dist. of Columbia, 198 F.3d 874, 878 (D.C. Cir.1999), cert. denied, 531 U.S. 812 (2000).

were duties that were at the same level that Steve Brockhouse was performing as the Magnet

program lead." Pl.'s Ex. N, Dep. of Richard Kress ("Kress Dep.") 14:1-3. But although some of

their duties may have overlapped, Brockhouse was plaintiff's supervisor and had greater

responsibilities than plaintiff. Kress' bald assertion does not establish that plaintiff was qualified

for a grade 14 promotion. In fact, Kress also testified that plaintiff's duties were at the same level

as the duties he was performing as a grade 13 on the Magnet Schools team. Id. 14:3-6.

Plaintiff also relies on a statement from Shelton Allen indicating that plaintiff was

"challenged to do the very same work a previous GS-14 employee had been doing." Pl.'s Ex. B,

Investigation Report, Statement of Shelton Allen at 153. As discussed earlier, there is no dispute

that plaintiff did assume some of Daisy Greenfield's duties in an acting capacity. But Allen does

not indicate that plaintiff performed all of Greenfield's duties and that she was entitled to assume a

GS-14 position. In fact, Allen's statement that he, Fiegel, and Brockhouse were all formerly

employed as "Education Program Team Leaders at the GS-13 level," substantially weakens

plaintiff's argument that all team leader positions must be at or above a grade 14. Id. at 152.

Plaintiff next argues that she was qualified for a grade 14 position because plaintiff's "GS-

13 position description was almost identical to the job description of the GS-14 position held by

Daisy Greenfield." Pl.'s Opp. at 24; compare Pl.'s Ex. C, GS-13 Education Program Specialist

with Pl.'s Ex. D, GS-14 Education Program Specialist. Although the position descriptions are

similar, they are by no means "almost identical" to each other. In response to plaintiff's argument,

DOE highlights the aspects that support the one grade difference in these positions, and points out

that, in any event, plaintiff failed to present evidence demonstrating that she performed all of the

duties in the grade 14 position description. Def.'s Reply at 16-17. Plaintiff did not show, for

example, that she provided "consultant services to top-level officials of ED, State and local agencies, institutions, and organizations"; that she had expert knowledge to "plan, evaluate, and advise on OESE programs, their requirements and problems"; and that she had contacts "generally with high-level officials from outside ED." Id. Thus, for these reasons, plaintiff failed to prove that she was in fact qualified to be promoted or compensated at the grade 14 level.[2]

Plaintiff's assertion that she officially requested a grade 14 promotion based upon her increased responsibilities as Acting Team Leader also finds scant support in the record. Plaintiff's main comparator, Greenfield, received her promotion through a desk audit -- "a process by which an employee may request his or her work to be reviewed and if, in the eyes of the reviewers, that work is at a level higher than that at which the employee is currently graded, the employee will be promoted to the level which is reflected by his or her performance." Marshall, 16 F. Supp. 2d at 20. Although plaintiff claims that she "repeatedly requested an accretion in duties/desk audit from the time she began the position" in 2002, she presents no evidence to this effect. Pl.'s Opp. at 24. In fact, her assertion is contradicted by her sworn testimony in her deposition. When asked when she requested a desk audit, plaintiff responded that she made her request in 2006 -- a year after plaintiff initiated action in this Court. Def.'s Ex. 14, Dep. of Patricia Kilby-Robb ("Kilby-Robb Dep.") 37:6-7; see Marshall, 16 F. Supp. 2d at 20 ("Because plaintiff failed to take even the most elementary step necessary by applying for a promotion to the GS-13 level [through a desk audit],

---

[2]Plaintiff argues that DOE's failure to promote her was discriminatory because Office of Personnel Management (OPM) guidelines encourage supervisors to make temporary promotions "if an employee's services are needed in a higher-grade position for more than brief periods," i.e. more than 120 days. Pl.'s Opp. at 37. Although the length of time that she was Acting Team Leader is disputed, plaintiff has failed to show that she assumed a "higher-grade position." Therefore, plaintiff's reference to OPM guidelines is to no avail.

this Court finds that plaintiff has failed to establish a prima facie case of discriminatory non-promotion.").

Nevertheless, the Court will assume that plaintiff has presented sufficient evidence that she sought a promotion to a grade 14 level. Plaintiff asserts, without any supporting evidence, that in "June 2003, John Fiegel was still promising to submit a request to personnel for his 2 senior staff members (African-American females) to receive compensation for the GS-14 position." Pl.'s Opp. ¶ 39.[3] Fiegel contests this allegation, but he does indicate that "it came to light that [plaintiff] was assuming that since she was acting team leader, she was assuming a GS-14 position, presumably Daisy Greenfield's position." Def.'s Ex. 5, Fiegel Dep. 15:8-11. According to Fiegel, he talked with plaintiff to explain that her position description was not changing based upon her acting status as team leader. Id. 15:19-20. Since Greenfield kept her position as a GS-14, there was no GS-14 position available for plaintiff. Id. 15:13-14. Fiegel indicated that he had several meetings with plaintiff during which they "differed on the level of responsibility she had," since plaintiff and Brockhouse shared Greenfield's previous duties in the

_____

[3]To the extent that plaintiff attempts to raise a retaliation claim for the first time in her opposition by alleging that Fiegel refused to pursue a grade 14 promotion for her after she filed an EEO complaint, plaintiff's claim must fail because that claim was not raised administratively and was not pled in the instant complaint. At this stage in the litigation, plaintiff may not amend her complaint through her responsive pleadings. E.g., Calvetti v. Antcliff, 346 F. Supp. 2d 92, 107 (D.D.C. 2004) (stating that plaintiffs' attempt to amend their complaint through their pleadings was "clearly impermissible"); Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv., 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quoting Coleman v. Pension Benefit Guar. Corp., 94 F. Supp. 2d 18, 24 n.8 (D.D.C. 2000)). Moreover, plaintiff contradicts herself in attempting to raise a retaliation claim. Plaintiff first states that after she "refused to sign [her June 2003 performance] evaluation, Fiegel said he was not going to submit the paperwork for the GS-14 PIRC Team Leader position." Pl.'s Ex. A, Dec. of Patricia Kilby-Robb ¶ 42. Plaintiff later states that Fiegel told her "he would not submit the paperwork for a GS-14 PIRC team leader position because [she] filed an EEO complaint" in November 2003. Id. ¶ 48.

PIRC. Id. 20:15-16.

Plaintiff does not cite to the deposition of Michael John Petrilli, the associate assistant deputy secretary in OII. Petrilli also states that while OII was being formed and DOE was being reorganized, plaintiff indicated to him that "she was interested in receiving a promotion to a GS-14." Def.'s Ex. 2, Dep. of Michael Petrilli 33:15-16. Based on plaintiff's conversations with Fiegel and Petrilli, there is sufficient evidence that plaintiff at least made it known that she desired a grade 14 promotion.

Nevertheless, plaintiff cannot meet the fourth element necessary to establish a prima facie case of discrimination. She is unable to identify "other employees of similar qualifications . . . [who] were indeed promoted at the time the plaintiff's request for promotion was denied." Taylor, 350 F.3d at 1294 (quoting Bundy, 641 F.2d at 951). Plaintiff's deposition testimony concedes this fact:

"Q. Was there anybody under Mr. Fiegel's supervision that was at all comparable to you and he actually arranged for that individual to be paid at the GS-14 level?

A. The answer is no."

Def.'s Ex. 14, Kilby-Robb Dep. 51:22-25.

Immediately thereafter in her deposition, plaintiff claimed Iris Lane, an African-American female, was a GS-13 who performed duties similar to the ones plaintiff performed as Acting Team Leader. Id. 52:4-5. Yet plaintiff also conceded that Lane was not promoted to a GS-14 level.

"Q. And did Iris Lane, did she ever become a GS-14?

A. No."

Id. 52:6-8.

Plaintiff therefore identifies no other individuals who were promoted when her alleged request was denied. Even if the Court looks more expansively at plaintiff's proposed comparables described above, there is no evidence that individuals performing work similar to plaintiff were employed at or above a grade 14 level. In fact, there is evidence to the contrary. Plaintiff herself admits that Iris Lane performed similar work and was also a grade 13. Id. 52:4-5. Kress indicates he performed similar work to plaintiff as a grade 13. Pl.'s Ex. N, Kress Dep. 14:1-6. And Allen says that Fiegel, Brockhouse, and he at one time all worked as Team Leaders at a grade 13 level before they earned additional tasks, titles, and promotions. Pl.'s Ex. B, Investigation Report, Statement of Shelton Allen at 152.

Plaintiff cannot show that similarly qualified employees who were not members of plaintiff's protected class were promoted when plaintiff's request was denied, and hence cannot establish a prima facie case of discrimination. The Court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" Fischbach v. Dist. of Columbia Dep't of Corrs., 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir.1982)); see also Taylor, 350 F.3d at 1295, 358 (holding that "[b]ecause [plaintiff] falls far short of showing that [the employer] promoted "other employees of similar qualifications," Bundy, 641 F.2d at 951, the district court properly held her claim fails as a matter of law"); Bolden v. Ashcroft, 2007 WL 2727221, *4 (D.D.C. Sept. 19, 2007) (holding that because there was "no evidence before the Court of any similarly situated employees who were promoted to a higher salary grade when plaintiff was denied a promotion, plaintiff [could not] establish a prima facie case of discriminatory failure to promote").

B.    2003 Performance Evaluation

Plaintiff next argues that she was subjected to disparate treatment as an African-American

female when she received a "successful" performance evaluation in June 2003.  However, a "thick

body of precedent . . . refutes the notion that formal criticism or poor performance evaluations are

necessarily adverse actions," especially when the evaluation does not affect the plaintiff's "grade

or salary."  Brown, 199 F.3d at 458; see also Taylor, 350 F.3d at 1293.  Here, plaintiff's failure to

promote claim is independent of her claim regarding a discriminatory performance evaluation.

She does not argue that her grade or salary was affected by her 2003 performance evaluation.

Thus, plaintiff's "successful" performance evaluation does not constitute an adverse action under

Title VII.[4]

Plaintiff simply argues that DOE "cannot present any rational justification for giving

Plaintiff a lower rating than Caucasian employees who performed less work and had lower levels

of responsibility."  Pl.'s Opp. at 41.  Plaintiff refers to one Caucasian female and one African-

American male, arguing that they had "less work and lower levels of work but received higher

evaluations."  Id. at 41.  In response, DOE points out the flawed nature of plaintiff's argument.

Def.'s Reply at 21.  Performance appraisals are not based entirely upon the level and amount of

---

[4]In plaintiff's opposition, she argues for the first time that she received an improperly low
bonus award in 2003, 2004, and 2005.  "To be sure, loss of bonus money because of an
improperly low performance rating may constitute an adverse employment action for the purposes
of Title VII."  Taylor, 350 F.3d at 1293 (citing Russell v. Principi, 257 F.3d 815, 819 (D.C. Cir.
2001)).  However, plaintiff's claims regarding discriminatory bonus awards are not properly before
this Court because she did not raise this issue in her EEO counseling, her formal EEO complaint,
or her complaint in this action.  See 29 C.F.R. § 1614.105(a)(1); see also Schrader v. Tomlinson,
311 F. Supp. 2d 21, 27 (D.D.C. 2004) ("[T]he plaintiff who fails to comply, to the letter, with
administrative deadlines 'ordinarily will be denied a judicial audience.'") (quoting Brown v.
Marsh, 777 F.2d 8, 13 (D.C. Cir.1985) (citation omitted)).

work an employee performs.  Otherwise, an employee working at a higher grade with more

responsibility would necessarily have to receive a higher performance appraisal than someone

working at a lower grade with less responsibility -- regardless of the quality of each employee's

work.  Such a system would make performance appraisals obsolete.  Instead, performance

appraisals are designed to recognize an employee's performance and accomplishments based upon

the expectations for her particular level of employment.

Even assuming plaintiff's "successful" evaluation is an adverse action, DOE has provided

a thorough and legitimate explanation supporting the evaluation, and plaintiff points to no

evidence of pretext.  Def.'s Mot. at 10-11.  In evaluating each employee, Fiegel relied on the

employee's self-prepared list of accomplishments, information received from Brockhouse, and his

own observations of each employee's work.  Def.'s Ex. 5, Fiegel Dep. 49:6-13.  Fiegel rated

plaintiff "successful" on four components of her evaluation, "highly successful" on seven

components of her evaluation, and "outstanding" on two components of her evaluation.  Def.'s Ex.

12, Kilby-Robb Performance Evaluation at 1-2.  When the average was calculated based upon the

numerical score of each component, plaintiff received a score at the highest end of the

"successful" category.  Although plaintiff takes issue with the fact that another African-American

employee also received a "successful" rating -- a rating plaintiff thought too high -- that

individual's rating was at the lower end of the "successful" scale, and he received criticism of the

work he performed.  Def.'s Ex. 5, Fiegel Dep. 53:13-19.  Hence, while both employees fell into

the "successful" range of the performance appraisal system, they were not given identical

evaluations.  In the end, then, although plaintiff's evaluation may have been lower than she hoped,

her argument does not support a conclusion that her evaluation was the product of racial or gender

discrimination.

## II.    Hostile Work Environment

To establish a prima facie case of hostile work environment, plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was subject to unwelcome harassment; (3) the harassment occurred because of her race or disability; (4) the harassment affected a term, condition or privilege of employment; and (5) the employer knew or should have known of the harassment, but failed to take any action to prevent it.  See Jones v. Billington, 12 F. Supp. 2d 1, 11 (D.D.C. 1997), aff'd, 1998 WL 389101 (D.C. Cir. June 30, 1998).  The workplace environment becomes "hostile" for purposes of Title VII and legal relief only when the offensive conduct "permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998); accord Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); see also Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270-271 (2001); Holbrook v. Reno, 196 F.3d 255, 262 (D.C. Cir. 1999).

The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive or discriminatory conduct rises to an actionable hostile work environment.  Under Faragher v. Boca Raton, 524 U.S. 775, 787-88 (1998), in order to determine whether a work environment is sufficiently hostile to be actionable under Title VII, a court should consider: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct reasonably interferes with the employee's performance.

These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code."  See Oncale, 523 U.S. at 80 (explaining that Title VII "does not prohibit all verbal or physical harassment in the workplace," only discriminatory harassment that satisfies the requirements of the statute).  Properly applied, this will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."  Faragher, 524 U.S. at 787 (citations omitted); see also Breeden, 532 U.S. at 271 ("simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are insufficient); Neuren, 43 F.3d at 1513.

Moreover, it must be clear that the hostile work environment was the result of discrimination based on a protected status. As the Second Circuit has explained:

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.  Otherwise, the federal courts will become a court of personnel appeals.

Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002).  To sustain her hostile work environment claim, then, plaintiff must produce evidence that she was discriminated against because of her race or gender.  See, e.g., Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345-46 (7th Cir. 1999) (hostile work environment claim failed where there was insufficient evidence that the alleged harassing behavior was motivated by discrimination); Jones, 12 F. Supp. 2d at 12 (hostile work environment claim failed where plaintiff had "not demonstrated that any of the conduct of which he complain[ed] was related to his race, or that his workplace was permeated with racially discriminatory behavior").

Plaintiff's hostile work environment claim is based upon several distinct allegations. First, plaintiff relies on the same set of facts underlying her disparate treatment claims. As discussed above, however, the Court has found no inference of discrimination with respect to DOE's failure to promote plaintiff to grade 14 and failure to provide plaintiff with a performance evaluation above "successful." Plaintiff's reliance on these two events, therefore, falls far short of the showing she must make for a <u>discriminatory</u> hostile work environment claim. <u>See</u> <u>Childs-Pierce v. Util. Workers Union of Am.</u>, 383 F. Supp. 2d 60, 79 (D.D.C. 2005) (explaining that the plaintiff could not "show a pervasive, severe and <u>discriminatory</u> hostile work environment, because the Court [had] already found the acts to be non-discriminatory").

Moreover, alleged acts of disparate treatment cannot be transformed, without more, into a hostile work environment claim. <u>See, e.g.</u>, <u>Lester v. Natsios</u>, 290 F. Supp. 2d 11, 33 (D.D.C. 2003) ("Discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult."); <u>Gardner v. Tripp County, South Dakota</u>, 66 F. Supp. 2d 1094, 1101 (D.S.D. 1998) (explaining that retaliation claims are distinct from hostile work environment claims because "if the same set of facts could support both claims, state and federal provisions that provide a separate cause of action for retaliatory acts would be rendered superfluous"); <u>Parker v. State, Dep't of Public Safety</u>, 11 F. Supp. 2d 467, 475 (D. Del. 1998) (stating that "the dangers of allowing standard disparate treatment claims to be converted into a contemporaneous hostile work environment claim are apparent. Such an action would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address."). Plaintiff cannot rely, therefore, on two alleged acts of disparate

treatment, which are neither pervasive and severe nor discriminatory, to establish a viable hostile work environment claim.

Next, plaintiff relies on two e-mails she received from Brockhouse: an e-mail dated June 28, 2003, regarding plaintiff's referral of calls and e-mails, and an e-mail dated February 8, 2005, regarding plaintiff's amendment to a meeting agenda. See Pl.'s Ex. B, Investigation Report, Brockhouse E-mail at 42; Pl.'s Ex. V, Kilby-Robb E-mail at 1. Plaintiff argues that these e-mails are "harshly worded" and "demeaning," but the Court concludes that they are facially neutral, and plaintiff has not demonstrated that they were the result of racial or gender discrimination. Instead, the e-mails appear to be legitimate responses from plaintiff's supervisor to plaintiff's actions taken without prior approval.

Brockhouse was upset that during plaintiff's absence he suddenly -- and without warning -- received a number of calls and e-mails that detracted from his ability to perform other tasks. Def.'s Ex. 8, Dep. of Steven L. Brockhouse 43:8-44:14. Brockhouse believed the situation could have been handled in a better manner, and his e-mail directed plaintiff to talk with him in the future about how her calls and e-mails should be handled when she was going to be out of the office. Id. Brockhouse's 2005 e-mail expresses frustration with plaintiff's action in amending a meeting agenda without permission because her action led to other complications and affected the time allotment for discussion within the meeting. Pl.'s Ex. V, Kilby-Robb E-mail at 1. Although plaintiff also asserts that this e-mail informed her for the first time that she was no longer the Acting Team Leader, DOE contends that plaintiff should have been well aware of this fact at a much earlier date. Regardless, a delay in informing plaintiff of the status of her title does not support plaintiff's argument that she was subjected to a hostile work environment. In sum, there is

insufficient evidence that these e-mails constituted harassing behavior that was motivated by racial or gender discrimination.

Plaintiff also points to the deposition testimony of Kress.  Pl.'s Opp. at 43.  According to Kress, Brockhouse "reprimanded [plaintiff] publicly as someone would scold a child; solicited another employee to criticize Plaintiff's work at a staff meeting so he would not have to; tried to prevent her from receiving an award because it would hamper his efforts to terminate her; and did not provide her necessary resources to perform her job."  Id.  Upon closer examination of these broad claims, however, it is clear that plaintiff still cannot establish that any aspects of her alleged hostile work environment were the result of discrimination based upon her protected status.  These alleged incidents simply are not enough to move beyond "the ordinary tribulations of the workplace" to "create an abusive working environment."  Faragher, 524 U.S. at 787-88; Oncale, 523 U.S. at 81.

To begin with, plaintiff's referral to Kress' testimony is not accurate.  Kress does not state that Brockhouse scolded plaintiff like a child but instead states that Donna Hoblit told Kress that Brockhouse told her to "criticize, admonish, [and] respond negatively to the contents of the report" that several people, including plaintiff, had worked on.  Pl.'s Ex. N, Kress Dep. 22:21-23.  Since plaintiff's evidence is "'sheer hearsay,' it 'counts for nothing' on summary judgment."  Greer v. Paulson, 2007 WL 3225370, at *6 (D.C. Cir. Nov. 2, 2007) ("To survive summary judgment the non-moving party must 'produce evidence . . . capable of being converted into admissible evidence.'") (quoting Gleklen v. Democratic Cong. Campaign Comm., 199 F.3d 1365, 1369 (D.C. Cir. 2000)).  Plaintiff attaches the deposition of Donna Hoblit to her opposition, but she cites no excerpts that support her argument.  In fact, Hoblit appears to provide no testimony supporting

this alleged episode.  <u>See</u> Pl.'s Ex. Z, Hoblit Dep. 1-34.

According to Kress, Hoblit acted out on Brockhouse's instruction and "was very demeaning" in her comments "like someone scolding a child" when she "specifically criticized data that . . . was unrealistic."  Pl.'s Ex. N, Kress Dep. 24:21-25.  When Kress was asked at his deposition if the data actually was unrealistic, Kress responded that the "data could be unrealistic" and "questionable."  <u>Id.</u> 25:2, 26:7-8.  Kress himself admitted, therefore, that DOE had a legitimate reason for critiquing the report that several people worked on.  When asked if anything else occurred at this meeting that was hostile to plaintiff, Kress' response was no, "it was only about this report."  <u>Id.</u> 27:9-10.  Clearly then, plaintiff has failed to present any evidence that the alleged conduct at the staff meeting was in any way linked or correlated to racial or gender discrimination.

In his deposition, Kress also indicates that during a meeting of a peer review award committee, Hoblit said a supervisor had asked that the committee "not give a favorable recommendation for [one] particular nomination because . . . the work performance of this employee was very poor."  <u>Id.</u> 29:4-6.  According to Kress, Hoblit indicated that the supervisor "was trying to get enough documentation to get them removed and that this person getting an award would hamper that effort."  <u>Id.</u> 29:6-8.  At the time, Kress did not know who Hoblit was referring to since the nominations were reviewed anonymously, but he claims Hoblit later indicated she was referring to plaintiff at Brockhouse's request.  <u>Id.</u> 29:9-14.  Again, plaintiff does not attach any supporting evidence from Hoblit indicating that Brockhouse made any such comments to her regarding the peer review process.  Therefore, Kress' hearsay allegations cannot support plaintiff's claim of a hostile work environment.  Moreover, plaintiff has again failed to

demonstrate that this alleged incident was related to her race or gender, and she has failed to demonstrate that the alleged conduct at these meetings permeated the workplace with severe or pervasive discriminatory intimidation, ridicule, and insult.  Oncale, 523 U.S. at 81.

Plaintiff further argues that the refusal to grant her a computer to work at home while she was ill also constitutes an aspect of her hostile work environment.  Pl.'s Opp. at 42.  However, DOE presents legitimate reasons for denying plaintiff's request, and plaintiff fails to rebut that explanation.  In a sworn declaration from Margo Koines Anderson, the individual who reviewed plaintiff's request in the front office of OII, Anderson explains that plaintiff's request for a home computer was denied due to economic considerations and DOE's internal policy.  Def.'s Ex. 9, Anderson Dec. at 4-5.  Plaintiff presents no evidence that other individuals have been treated differently in this situation.  In fact, Fiegel stated that the other person on his staff who works from home was also not provided a home computer by DOE.  Def.'s Ex. 7, Fiegel Statement ¶ 17.  Furthermore, when plaintiff submitted her request to telework, she did not present any evidence that her request was a reasonable accommodation request.  Def.'s Ex. 9, Anderson Dec. at 4.  She could have filed her request for a home computer with the departmental 504 coordinator if she had a valid reasonable accommodation claim, but she failed to pursue that option.  Id. at 5.

Although plaintiff does not assert any additional claims of a hostile work environment in the argument section of her opposition brief, she raises other allegations in the background section.  Specifically, plaintiff refers to two situations that Kress testified about during his deposition.  Pl.'s Opp. ¶ 60.  According to Kress, these situations indicate that Fiegel and Brockhouse "have some views that suggest a discomfort with diversity."  Pl.'s Ex. N, Kress Dep. 34:20-21.  First, Kress claims that during a casual conversation he mentioned to Brockhouse "that

during the French Revolution there was a time period when racial discrimination was a criminal rather than a civil offense." Id. 35:23-25.  According to Kress, Brockhouse responded "that he was not surprised the French would do something stupid like that." Id. 36:4-5.  Second, Kress indicated that during a staff meeting in 2004 or 2005, there was a general discussion about contractors where Brockhouse and Fiegel allowed a number of people to make comments attacking minority owned firms.  Id. 39:5-17.  When an employee complained about how the meeting was handled, Brockhouse allegedly indicated he would find out who complained and would get retribution.  Id. 41:25-42:2.

One could strain to interpret these isolated incidents as reflecting racial animus, but in any event they do not rise to the level of severity and pervasiveness necessary to maintain a hostile work environment claim.  Moreover, these allegations are further weakened by the fact that these comments were not directed at plaintiff nor is there any evidence that these comments were made in the presence of plaintiff.  See Yuknis v. First Student, Inc., 481 F.3d 552, 555 (7th Cir. 2007) ("The more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that the worker's working environment was actually made unbearable, as the worker claims."); Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1144 (7th Cir. 1997) (explaining that "the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff").[5]

_____

[5]Plaintiff also cites to a statement from Wanda E. Gill, an African-American female employee at DOE, to support her allegation that she was subjected to a hostile work environment.  Pl.'s Ex. B, Statement of Wanda E. Gill at 147-49.  However, Gill's statement consists mainly of mere speculation about racial motivations within DOE.  Moreover, Gill speaks about situations that she herself experienced while plaintiff was not present.  Even assuming these allegations could constitute harassment, they do not rise to the level of a hostile work environment.

The Court concludes, therefore, that plaintiff cannot establish a prima facie case of a hostile work environment based upon the alleged incidents she cites. The alleged events, individually or collectively, simply do not establish that offensive conduct "permeated [the workplace] with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Oncale, 523 U.S. at 81.

## CONCLUSION

For the foregoing reasons, plaintiff's disparate treatment and hostile work environment claims cannot succeed. Accordingly, defendant's motion for summary judgment will be granted. A separate order has been issued herewith.


                                    _____/s/ John D. Bates_____
                                         JOHN D. BATES
                                    United States District Judge


        Dated: November 23, 2007